UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------ x

J.D. Salinger, individually and as
Trustee of the J.D. Salinger Literary Trust,

                Plaintiff,

         - against -

JOHN DOE, writing under the name JOHN
DAVID CALIFORNIA; WINDUPBIRD
PUBLISHING LTD.; NICOTEXT A.B.; and
ABP, INC. d/b/a SCB Distributors Inc.,

               Defendants.

------------------------------------------------------------ x

09 Civ. 5095 ( ) DAB

ECF CASE

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## APPLICATION FOR PRELIMINARY INJUNCTION

**DAVIS WRIGHT TREMAINE LLP**
**1633 Broadway**
**New York, New York 10019**
**(212) 603-6427**
**Attorneys for Plaintiff**

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF FACTS ................................................................................................ 3

    *The Catcher in the Rye* ......................................................................................... 3

    The Character Holden Caulfield ............................................................................ 4

    The Success of *Catcher* ........................................................................................ 6

    Salinger's Protection of His Intellectual Property ................................................. 7

    A Comparison of the Infringed and Infringing Works ......................................... 8

    Plaintiff Learns of the Unauthorized Sequel ...................................................... 12

ARGUMENT ............................................................................................................... 12

    I.       THE STANDARD ON PRELIMINARY INJUNCTION ......................... 12

    II.      LIKELIHOOD OF SUCCESS ON THE MERITS ................................... 13

          A.    *60 Years Later* Infringes Salinger's Copyright in the Character of Holden Caulfield ............................................................................... 14

          B.    *60 Years Later* is an Unauthorized Derivative Work ...................... 18

          C.    *60 Years Later* is Not a Fair Use .................................................... 20

                1.    The Purpose and Character of the Use .................................. 21

                        a.    The Sequel is Not a Parody ........................... 21

                        b.    No Transformative Nature ............................. 24

                2.    The Nature of the Copyrighted Work ................................... 25

                 3.    The Amount and Substantiality of the Portion Used ............ 26

                4.    The Impact On the Actual Or Potential Market .................... 26

    III.     IRREPARABLE INJURY AND BALANCE OF HARDSHIPS ............... 29

CONCLUSION ............................................................................................................ 30

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

**Page(s)**

CASES

*ABKCO Music, Inc. v. Stellar Records, Inc.,*
   96 F.3d 60 (2d Cir. 1996)................................................................................29

*Anderson v. Stallone,*
   1989 U.S. Dist. LEXIS 11109 (C.D. Cal. 1989)...........................................19

*Bach v. Forever Living Prods. U.S., Inc.,*
   473 F. Supp. 2d 1127 (W.D. Wash. 2007).....................................................15

*Bill Graham Archives v. Dorling Kindersley Limited,*
   448 F.3d 605 (2d Cir. 2006)..........................................................................24

*Bronx Household of Faith v. Board of Education,*
   331 F.3d 342 (2d Cir. 2003)..........................................................................13

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
   519 F. Supp. 388 (S.D.N.Y. 1981), *aff'd*, 683 F.2d 610 (2d Cir. 1982)................................15

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
   683 F.2d 610 (2d Cir. 1982)..........................................................................16

*Caffey v. Cook,*
   409 F. Supp. 2d 484 (S.D.N.Y. 2006) (Holwell, J.) .....................................18

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)................................................................................ *passim*

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,*
   150 F.3d 132 (2d Cir. 1998).................................................................. *passim*

*CBS Operations Inc. v. Reel Funds Int'l,*
   2007 U.S. Dist. LEXIS 58939 (N.D. Tex. August 13, 2007) ........................19

*Craft v. Kobler,*
   667 F. Supp. 120 (S.D.N.Y. 1987) (Leval, J.) ..............................................26

*D.C. Comics Inc. v. Leo Reel Fantasy, Inc.,*
   696 F.2d 24 (2d Cir. 1982)............................................................................15

*Dastar Corporation v. Twentieth Century Fox,*
   539 U.S. 23 (2003).........................................................................................28

ii

*Detective Comics, Inc. v. Bruns Publications, Inc.,*
    111 F.2d 432 (2d Cir. 1940)................................................................15, 16, 17

*Detective Comics, Inc. v. Fox Publications, Inc.,*
    46 F. Supp. 872 (S.D.N.Y. 1942) (Bright, J.)........................................15

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,*
    109 F.3d 1394 (9th Cir. 1997)................................................................22

*E. Gluck Corp. v. Rothenhaus,*
    585 F. Supp. 2d 505 (S.D.N.Y. 2008) (Marrero, J.) ........................29

*eBay Inc. v. MercExchange LLC,*
    547 U.S. 388 (2006)................................................................................29

*Filmvideo Releasing Corp. v. Hastings,*
    509 F. Supp. 60 (S.D.N.Y. 1981) (Werker, J.), *aff'd* 668 F.2d 91 (2d Cir. 1981)............15, 17

*Harper & Row v. Nation Enterprises,*
    471 U.S. 539 (1985)................................................................................26

*Hill v. Whalen & Martell, Inc.,*
    220 F. 359 (S.D.N.Y. 1914)....................................................................16

*Infinity Broad. Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir. 1998)....................................................................20

*Jorgensen v. Epic/Sony Records,*
    351 F.3d 46 (2d Cir. 2003)......................................................................13

*King Features Syndicated v. Fleischer,*
    299 F. 533 (2d Cir. 1924)........................................................................15

*Lennon v. Premise Media Corp., L.P.,*
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) (Stein, J.) ..............................29

*Nichols v. Universal Pictures Corp.,*
    45 F.2d 119 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931)................15

*NXIVM Corp. v. The Ross Inst.,*
    364 F.3d 471 (2d Cir. 2004)....................................................................13

*Repp v. Webber,*
    132 F.3d 882 (2d Cir. 1997)....................................................................13

*Salinger v. Random House, Inc.,*
    811 F.2d 90 (2d Cir. 1987)................................................................8, 27, 28

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

*Sony v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ..................................................................................21

*SunTrust Bank v. Houghton Mifflin Company*,
    268 F.3d 1257 (11th Cir. 2001) ...............................................................23

*Tough Traveler v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995), *cert. denied*, 527 U.S. 1036 (1999) ............13

*Tufenkian Imports/Export Ventures, Inc. v. Einstein Moomjy, Inc.*,
    338 F.3d 127 (2d Cir. 2003) ....................................................................13

*United Feature Syndicate, Inc. v. Koons*,
    817 F. Supp. 370 (S.D.N.Y. 1993) (Leisure, J.) .....................................17

*Walt Disney Prods. v. Air Pirates*,
    581 F.2d 751 (9th Cir. 1978) ...................................................................15

*Warner Bros. Entertainment, Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008) (Patterson, J.) .............................29

*Warner Bros. Inc. v. American Broadcasting Cos., Inc.*,
    720 F.2d 231 (2d Cir. 1983) ..............................................................15, 16

*Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*,
    354 F.3d 112 (2d Cir. 2003) ....................................................................18

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) ..............................................................13, 14

**STATUTES**

Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* .............................13, 18, 20

**OTHER AUTHORITIES**

*1 Nimmer on Copyright*, § 2.12 ........................................................................15

*1 Nimmer on Copyright*, § 3.01 ........................................................................18

*4 Nimmer on Copyright*, § 13.03[A][1] ............................................................14

iv

Plaintiff J.D. Salinger, individually and as Trustee of the J.D. Salinger Literary Trust ("Salinger") respectfully submits this memorandum of law in support of his application, pursuant to Federal Rule of Civil Procedure Rule 65, for a preliminary injunction enjoining and restraining defendants from manufacturing, publishing, distributing, advertising, selling or otherwise disseminating a book entitled *60 Years Later: Coming Through the Rye* (the "Sequel"), authored by defendant John Doe, writing under the pen name J.D. California ("California"), published by defendant Nicotext A.B. ("Nicotext"), under the "imprint" Windupbird Publishing Ltd. ("Windupbird"), and, upon information and belief, offered for sale to booksellers in the United States on Nicotext's behalf by defendant ABP, Inc. d/b/a SCB Distributors Inc. ("SCB").

The Sequel is being marketed as, and in fact is, an unauthorized sequel to Salinger's acclaimed 1951 novel *The Catcher in the Rye* ("*Catcher*"). *Catcher* is the quintessential coming of age story, told in a unique and distinct voice, and much beloved by several generations of readers. Many may not recall the specific details of his adventures and mishaps in New York City years after reading the book, but few if any forget the name Holden Caulfield, his undisguised angst and precocious cynicism, his distinctive jargon (labeling people, places and objects "crumby" and "phony"), his love for his kid sister Phoebe ("she kills me"), his disdain of his brother D.B.'s selling out to Hollywood, and – perhaps most of all – that the disaffection, confusion, cynicism, pseudo-sophistication and angst Holden exudes just ring true.

Salinger created Holden Caulfield, gave him life, put words in his mouth, and gave us this iconic figure. While others have sought permission from him to make a movie of *Catcher* or to use his Holden Caulfield character, Salinger has consistently declined. As he told *The Boston Globe* in 1980:

> **There's no more to Holden Caulfield. Read the book again. It's all there. Holden Caulfield is only a frozen moment in time.**

Despite Mr. Salinger's unequivocal decision to lay Holden Caulfield to rest (at least for

the life of his copyright), defendants have now resurrected him under the name "Mr. C" and feature him in an unabashed sequel, apparently written under a pseudonym ("J.D. California") and title (*60 Years Later: Coming Through the Rye*) which are clear references to Salinger and *Catcher*, respectively. But the similarities by no means end there. Despite having aged some sixty years, Holden Caulfield has all of the same character traits, flaws and quirks as he did in the original. Many of Salinger's original characters – with their original names – are pervasive in the Sequel. Both works start out with Holden Caulfield leaving an institution; in *Catcher*, he is kicked out of prep school; in the Sequel, he leaves his nursing home. In both works, he heads for New York. Salinger wrote in *Catcher*:

> I'll just tell you about this madman stuff that happened to me around last Christmas just before I got pretty run-down and had to come out here and take it easy.

(*Catcher*, 1.) The Sequel states:

> I keep my eyes closed and think about all the madcap stuff that happened to me around last Christmas, before I got so run down I had to come out to this place to rest.

(Sequel, 24.) Defendants preface the story and the character who tells it in Salinger's words. They then take Salinger's character, Holden Caulfield, lock, stock and barrel. In so doing, have infringed Salinger's copyright in that character. The Sequel's author has admitted: "He's still Holden Caulfield and has a particular view on things". Likewise, comparing the two books as a whole, particularly given that Holden *is* the story being told in each, it is clear that the Sequel is an unauthorized derivative and infringes Mr. Salinger's copyright rights in that respect, as well. Again, the author of the Sequel sums it up well: "It's pretty much like the first book in that he roams around the city, inside himself and his past".

As explored below, and as is apparent from reading the Sequel, it is not a parody and it has no claim to fair use. It does not poke fun of, ridicule, comment upon, criticize, or otherwise transform *The Catcher in the Rye*. If aging Holden Caulfield 60 years constitutes "transforming"

2

him for fair use purposes, then virtually no sequel featuring the main character of an original work, could, by definition, be infringing. That is not the law. Rather than transform *Catcher*, the Sequel simply appropriates it – its soul, its life, its characters, its narrative, and its essence – and uses it to try to attract the millions of readers who fondly remember *Catcher* and Holden Caulfield. Defendants should not be permitted to do this under the applicable law, as explained below.

## STATEMENT OF FACTS

### *The Catcher in the Rye*

*The Catcher in the Rye*, the classic 1951 novel by J.D. Salinger, tells the story of Holden Caulfield, a disaffected 16-year old boy who, after he is kicked out of his prep school just prior to Christmas, impulsively decides to hang out in New York City for a few days before returning to his parents' home.[1] He spends those few days meeting people both new and old, wandering from encounter to encounter, never sure what to do with himself, and constantly drawn back to Central Park. His adventures come to an end when he finally meets with the one person he trusts and enjoys spending time with: his kid sister Phoebe.

Much of the plot of *Catcher* involves Holden roaming New York. He takes a cab to a hotel (60), goes out (66), walks back to his hotel (88), goes to Grand Central Station (107), takes a long walk (113), takes a cab to Central Park (118), goes to various bars and nightclubs (69, 90, 129), *etc*. Unlike the plots of more traditional novels, Holden has no explicit goal, and there is no particular arc he attempts to complete. The plot is thus best described as a series of incidents over the course of his New York sojourn.

*Catcher* is narrated by Holden in the first person and, as *The New York Times* explained, it "is told in Holden's own strange, wonderful language...." Affidavit of Phyllis Westberg, sworn to June 1, 2009 ("Westberg Aff't"), Ex. B. Because of this, the tone of the book is

---

[1] A copy of *The Catcher in the Rye* is annexed to the affidavit of Marcia B. Paul, sworn to June 1, 2009 ("Paul Aff't") as Exhibit A.

Holden's own tone, and it is extremely casual and filled with slang, repeatedly using words like "phony" (3, 9, 14, 17, *et al.*), "crumby" (23, 24, 30, 39, *et al.*), "lousy" (1, 9, 12, 19, *et al.*), "hell" (2, 4, 10, 12, *et al.*), "bastard" (13-14, 17, 28, 32, *et al.*), *etc.*, all words in Holden's vernacular. The entire narrative is told in short, choppy sentences, and reads as if it were dictated by a character, leaning towards stream of consciousness. Indeed, the narrator often addresses the reader directly: "...that I finished telling you...", "If you want to know the truth...". *Catcher*, 38, 92.

*Catcher* is told in flashback; the narrator explains upfront that he is going to tell a story, and at the end, revealing that he is now in a mental hospital and "That's all I'm going to tell about". *Id.*, 1, 213. While the narrative in between takes place over only a few days, Holden is prone to digressions, so much of the novel actually describes events that occurred before Holden's time in Manhattan. Many of the incidents in the novel set off memories in Holden: he makes pronouncements like "I forgot to tell you about..." or "Anyway, that's what I was thinking about while I sat in that vomity-looking chair in the lobby", that set off side stories that can last for a few pages. *Id.*, 4, 80.

Holden's encounters during his few days in New York involve several of his friends, family and associates, and his digressions involve even more individuals from his past and present. These characters include his high school friends Ackley and Stradlater (18, 19, 21, *et al.*), his teacher Mr. Spencer (3, 5, 168, *et al.*), his sister/best friend Phoebe (59, 66, 67, *et al.*), his deceased brother Allie (38, 67, *et al.*), and his other brother D.B., who Holden believes has sold out to Hollywood (2, 59, 80, *et al.*).

**The Character Holden Caulfield**

Holden Caulfield, the protagonist of *Catcher*, is one of the most recognized characters in

DWT 12917521v.4 - 0062258-000003
DWT 12917521v4 0062258-000003

American literature.[2] He is a precocious 16-year old boy struggling to find his way in the world and an angst-filled cynic. Holden has a very specific speaking style; indeed, as *The New York Times* observed in 1961, "[t]he critique in [the *Times*] was written entirely in Holdenese, something to which a number of other reviewers partially succumbed". Westberg Aff't, Ex. B. As noted above, he speaks with a good deal of slang, and constantly criticizes people and things for being "phony", labels things "crumby", and notes things that are or people who "kill me" (a good thing). He lies a lot, and is sarcastic – both to the characters he interacts with and to the reader. He addresses the reader directly and – perhaps because he lies so much – explains to the reader when he is being honest, prefacing statements with "If you want to know the truth". *Catcher*, 92. He is quick to criticize, and, throughout the novel, points out many things that he hates: "God, I hate that stuff"; "It isn't important, I know, but I hate it when somebody has cheap suitcases". *Catcher*, 87, 108.

Holden feels disconnected from his prep school, Pencey, and is happy to leave it behind. Indeed, he feels disconnected from most of those around him, with the notable exception of his sister Phoebe and his deceased brother Allie. He sees his other brother D.B. as a sell-out for working in Hollywood, making off-hand comments such as, "Ernie's is this night club in Greenwich Village that my brother D.B. used to go to quite frequently before he went out to Hollywood and prostituted himself." *Catcher*, 80. Holden fixates on many ideas, some philosophical, and repeats himself throughout the book. For example, throughout the novel, Holden wonders where the ducks in the pond in Central Park go in the winter when the water freezes. He returns to this question repeatedly, asking others if they know. *Catcher*, 13, 60, 81, 153.

---

[2] *Catcher* is not Salinger's only work to feature Holden Caulfield. Holden first appeared in a short story, "Slight Rebellion Off Madison," that was published in *The New Yorker* in 1946, and which Salinger later adapted as part of *The Catcher in the Rye*. He appeared in other works by Salinger, including the short story "I'm Crazy," published in *Collier's* magazine (December 22, 1945). Holden's family members appear in "Last Day of the Last Furlough," published in *The Saturday Evening Post* (July 15, 1944), "This Sandwich Has No Mayonnaise" (*Esquire*, October 1945) and the unpublished short stories "The Last and Best of the Peter Pans" and "The Ocean Full of Bowling Balls." Westberg Aff't, ¶ 11.

While Holden may be more mature than his years in some ways, it is clear that during his adventures, he is in over his head. He brings a prostitute to his hotel room, only to chicken out and send her away. *Catcher*, 94. He gets physically beaten up twice in as many days. *Catcher*, 43, 103. And he constantly wanders around Manhattan with no goal in mind and enters phone booths without knowing who to call or not being in the mood to make a call at all. *Id.*, 59. Even the mere act of walking through the bathroom at night is a challenge for Holden, as he stumbles in the dark unable to find the light switch, stepping on things along the way. *Catcher*, 46.

**The Success of *Catcher***

*The Catcher in the Rye* became a commercial and critical success soon after its release in 1951, and it has never lost that status. Indeed, it is in a category with only few other books of all time and has been a perennial presence on high school required reading lists for over 50 years. *Time* magazine named *Catcher* one of the 100 greatest novels of 1923-2005; The Modern Library named it the 64th greatest English-language novel (and its readers voted it their 19th favorite); and customers of Manhattan's famed Strand Bookstore voted it their fourth favorite book *of any kind*, trailing only *To Kill a Mockingbird*, *Pride and Prejudice*, and *The Great Gatsby*. Westberg Aff't, Ex. B. Critical praise for the novel has been extraordinary and sustained. In 2008, *The New York Times* wrote of *Catcher* that "[e]xcept perhaps for Mark Twain no other American writer has registered with such precision the humor – and the pathos – of false sophistication and the vital banality of big-city pretension". *Id.* In 1963, *The New York Review of Books* stated that "[n]o book dealing formally with education is ever likely to influence secondary education so much as *The Catcher in the Rye*". *Id.*[3]

*Catcher* has also been a commercial success. It has been translated into dozens of

---

[3] A small sampling of the critical accolades for the book follows: "'The Catcher in the Rye' has become a crucial American novel...." it is an "unusually brilliant novel"; "'The Catcher in the Rye' remains the playbook for smart, sensitive adolescents trying to navigate the shark-infested waters of the adult world."; "With its very first sentence, his novel 'The Catcher in the Rye,' which came out in 1951, introduced a brand-new voice in American writing, and it quickly became a cult book, a rite of passage for the brainy and disaffected." Westberg Aff't, Ex. B.

6

languages and sold more than 35 million copies worldwide. *Id.*, ¶ 8. Even today, 58 years after

first publication, *Catcher* holds the 268th spot on Amazon.com's *current* best-seller list. *Id.*, Ex.

A.[4] A copy of the book signed by Salinger is currently priced at $14,000 on eBay. *Id.*

Because of its immense popularity, *Catcher* has become the benchmark against which

any coming-of-age story is measured. Such references are ubiquitous in book and movie reviews

("'Igby Goes Down' ... is the second film in recent months ... to take its cue from 'The Catcher

in the Rye' by giving us a fresh-scrubbed, upscale teenage rebel with a brain to match his

attitude"). *Id.*, Ex. C. The title alone is enough to conjure up the original: for instance, the *Times*

referred to a recent novel as "'The Catcher in the Rye' for young Muslims". *Id.* Holden

Caulfield himself has his own place in American culture as the prototype of the angst-filled,

cynical teen coming into his own. *The New York Times* has featured headlines including

"Holden Caulfield From the East Bay," "Holden Caulfield on Ritalin," "Who's Afraid of Holden

Caulfield?" "A Female Holden Caulfield for the 1990's," *etc. Id.*[5]

**Salinger's Protection of His Intellectual Property**

While *Catcher* itself and the character of Holden have almost unique fame, neither

Salinger (nor anyone else – with or without Salinger's permission) has written any new narrative

for Holden Caulfield or created any works derivative of *The Catcher in the Rye* in the 58 years

since the novel's release. Westberg Aff't, ¶ 15. This is no accident or oversight: for over fifty

years, J.D. Salinger has been fiercely protective of both his intellectual property and his privacy.

*Id.* He has not published a new work since 1965. *Id.* Other than a 1949 film of one of his early

---

[4] By way of comparison, *The Catcher in the Rye* currently sells more copies on Amazon than *Harry Potter and the Sorcerer's Stone* (ranked 1,244) and *The DaVinci Code* (ranked 1,585), as well as perennial sellers such as *To Kill a Mockingbird* (ranked 670) and *Of Mice and Men* (ranked 688). Westberg Aff't, Ex. A (Sales rankings were retrieved from Amazon on May 27-28, 2009).

[5] Even other cultural icons have been measured against Holden. A 1996 CNN analysis of Bill Clinton compared him to Holden Caulfield. Westberg Aff't, Ex. C. As the fictional Harry Potter turned 15, Time.com noted that "he could be the Holden Caulfield of wizards". *Id.* The *Times*'s original review of the film *The Graduate* described its lead role as "a character very much reminiscent of Holden Caulfield in J.D. Salinger's Catcher in the Rye". *Id.*, Ex. C.

short stories, Salinger has never permitted any adaptations of any of his works. *Id.*, ¶ 16. Numerous filmmakers – including Harvey Weinstein and Steven Spielberg – have sought the rights to make a film version of *The Catcher in the Rye*, and Salinger has always declined. *Id.*[6] While Salinger's copyright in *Catcher* could no doubt be put to lucrative use if he chose to author or allow an adaptation, sequel, or any other derivative work, he has instead chosen – as is his right – not to further exploit his copyright.[7] *Id.*, ¶ 18.

## A Comparison of the Infringed and Infringing Works

*60 Years Later* (Paul Aff't, Ex. B) is an unauthorized sequel to *The Catcher in the Rye*, expressly labeled a "sequel to one of our most beloved classics". Paul Aff't, Ex. B (back cover). California, who according to a May 30 story in *The Daily Telegraph* is based in New York, did not seek or obtain permission from Salinger, before writing, publishing or distributing it.[8] Westberg Aff't, ¶ 4; Ex. D. The main character in it is Holden Caulfield, the very same character who dominates *Catcher*. As the back cover of the Sequel explains: "60 years after his debut as the great American antihero, Mr. C is yanked back onto the page without a goddamn clue why". Paul Aff't, Ex. B (back cover).

The Sequel, like *Catcher*, is told as a first-person narrative from Holden's point of view, and thus Holden is omnipresent throughout. The Sequel makes use of every aspect of the Holden Caulfield character. Quite overtly, the Holden of the Sequel has the *memories* of all of

---

[6] Salinger's protection of his intellectual property – like his desire for privacy – is well known. In 1961, the *Times* reported that *Catcher* has not had "the help or hindrance of television, movies, or dramatization, for Salinger has always refused to permit any kind of adaptation of the book...." Westberg Aff't, Ex. B. And in May 2009, *The Guardian* reported, "Salinger, however, has blocked all attempts to publish any of his writings not available before 1965, hindered would-be biographers, and kept his work out of Hollywood ever since the 1950 movie version of his short story Uncle Wiggily in Connecticut, My Foolish Heart, was panned by the critics". *Id.*, Ex. G.

[7] Salinger has brought legal action in the past against individuals exploiting his intellectual property. In 1974, he obtained an injunction to prevent the distribution of unauthorized copies of early short stories he had written. Westberg Aff't, ¶ 19. In 1986, he successfully sued to prevent the unauthorized publication of letters he had written. *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987).

[8] Despite California's statement to the contrary in the *Telegraph* article, plaintiff believes that "John David California" may be a pseudonym, as there is no record of such an individual existing prior to May 2009. Much of the press coverage of the Sequel has come to the same conclusion, noting also that parts of the author's biography seem fictitious. *Id.*, Ex. G. For this reason, plaintiff has named Mr. California as John Doe in the complaint.

8

the events from *Catcher* and explicitly refers to many of them. For instance:

- "I close my eyes and try to think about the last time I left for New York." Sequel, 60.

- "It was a chilly day. I remember because someone had swiped my brand new leather gloves directly from my coat pocket, and I was freezing my goddamned fingers off." Sequel, 60.

- "I just wanted Stradlater to be the way I remembered him, an arrogant shit just for a minute or so, to make the world seem familiar again." Sequel, 93.

- "Remember? I used to be on the fencing team." Sequel, 96.

- "There was this one time I ran into this bloody gorilla called Maurice at this crummy hotel but that was nothing even close to getting crushed by a piece of falling metal or stabbed by a crazy woman in the park." Sequel, 106.

- "Remember when you gave me your Christmas money so I could run away to California?" Sequel, 251.

- "It's all the same horses, the same ones they had 60 years ago. I even remember the one Phoebe was on that day I was watching from the ground below, promising to be a better person." Sequel, 266.

Each of these (and many more memories Holden cites) is an event from *Catcher*. A more complete – although non-comprehensive – list of aspects of *Catcher* and Holden Caulfield taken by the Sequel is at Paul Aff't, Ex. C.

The Holden of the Sequel also has many of the same attributes as *Catcher*'s Holden. He has a sister named Phoebe (Sequel, 22, 49, 67, 68, *et al.*), a deceased brother named Allie (126, 127, *et al.*) and a brother named D.B. (13-14, 130). His high school roommate is still Stradlater (90-93, *et al.*), and his history teacher is Mr. Spencer (28-29, *et al.*). It is not just these characters that are the same, but also all their defining details. Holden's mother is still always nervous (Sequel, 127-128)[9] and he thinks his brother D.B. is a sellout. Sequel, 13-14.

He's out of shape, just as he was in *Catcher* (*Catcher*, 5, 29; Sequel, 11-12), and explains that he has stopped smoking (*Catcher*, 5, "I'm quite a heavy smoker, for one thing-that is, I used to be", *et al.*; Sequel, 12, "But I did quit smoking", *et al.*). The Sequel's Holden speaks in the

---

[9] Compare to *Catcher*, 107, 158.

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

"Holdenese" described by *The New York Times* – or at least an imitation of it. He may have aged but neither his tone nor his vocabulary has changed: his narrative is still punctuated with constant uses of words like "phony" (55, 56, 75), "crummy" (24, 25, 26, 29, *et al.*), "lousy" (24, 68, 73, 79, *et al.*), "hell" (17, 19, 26, *et al.*), and "bastard" (44, 67, 71, 90, *et al.*). Things that Holden likes still "kill" him, especially his sister Phoebe. Sequel, 57, 69, 168, *et al.;*[10] 250, 251, 267.[11] He still speaks in short, choppy sentences and thinks/narrates in streams of consciousness. He continues to lie to those around him (*see, e.g.*, Sequel, 15, 243) and notes that "I don't really know why I lie, it's been that way all my life. I lie about the silliest things in the world, and once I start there's no stopping." Sequel, 244. The new Holden, as in the original, constantly digresses in his narrative. Thus, as in *Catcher*, many of the incidents described take place in flashback, prior to the New York adventure. Holden still speaks directly to the reader, often "leveling with" the reader: "To tell you the truth, I'm not really too keen on this voice of mine, the way it sounds as if it's going to break down any second." Sequel, 33. Then, too, Holden has the same type of fixations as he did in *Catcher*. In fact, many of these are not merely the same *type* of fixation, but the same *exact* fixation:

| *Catcher* | Sequel |
|---|---|
| What made it even more depressing, old Spencer had on this very sad, ratty old bathrobe .... I don't much like to see old guys in their pajamas and bathrobes anyway. Their bumpy old chests are always showing. (7.) | Even so, when I get as old as Mr. Spencer, I will still never walk around in nothing but a crummy robe showing the whole goddamned world my wrinkled chest. (29.) |
| I was wondering where the ducks went when the lagoon got all icy and frozen over. I wondered if some guy came in a truck and took them away to a zoo or something. (13.) | For a moment I feel the sadness inside me stir and I concentrate on the story. It's the one about the ducks that are surprised by the sudden cold of the winter, and they all freeze to the lake as the water turns to ice. (252.) |

Holden also has many of the same adventures as his younger self. As in *Catcher*, Mr. C spends a few days in New York trying to find himself before finally ending up in a home. As in

---

[10] Compare with *Catcher*, 2, 17, 47, *et al.*
[11] Compare with *Catcher*, 159, 160, 164, *et al.*

DWT 12917521v.4 - 0062258/000003
DWT 12917521v4 0062258-000003

*Catcher*, he goes from encounter to encounter, connecting and reconnecting with people from his past until finally finding happiness with his sister Phoebe. As in *Catcher*, much of the plot of the Sequel includes Holden roaming New York. He walks to Times Square (68), goes to Central Park (99), takes a bus to midtown (120), takes a cab to Battery Park (125), takes long walks (145, 174), *etc.* Indeed, many of the same incidents – both major and mundane – occur in both books. Below is a sampling:

- Holden's first stop in New York City is a phone booth. *Catcher*, 59; Sequel, 86.

- Holden takes many trips to Central Park. *Catcher*, 116, 118, 153, 208; Sequel, 74-75, 99, 155, 189, 263.

- Holden goes to the Museum of Natural History. *Catcher*, 119; Sequel, 190.

- Holden wonders whether time stands still inside museums. *Catcher*, 121, 122; Sequel, 195.

- Holden goes ice skating. *Catcher*, 128; Sequel, 264.

- Stradlater punches Holden on the shoulder. *Catcher*, 43; Sequel, 95.

- Holden combs his hair with his hand. *Catcher*, 6, 9; Sequel, 31.

- Holden has a prized red hunting cap. *Catcher*, 17, 21, *et al.*; Sequel, 130, 153.

- Holden prepares to have sex with a woman but chickens out. *Catcher*, 96; Sequel, 180.

- The woman Holden was going to have sex with comes back with another man. *Catcher*, 100-101; Sequel, 181.

- Phoebe worries that her parents will be angry with Holden for being kicked out of school. *Catcher*, 165; Sequel, 251.

- In the final scene of both books, Phoebe rides the carousel in Central Park. *Catcher*, 210-211; Sequel, 266-267.

As with the plot of *Catcher*, again Holden has no explicit goal; the plot is a series of separate incidents. And, again, Holden is in over his head, coming in physical harms' way twice. Sequel, 107. Even in such unimportant matters as not being able to find a light switch at night and clumsily stepping on things along the way, the Sequel copies *Catcher*. *Id.*, 12.

DWT 12917521v.4 – 0062258-000003
DWT 12917521v4 0062258-000003

**Plaintiff Learns of the Unauthorized Sequel**

Unsurprisingly based on Salinger's history, as soon as he learned through his agent of the existence of this unauthorized Sequel, he instituted this action. His agent first learned of the Sequel's existence on May 14, 2009. Westberg Aff't, ¶ 4. The first public mention of the Sequel appears to have been in an online article in the British paper *The Guardian* that same day. *Id.*, Ex. G.[12] Salinger's English literary agent immediately sent an email to the agent for the Sequel's publisher, Nicotext, demanding that it desist from publishing the Sequel. *Id.*, Ex. L. The next day, Nicotext's agent responded that it would not comply with that demand. *Id.*[13]

The Sequel was published in England on May 9 and it is currently available for purchase in the U.K. in both stores and online through booksellers such as Amzon.co.uk. Copies of it are already available for sale on eBay for purchase in the United States. Westberg Aff't, ¶ 33. The American arm of Amazon.com lists it for sale in the United States as of September 15, 2009 and is taking pre-orders. *Id.*, Ex. I. Likewise, defendant SCB is taking pre-orders from bookstores for a September 15 on-sale date. *Id.*, ¶ 33.

As explained below, California's Sequel runs afoul of Salinger's copyright interests and should be enjoined.

## ARGUMENT

### I.
### THE STANDARD ON PRELIMINARY INJUNCTION

To obtain preliminary injunctive relief under F.R.C.P. Rule 65, plaintiff must demonstrate either a likelihood of success on the merits and irreparable injury or, in the alternative, serious questions going to the merits sufficient to make them fair ground for litigation, irreparable injury, and a balance of hardships tipping decidedly in plaintiff's favor.

---

[12] That first mention led to a firestorm of press coverage: a Google search two weeks later produced 925 web pages discussing "60 Years Later" in conjunction with "The Catcher in the Rye." Westberg Aff't, Ex. G. (Google results retrieved on May 28, 2009.)

[13] Simultaneously, Salinger's U.S. agent wrote to Amazon.com requesting that Amazon not distribute the Sequel. Westberg Aff't, Ex. O. The very next day, Amazon declined to stop selling the Sequel. *Id.*

*Bronx Household of Faith v. Board of Education*, 331 F.3d 342, 348-49 (2d Cir. 2003); *NXIVM Corp. v. The Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004); *Tough Traveler v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir. 1995), *cert. denied*, 527 U.S. 1036 (1999). Under either prong of this standard, plaintiff has carried his burden and the injunction should issue forthwith.

## II.
## LIKELIHOOD OF SUCCESS ON THE MERITS

The complaint pleads three claims for relief, two arising under the copyright laws, 17 U.S.C. § 501 and one for common law unfair competition. Only the copyright claims are the predicate for this motion and arise from (i) the wholesale taking by defendants of the fully delineated character "Holden Caulfield" from *Catcher*; and (ii) defendants' creation of an unauthorized Sequel, which constitutes a derivative work.

To state a claim for copyright infringement, Salinger must show (i) "ownership of a valid copyright" and (ii) "unauthorized copying of the copyrighted work". *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (citing *Feist Pub'lns, Inc. v. Royal Hotel Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)). To show unauthorized copying, plaintiff must demonstrate that (a) "defendant has actually copied the plaintiff's work", and (b) "the copying is illegal because substantial similarity exists between the defendant's work and the protectable elements of plaintiff's". *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir. 2001); *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). In the absence of direct evidence of copying, plaintiff must prove "probative similarity" between the allegedly infringing work and the original work, and access. *Castle Rock*, 150 F.3d at 137; *Jorgensen*, 351 F.3d at 51.

Assuming a showing of actual copying, plaintiff must then show "substantial similarity between the two works related to the protectable material". *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997). This requires that plaintiff show that protected expression in the earlier work was copied and that the amount copied is more than *de minimis*. *Tufenkian Imports/Export Ventures,*

13

*Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003). Substantial similarity is proved, in most cases, under the ordinary observer test, which asks "if an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work". *Yurman* 262 F.3d at 111. Courts in this Circuit also compare the "total concept and feel" of the works, which, in the context of literary works, largely mirrors what *Nimmer* refers to as "comprehensive non-literal similarity". 4 *Nimmer on Copyright*, § 13.03[A][1] at 13-36.

Salinger owns a valid copyright in *Catcher*. Westberg Aff't, Exs. D, E. That copyright protects the character of Holden Caulfield, who pervades that novel; it is in fact his story. Even prior to answer, defendants have conceded probative similarity and access, as the book jacket copy, marketing materials, and media interviews given by the author blithely admit that California was inspired to write this book when he found a copy of *Catcher* in a cabin in Cambodia; according to the author's web site, "he has been captivated by the story of Holden Caulfield for years"; the author admits "Mr. C" in the book is Holden Caulfield in *Catcher*; and he admits that the Sequel revisits and recounts events which occurred 60 years earlier in *Catcher*. Westberg Aff't, Exs. G, I.

Therefore, the burden Mr. Salinger carries on this application is to demonstrate that he is likely to succeed on his claim that the character of Holden Caulfield has been infringed by the character of Mr. C. in the Sequel, *i.e.*, substantial similarity between those characters; or, independently, that the Sequel is an unauthorized derivative of *Catcher*, *i.e.*, substantial similarity between those two works. While defendants have not yet answered and they will bear the burden of proof on any claim of fair use, given the urgency of this application, we anticipate and dispel any notion that the Sequel is a parody or otherwise entitled to protection as a fair use.

## A.    *60 Years Later* Infringes Salinger's Copyright in the Character of Holden Caulfield

Defendants would be hard pressed indeed to argue that they did not copy the character of Holden Caulfield from *The Catcher in the Rye* in *60 Years Later* – notwithstanding that they refer

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

to him as "Mr. C" – not only because they have expressly admitted it (Westberg Aff't, Ex. B), but also because Mr. C. reflects upon Holden Caulfield's experiences (and re-experiences many of the same things); has the same family members by name and by description, with many of the same or very similar familial interactions; has many of the same friends by name and by description and remembers or re-enacts experiences recounted in *Catcher* with them; refers to the same red hunting hat and recalls that he lost his gloves the week before; combs his hair with his hand; ponders the fate of the ducks in Central Park during the winter; gets nervous about having sex with women; lies to those around him; is sarcastic to those around him and to the reader; speaks directly to the reader; speaks in "Holdenese"; and spouts again and again the trademark vernacular Holden employs. In short, Mr. C bears all of the indicia of the fully delineated character of Holden Caulfield as he appears in *The Catcher in the Rye*.

In using the character of Holden Caulfield, defendants infringe Salinger's copyright rights in that character, independent of any copyright infringement of the novel in which he first appeared. So long as the character appropriated was distinctively delineated in plaintiff's work, and that delineation has been copied in defendant's work, a claim for infringement will lie. *1 Nimmer on Copyright*, § 2.12, p. 2-178.25; *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931).[14] As the Second Circuit noted in *Warner Bros. Inc. v. American Broadcasting Cos., Inc.*, 720 F.2d 231 (2d Cir. 1983), in deciding whether one character is substantially similar to another, courts consider not only their visual resemblance but the totality of the characters' attributes and traits, looking to see the extent to which the allegedly

---

[14] *See also Walt Disney Prods. v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) (Mickey Mouse *et al.*); *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1127, 1136 (W.D. Wash. 2007) (Jonathan Livingston Seagull constituted the story being told); *D.C. Comics Inc. v. Leo Reel Fantasy, Inc.*, 696 F.2d 24 (2d Cir. 1982) (Batman character); *Detective Comics, Inc. v. Bruns Publications, Inc.*, 111 F.2d 432 (2d Cir. 1940) (Superman character protected by copyright); *King Features Syndicated v. Fleischer*, 299 F. 533 (2d Cir. 1924) (Barney Google and Spark Plub Characters); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 519 F. Supp. 388 (S.D.N.Y. 1981), *aff'd*, 683 F.2d 610 (2d Cir. 1982) (Tarzan character protected by copyright); *Filmvideo Releasing Corp. v. Hastings*, 509 F. Supp. 60 (S.D.N.Y. 1981) (Werker, J.), *aff'd* 668 F.2d 91 (2d Cir. 1981) (Hopalong Cassidy character protected by copyright); *Detective Comics, Inc. v. Fox Publications, Inc.*, 46 F. Supp. 872 (S.D.N.Y. 1942) (Bright, J.) (Superman character).

15

infringing character captures the "total concept and feel" of the copyrighted character. "The character is an aggregation of the particular talents and traits his creator selected for him. That each one may be an idea does not diminish the expressive aspect of the combination". *Id.* at 243.

Here, the differences between Holden Caulfield and Mr. C exist by reason of the aging process. Mr. C does not stir one's memory of Holden Caulfield; he *is* – by identification, traits, attributes, speech, setting, narrative, events (and by the writer's own admission) – Holden Caulfield. Almost 70 years ago, the Second Circuit found an infringement of the Superman character in a case involving far fewer similarities than those present here. In *Detective Comics, Inc. v. Bruns Publications, Inc.*, 111 F.2d 432, 433 (2d Cir. 1940), the Court found that a superhero known as "Wonderman" infringed on the character rights of "Superman" because the "attributes and antics" of the two characters were similar: both could stop bullets; both could leap long distances; and both had super strength. Defendants argued that these attributes were too generic as to warrant protection; the Court disagreed: "[w]e think it plain that the defendants have used more than general types and ideas and have appropriated the pictorial and literary details embodied in the complainant's copyrights". *Id.* Here, defendants do not even contend that the characters are not one and the same[15] and they have appropriated the names of Holden's siblings and friends, his wardrobe, his vocabulary, and indeed his entire memory, so there can be no claim that only "general types" have been taken. *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 632 (2d Cir. 1982), is instructive by way of contrast. There, the court acknowledged that there was stand-alone character protection for Tarzan as developed in the original book and motion picture, but because that character had been licensed to MGM for the remake at issue, the only applicable comparison for substantial similarity was of the settings

---

[15] Given that, the facts here are similar to those in *Hill v. Whalen & Martell, Inc.*, 220 F. 359 (S.D.N.Y. 1914), where the Court found that characters named "Nutt" and "Giff" infringed upon the characters of "Mutt" and "Jeff" because, despite the difference in names: "They were 'Mutt' and 'Jeff.' Everybody so understood, and it was intended that everybody should so understand." *Id.* at 359.

16

*divorced from* the character.

Nor can California prevail in the argument that simply because Holden Caulfield has become such an iconic character he is permitted to use that character for these purposes and in this manner. As stated in *United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370, 380 (S.D.N.Y. 1993) (citation omitted) (emphasis added) (Leisure, J.):

> Unlike a trade name that loses its protection under the Lanham Act when it becomes generic, these imaginative characters do not lose copyright protection as a result of their incorporation into American culture. ***No matter how popular a character may become, the copyright owner is entitled to guard against the unauthorized commercial exploitation of that character….*** To hold otherwise would thwart a fundamental purpose of the Copyright Act which is to foster creativity by assuring a creator of an original work that he or she would reap the exclusive benefits generated from the commercial success of the work.

Also not determinative for purposes of character infringement claims is the particular story line defendants inject Holden into. The *Detective Comics* Court found the Wonderman character to be an infringement of the Superman character without even looking at the stories in which Wonderman was featured! That the characters alone were too similar sufficed. 111 F.2d 432. In *Filmvideo Releasing Corporation v. Hastings*, 509 F. Supp. 60 (S.D.N.Y.) (Werker, J.), *aff'd*, 668 F.2d 91 (2d Cir. 1981), where characters in "Hopalong Cassidy" movies were found to infringe upon the characters in books by the same name, the court explicitly noted that characters are protected independent of any similarity in plot:

> [T]hese characters and others were sufficiently delineated, developed and well known to the public to be copyrightable. The use of these characters for the purposes intended by [defendant] therefore would constitute infringement with respect to the above numbered films *irrespective and independent of the similarity of the story line.*

509 F. Supp. at 66 (emphasis added). Under this line of cases, had defendants merely taken the *character* of Holden Caulfield and injected him into an entirely dissimilar story, devoid of plot similarities, they would have infringed Salinger's copyright, and the analysis could stop here. But defendants here took far more, as explained below.

17

## B.    *60 Years Later* is an Unauthorized Derivative Work

One of the exclusive § 106 rights reserved to the copyright holder is the right to make and authorize others to make derivative works, otherwise known as the adaptation right.  A derivative work is defined under § 101 as "a work based upon one or more pre-existing works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast or adapted".  Under this definition, *60 Years Later* is also an unauthorized derivative work based upon *Catcher* and, as such, another infringement of Salinger's exclusive rights.

In this Circuit, a work is not derivative unless it has substantially copied expression from a prior work.  *1 Nimmer on Copyright*, § 3.01, p. 3-3; *Caffey v. Cook*, 409 F. Supp. 2d 484, 496 (S.D.N.Y. 2006) (Holwell, J.); *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 117 (2d Cir. 2003); *Castle Rock*, 150 F.3d at 143 n.9.  Therefore, to prove that the Sequel is an unauthorized derivative, Salinger must establish that the Sequel is substantially similar to *Catcher* in protectable expression.  While there is some fragmented literal similarity and close paraphrase between the two (Paul Aff't, Ex. C),[16] plaintiff's claim here rests on the importance of the central character (Holden Caulfield); on *Nimmer*'s "comprehensive non-literal similarity" test, which examines whether there has been a taking of the fundamental essence or structure of a work; and/or the "total concept and feel" test, which, in the context of literary works, collapses into one and the same analysis, *i.e.*, a comparison of characters, narrative, plot, tone, setting, and the like. [17]

---

[16] *E.g.*, "I remember around three o'clock that afternoon I was standing way the hell up on top of Thomsen Hill, right next to this crazy cannon that was in the Revolutionary War and all.... The other reason I *wasn't* down at the game was because I was on my way to say good-by to old Spencer, my history teacher." (*Catcher*, 3) became "I was standing on a hill watching the soccer game being played below.  Next to me stood an old cannon, massive and black as tar, and the players looked tiny from where I was standing.  I was really on my way to say goodbye to an old acquaintance, but I stopped on the way to smoke a cigarette and watch the players for a minute." Sequel, 60.

[17] In *Castle Rock*, the Court found defendant's trivia game was a derivative work because it recounted plot details of the *Seinfeld* television episodes notwithstanding the obvious differences between the numerous television episodes and Q&A format and the fact that no one episode or plot could be recreated from the trivia book.  The Second

18

Given that *Catcher* is really the story of Holden Caulfield and a few days in his life, spent largely in New York ruminating about his life, his past, his future, his friends, *etc.*, the taking of his character in and of itself renders the Sequel a derivative, *i.e.*, renders it substantially similar. Several cases support this conclusion. For instance, in *Anderson v. Stallone*, 1989 U.S. Dist. LEXIS 11109 (C.D. Cal. 1989), the court held that the characters in the *Rocky* motion pictures were sufficiently delineated to be protected when transposed into a sequel by another author, and that the treatment for that sequel was a derivative work because the main characters from three prior *Rocky* films were in it, and the treatment retained their names, relationships, and built upon the experiences of those characters as recounted in the earlier *Rocky* movies. As another example, in *CBS Operations Inc. v. Reel Funds Int'l*, 2007 U.S. Dist. LEXIS 58939 (N.D. Tex. August 13, 2007), the court considered whether certain episodes of the *Andy Griffith* television series which had fallen into the public domain were derivatives of earlier episodes which had not. Defendant claimed that it could freely exploit the public domain episodes without CBS's consent, despite the fact that the fully delineated characters of Andy Griffith, Aunt Bea, Opie, and Barney Fife appeared in the earlier episodes. The court concluded that they could not, because the public domain episodes were derivative of earlier episodes. Although there were totally different plots in each episode, they contained many of the same characters; the same opening sequence; many of the same recurring but very general themes including a single father raising his son, a surrogate mother, and teaching a child moral lessons; the same basic relationship between the sheriff and his deputy; and the primary settings and sets were the same.

But Salinger's derivative work claim does not rest solely on use of the character. Defendants have also: (i) taken a slew of other characters from *Catcher*, including Phoebe, Allie,

---

Circuit purposefully chose not to apply either the "fragmented literal close similarity" test or the "comprehensive non-literal similarity" test, because there was little direct quotation or close paraphrase and the trivia quiz at issue obviously did not have the same fundamental structure as the television series. Looking to either of those tests would place "undue focus upon these isolated quotations [and] could improperly distract us from inquiring as to whether substantial similarity exists between [the two]". 150 F.3d at 140.

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

D.B. and Stradlater, as they were fully developed by Salinger; (ii) adopted the tone of *Catcher*, including its choice of words, its sentence structure, its voice and its use of digressions; (iii) copied the overall plot of *Catcher*, with Holden starting in an institution, leaving for New York, spending a few days wandering, and ending up happily with his sister at the Central Park carousel; (iv) repeated specific incidents from *Catcher*, ranging from major (going to the Museum of Natural History, going ice skating and almost sleeping with a woman) to mundane (eating the same large breakfast); and (v) appropriated all of the events of *Catcher* as a backstory, with specific references to Holden being on the high school fencing team; getting kicked out of high school; standing on a hill next to a cannon watching a football game; borrowing money from Phoebe; going to the carousel the first time; getting beaten up by Maurice; and his brother D.B.'s story about a goldfish.

Comparing all of the requisite elements in the two books, whether with respect to comprehensive non-literal similarity or total concept and feel, the Sequel is an unauthorized derivative.

## C.  *60 Years Later* is Not a Fair Use

Defendants may try to fall within the fair use defense, but that safe harbor is simply not available here.  Fair use is an affirmative defense to a claim of infringement, so defendants will bear the burden of proof on point (*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998)), and they cannot carry that burden.

Fair use is an equitable rule of reason, enacted into the 1976 Copyright Act as 17 U.S.C. § 107.  In order to qualify as a fair use, the Sequel must be analyzed under the non-exclusive statutory factors including:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

In considering each factor, it is important to consider separately whether defendants' use of the

DWT 12917521v.4 – 0062258-000003
DWT 12917521v4 0062258-000003

Holden Caulfield character is a fair use, and whether the use that they have made of *Catcher* is a fair use, as Salinger poses two separate claims for copyright infringement: one based on the character and the other based on the novel he permeates. If *either* use is not a fair use, the injunction must issue, because the Sequel cannot exist without the character of "Mr. C" who is, as Holden Caulfield is in *Catcher*, the sum and substance of the story being told.

1. **The Purpose and Character of the Use** – While the Sequel will be published for commercial gain and that cuts against fair use, *Sony v. Universal City Studios, Inc.*, 464 U.S. 417, 449 (1984), that fact is not in and of itself dispositive of the first factor.[18] Rather, courts also look to determine whether the new work is "transformative" of the original, asking whether it adds something new, with further purpose or different character altering the first with new expression, meaning or message, rather than merely superseding the object of the original creation. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).[19]

a. **The Sequel is Not a Parody** – One form of transformative work which enjoys a fair but not unlimited latitude of protection under the fair use doctrine is parody. But the Sequel has no claim to parody protection either as a whole or in its use of the Holden Caulfield character: it does not poke fun of or comment on the original; rather, it uses it (and him) as a building block for a sequential work, featuring many of the same characters and settings found in Salinger's creative tale, but placed later in time. That is not parody under any definition, and certainly not under the Supreme Court's definition in *Campbell*:

> …. For the purposes of copyright law, *the nub of the definitions*, and the heart of any parody's claim to quote from existing material, *is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works. If, on the contrary,*

---

[18] *Campbell* rejected any hard evidentiary presumption that could be read into the Supreme Court's decision in *Sony*, against fair use for the commerciality of a work. 510 U.S. at 585.

[19] What is "transformative" for fair use purposes is quite different, as Judge Newman pointed out in *Castle Rock*, 150 F.3d at 143, from what is required to "transform" a work for purposes of creating a derivative work: Although derivative works that are subject to the author's copyright transform an original work into a new mode of presentation, such works – unlike works of fair use – take expression for purposes that are not transformative.

21

> **the commentary has no critical bearing on the substance or style of the original composition,** which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, **the claim to fairness in borrowing from another's work diminishes accordingly** (if it does not vanish), and other factors, like the extent of its commerciality loom larger....

510 U.S. at 580-581 (citations omitted) (emphasis added). The *Campbell* Court concluded that the rap version of the Roy Orbison song *Pretty Woman* was somewhat parodic because the juxtaposition of the romantic musings in the original against the contemporary street life demand for bawdy sex in the rap version, "comment[s] on the naïveté of the original" [and] "[i]t *is this joinder of reference and ridicule that marks off the author's choice of parody* from other types of comment and criticism that traditionally have had a claim to fair use protection as transformative works". *Id.* at 583 (emphasis added).

In contrast, California does not juxtapose Holden Caulfield's "musings" with anything: he simply repeats them and, to some degree, updates them, but he fails to comment upon them at all. For sure, the Sequel has plenty of reference to the original, but there is no ridicule of it to pair with it. The Sequel does try to imitate the characteristic style of Salinger (not very well), but it does not do so for comic or critical effect. Yes, California has used Salinger's original creative expression to create a somewhat new composition, but the Sequel does not, in any part, comment on Salinger's work or his writing style. *Id.* In Justice Souter's words, the Sequel "has no critical bearing on the substance or style of" *Catcher* but "merely use[s] [it] to get attention or to avoid the drudgery in working up something fresh".

The Ninth Circuit rejected the fair use defense in like circumstances of character infringement in *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1401 (9th Cir. 1997), concerning an alleged parody of *The Cat in the Hat* involving the O.J. Simpson trial. Finding substantial similarity based on use of the central character in the original work multiple times in the infringing work, the Court concluded that the latter work was not a parody, stating:

22

These stanzas and the illustrations [in the allegedly infringing work] simply retell the Simpson tale. Although *The Cat NOT in the Hat!* does broadly mimic Dr. Seuss' characteristic style, it does not hold his *style* up to ridicule. The standards have "no critical bearing on the substance or style of" *The Cat in the Hat*. [The author and illustrator] merely use the Cat's stove-pipe hat, the narrator ..., and the title ... "to get attention" or maybe even "to avoid the drudgery in working up something fresh", *citing Campbell*, 114 S.Ct. at 1172.

The Eleventh Circuit reached the opposite result *SunTrust Bank v. Houghton Mifflin Company*, 268 F.3d 1257 (11th Cir. 2001), holding that *The Wind Done Gone* ("TWDG") was a parody of *Gone with the Wind* ("GWTW") and a fair use, because it was a specific criticism of and rejoinder to the depiction of slavery and the relationships between blacks and whites in GWTW; it "is principally and purposefully a critical statement that seeks to rebut and destroy the perspective, judgments, and mythology of *Gone with the Wind*. *Id.* at 1270. No such critical element is present here. Another key distinction evidencing the parodic character of TWDG was the difference in perspective: GWTW is a third-person epic, whereas TWDG is a first-person account in diary form of one of the slaves from the original, showing the African-American take on a series of events in which such views had previously been ignored. In addition, the very language used in the diary was a distinct departure from the original prose. In contrast, in the instant case, both works are told in the same distinctively Salinger-esque first-person narrative, and California tries to imitate Salinger's distinct voice and writing style.

Even assuming *arguendo* that the Sequel had some limited claim to parodic character, the amount of the taking here extends far beyond that which is permissible for that purpose. Simply qualifying as a parody does not end the fair use analysis. Rather, "attention turns to the persuasiveness of a parodist's justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors, for, as in prior cases, we recognize that the extent of permissible copying varies with the purpose and character of the use...." *Campbell*, 510 at U.S. 586-87.

DWT 12917521v.4 - 0062258-000003
DWT 12917521v4 0062258-000003

b. **No Transformative Nature** – Having disposed of any claim that the Sequel qualifies as parody, it might nonetheless be "transformative" in some other sense, but it is not. The only even arguably transformative element in the Sequel is the injection of scattered italicized sentences throughout, purporting to be Salinger's voice and then, in Chapter 20 – towards the end – the interjection of Salinger himself as a character for 13 pages of the 277-page Sequel. By way of example, in his opening gambit, California writes, in disembodied italics: "I'm bringing him back. After all these years I've finally decided to bring him back". That's not commentary upon, or criticism of, *Catcher*; it's pure deception of readers, telling them that it is Salinger who decided to bring Holden Caulfield back!

Even if this literary technique could be said to "add something new", it does not serve a "further purpose" or provide "different character", and it most certainly does not *alter Catcher* in any sense, or provide any new meaning or message about, or criticize, Salinger's original. Further, even assuming some minimal level of transformative character by reason of this literary device, it is far too little both qualitatively and quantitatively to overcome the fact that this work tries to serve the exact same purpose as the original and strives to supplant it. While true parody and the original usually serve different market functions (*Campbell*, 510 U.S. at 591, *citing Bisceglia*, ASCAP, Copyright Law Symposium, No. 34 at 23), that is not the case here; indeed, the Sequel is aimed at the exact same target audience as that for the original. Westberg Aff't, Exs. G, I. That difference in purpose was the core value that led to a finding of fair use in *Bill Graham Archives v. Dorling Kindersley Limited*, 448 F.3d 605 (2d Cir. 2006), concerning the use of chronologically arranged thumbnail images of concert posters in a book about The Grateful Dead. That Court found that the use of those images was transformative precisely because the images were used for a *different* expressive purpose (to enhance the readers' understanding of the biographical text) than the original (artistic expression and promotion of the band's concerts).

24

The *Seinfeld* Court rejected the proffered fair use defense on facts far more deserving of that defense than presented in this case. Defendants argued that *The SAT* had "transformative" qualities in that the testing of one's knowledge of the television series qualified as criticism, comment, scholarship or research; they also argued that it was a commentary upon the obsessions with and mystiques surrounding the TV series. The Court flatly rejected these proffered justifications, stating:

> [a]ny transformative purpose possessed by *The SAT* is slight to non-existent.... *The SAT*'s purpose, as evidenced definitively by the statements of the book's creators and by the book itself, is to repackage *Seinfeld* to entertain *Seinfeld* viewers.... [The back cover] urges *SAT* readers to "open this book to satisfy [their] between-episode [*Seinfeld*] cravings". Golub, *The SAT*'s author, described the trivia quiz book not as a commentary or a *Seinfeld* research tool, but as an effort to "capture *Seinfeld*'s flavor in quiz book fashion.

150 F.3d at 142. In much the same way, the Sequel seeks to repackage *The Catcher in the Rye* to recapture its audience. That is not a transformative purpose but rather a piratic one. Given the commerciality and wholesale lack of transformative purpose, the first factor weighs heavily in favor of plaintiff.

**2.    The Nature of the Copyrighted Work** – As noted above, in the accompanying Westberg Aff't, and as the Court may judicially notice, *The Catcher in the Rye* is not only a highly creative original work, it has been hailed as an "unusually brilliant novel" by *The New York Times* and a "brilliant, funny, meaningful novel" by *The New Yorker*. Westberg Aff't, Ex. B. Salinger's voice, his writing style and his choice of words were unique in their time and, some may say, remain unique today. Thus, *The Catcher in the Rye* is "closer to the core of intended copyright protection than [other works], with a consequence that fair use is more difficult to establish when the former works are copied" (*Campbell*, 510 U.S. at 586), and this factor also weighs heavily in favor of plaintiff.

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

**3.    The Amount and Substantiality of the Portion Used** – The amount of the taking here, as detailed above and in Paul Aff't, Ex. C, is significant from both a qualitative and a quantitative standpoint.  First and perhaps foremost, California has simply pilfered Salinger's main and iconic character Holden Caulfield; notwithstanding calling him "Mr. C", everything about him is the same, save for his age:  his habits, his vocabulary, his family, his friends and teachers, his apparel, his hair, his likes and dislikes, and his entire life history.

With respect to the copyright in the work itself, California has also taken events, the narrative, and other characters in *Catcher*, and inserted them into his Sequel.  Mr. C appears on every single page of the sequel; the "new" story is told through his voice; he *is* the book.  He gets punched by Stradlater; wonders about the ducks in Central Park; almost gets killed twice; and experiences many of the same incidents as in, and recounts numerous events from, *Catcher* as detailed *supra*.  To add to this, there is also some fragmented literal similarity and close paraphrase.  In *Craft v. Kobler*, 667 F. Supp. 120, 129 (S.D.N.Y. 1987) (Leval, J.), Judge Leval concluded that defendant's takings, which constituted only approximately three percent of the infringing biography, were "the liveliest and most entertaining part" of it and were "far too numerous and with too little instructional justification to support the conclusion of fair use".  The same is true here, only more so.  In short, from both a qualitative and a quantitative standpoint, the amount of the taking here is very high and this factor weighs in Salinger's favor as well.

**4.    The Impact On the Actual Or Potential Market** – Courts expressly recognize that the market to be considered under the fourth factor includes the market for potential authorized derivatives that creators of original works would in general develop or license others to develop.  *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 568 (1985); *Campbell*, 510 U.S. at 593.  In this case, the relevant markets are for further works featuring Holden Caulfield or for sequels to *Catcher* (or both).  These, of course, *are* something Salinger *could* license.  (In fact,

DWT 12917521v.4 – 0062258/000003
DWT 12917521v4 0062258-000003

some reports of *60 Years Later* have theorized that it was written by Salinger himself using a pseudonym. Westberg Aff't, Ex. G.)

That Salinger himself has disavowed interest in writing or authorizing a sequel to *Catcher* or another work featuring Holden Caulfield is of no moment in this analysis. The inquiry is a theoretical one into the *potential* market, whether the author decides to exploit it or not. Salinger has an absolute right to decide when, whether, and how to resurrect the life that he breathed into Holden Caulfield in another work and/or at some different age. In Salinger's 1986 copyright case against Random House involving his unpublished letters, both Judge Newman on appeal and Judge Leval below concurred that:

> the need to assess the effect on the market for Salinger's letters is not lessened by the fact that their author has disavowed any intention to publish them during his lifetime. First, the proper inquiry concerns the 'potential market' for the copyrighted work [citations omitted]. Second, Salinger has the right to change to his mind. He is entitled to protect his *opportunity* to sell his letters, ...

*Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (emphasis in original). For this same reason, the *Seinfeld* Court had no difficulty concluding that *The SAT* substituted for a derivative market that a television program copyright owner such as Castle Rock would in the normal course develop or license others to develop, even though Castle Rock evidenced little if any interest in exploiting this market for derivative works: "[t]he copyright law must respect that creative and economic choice. It would ... not serve the ends of the Copyright Act – *i.e.*, to advance the arts – if artists were denied their monopoly over derivative versions of their creative works merely because they had made the artistic decision not to saturate those markets with variations of their original". 150 F.3d at 146.

Another telling parallel with that earlier case is the injection of Salinger himself into both infringing works. Discussing the fourth factor in the case of the biography, Judge Newman said that the fact that it "frequently laces [Hamilton's] paraphrasing with phrases such as "he wrote,"

DWT 12917521v.4 – 0062258.000003
DWT 12917521v4 0062258-000003

"said Salinger", "he speaks of," "Salinger declares," *etc.*; "[f]or at least an appreciable number of persons, these phrases would convey the impression that they have read Salinger's words, perhaps not recorded verbatim, but paraphrased so closely as to diminish interest in purchasing the originals". *Salinger*, 811 F.2d at 99. The same may be said some 23 years later of the Sequel; it is written by "J.D." California (as opposed to J.D. Salinger); its subtitle is "Coming Through The Rye" (as opposed to "*Catcher In The Rye*"); its back cover gloats that it is "a marvelous sequel to one of our most beloved classics"; and Salinger appears as a character in the novel and in italicized comments about Holden Caulfield. All these may well suggest to a reader that Salinger himself authored or at least authorized this Sequel, when he did not. While the Lanham Act no longer protects books as "goods" post-*Dastar Corporation v. Twentieth Century Fox*, 539 U.S. 23 (2003), the impact of this misleading literary device has continuing relevance to the fourth factor analysis, as a reader might well view defendants' book as authorized and, not liking it, might be less inclined to read other Salinger works or to buy the "theoretical" sequel that Salinger might himself someday author or authorize.

Then too, the court is charged with looking to see "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original. *Campbell*, 510 U.S. at 590, *citing 4 Nimmer on Copyright*, § 13.05[A][4], p. 193-13-202.1 (footnote omitted). If Salinger does not succeed in squelching this unauthorized Sequel, then he (and his heirs) will have difficulty indeed stopping others from following suit; nothing will stop them from taking others of his unique characters and placing them in alternate times or settings. All of this is the prerogative of the copyright proprietor. The lack of any "transformative" quality in the Sequel will be a powerful statement to others, not just those who might trade on Salinger's works, that they can lift another's copyrighted creations with impunity. While some copyright proprietors elect to allow the unauthorized creation and uploading of derivative works in the form of fan fiction, Salinger is

DWT 12917521v.4  0062258-000003
DWT 12917521v4 0062258-000003

decidedly not of that mind set. He has the right to control the publication of unauthorized derivatives and he should be allowed to exercise that right with respect to the particular work at issue here.

Thus, none of the fair use factors weighs in defendants' favor and any fair use defense asserted here would not withstand scrutiny.

## III.
## IRREPARABLE INJURY AND BALANCE OF HARDSHIPS

Salinger also bears the burden of demonstrating that he will be irreparably injured in order to be entitled to preliminary injunctive relief. Notwithstanding the Supreme Court decision in the patent context in *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 392-93 (2006) that a preliminary injunction does not automatically follow a determination that a patent has been infringed, generally when a copyright plaintiff makes out a *prima facie* showing, irreparable harm may be presumed. *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 66 (2d Cir. 1996); *Warner Bros. Entertainment, Inc. v. RDR Books*, 575 F. Supp. 2d 513, 552 (S.D.N.Y. 2008) (Patterson, J.).[20] Salinger is entitled to that presumption of irreparable harm in this case.

To the extent that any further or other showing is required to bolster that presumption, as the Westberg Aff't makes clear, the value of sequel rights to the iconic novel the *Catcher in the Rye* cannot be underestimated. That Salinger has consistently for decades and vocally refused to write or authorize any such sequel or any other derivative use of either his Holden Caulfield character or his novel is readily apparent. Therefore, the damage that he will suffer not only includes the difficult to quantify monetary return he could theoretically receive were he to authorize a first sequel, but also his constitutionally based right *not* to publish derivatives of works he has previously authored and published, *i.e.*, the privacy underpinning of the Copyright Clause. Once the genie is out of the bottle, it cannot be put back in. This is not the type of injury

---

[20] *See also E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 519 (S.D.N.Y. 2008) (Marrero, J.); *Lennon v. Premise Media Corp., L.P.*, 556 F. Supp. 2d 310, 319 n. 1 (S.D.N.Y. 2008) (Stein, J.).

DWT 12917521v.4 – 0062258-000003
DWT 12917521v4 0062258-000003

that can be remedied by monetary damages, as that would be wholly inadequate to compensate him for the loss of that first publication right and the invasion of his privacy right.

Although the Sequel is not yet available from United States booksellers, as Amazon and SRC are only accepting pre-order for a September 15, 2009 publication date in this country, Salinger cannot wait until the official publication date to seek relief because the book is presently available in the United States through eBay (from U.K. booksellers) and online directly from Amazon.co.uk and other online booksellers in England. Plaintiff cannot sit on his hands and allow copies of the book to enter this country in violation of his United States copyright rights. For this reason, promptly upon learning of the impending release of the book in this country and the availability here of copies from overseas, plaintiff is seeking immediate injunctive relief.

## CONCLUSION

For the foregoing reasons and as set forth in the accompanying affidavits, plaintiff's application for a preliminary injunction should be granted in its entirety.

Dated: New York, New York
      June 1, 2009

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: *Marcia B. Paul*

Marcia B. Paul (MBP 8427)
Kevan Choset (KC 7319)
1633 Broadway
New York, New York 10019
(212) 603-6427
marciapaul@dwt.com
kevanchoset@dwt.com

*Attorneys for Plaintiff*
J.D. Salinger, individually
and as trustee of the
J.D. Salinger Literary Trust

30