UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
J.D. SALINGER, individually, and as                    :
TRUSTEE OF THE J.D. SALINGER                           :
LITERARY TRUST,                                        :       09 Civ. 05095 (DAB)
                                                       :
            Plaintiff,                                 :
                                                       :
    -against-                                          :
                                                       :
JOHN DOE, writing under the name JOHN                  :
DAVID CALIFORNIA; WINDUPBIRD                           :
PUBLISHING LTD.; NICOTEXT A.B.; and                    :
ABP, INC/ d/b/a SCB DISTRIBUTORS, INC.,                :
                                                       :
            Defendants.                                :
--------------------------------------------------------X


## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Edward H. Rosenthal (EH-8022)
Maura J. Wogan (MW-9589)
Jessie F. Beeber (JB-3129)
Cameron A. Myler (CM-7942)
Marisa Sarig (MS-3786)
488 Madison Avenue, 10th Floor
New York, New York  10022
Tel: (212) 980-0120
Fax: (212) 593-9175

*Attorneys for Defendants John Doe, writing under
the name John David California, Windupbird
Publishing Ltd., Nicotext A.B and ABP, Inc. d/b/a
SCB Distributors, Inc.*

Dockets.Justia.com

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

    Plaintiff Salinger and His Book ...................................................................... 3

    *60 Years* is Critical Commentary on *Catcher* and Holden Caulfield in Fictional
    Form ........................................................................................................... 4

    *60 Years* Takes Minimal Material from *Catcher* and Only to Serve its Critical
    Purpose ...................................................................................................... 5

    Academic Experts Conclude that *60 Years* is Both Transformative and a Serious
    Commentary on *Catcher* and Holden Caulfield .............................................. 6

    The Defendants Will Be Damaged If *60 Years* Is Enjoined ............................. 7

ARGUMENT ...................................................................................................... 7

I. PLAINTIFF HAS NOT MET THE EXTRAORDINARY BURDEN REQUIRED TO
   OBTAIN A PRELIMINARY INJUNCTION ...................................................... 7

II. SALINGER HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS
    ON THE MERITS ......................................................................................... 8

    A.    Salinger Is Unlikely to Succeed on His Claims for Copyright Infringement ......... 8

        1.    Salinger Has Not Demonstrated a Likelihood of Success on His
            Claim for Infringement of the Holden Character....................................... 9

            (a)    The Holden Character Standing Alone is Not
                 Copyrightable............................................................................. 9

            (b)    Mr. C Is Not Substantially Similar to Protectable Aspects
                 of Holden ................................................................................. 11

        2.    Salinger is Unlikely to Succeed on His Claim that *Catcher* Was
            Infringed ................................................................................................ 13

            (a)    Salinger Impermissibly Seeks Protection for His Ideas
                 Rather than Copyrightable Expression of Those Ideas................. 13

(b)    There Is No Substantial Similarity Between *60 Years* and *Catcher* ........................................................................ 14

B.    *60 Years* Is Entitled to a Fair Use Defense ........................................... 16

    1.    *60 Years* Is a Parody that Directly Comments upon and Criticizes *Catcher* and its Author.......................................................... 16

    2.    Applying the Four Factor Analysis to the Parody .................................... 20

        (a)    The Purpose and Character of the Use............................................ 20

        (b)    The Nature of the Copyrighted Work ............................................ 21

        (c)    The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole ............................. 22

        (d)    Effect of the Use upon the Potential Market for or Value of the Copyrighted Work.................................................................. 22

III. SALINGER HAS FAILED TO DEMONSTRATE IRREPARABLE HARM ...................... 23

IV. THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS NOT SALINGER ......... 25

CONCLUSION    ........................................................................................................ 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allora, LLC v. Brownstone,*
  Civ. No. 1:07CV87, 2007 WL 1246448, at *5 (W.D.N.C. Apr. 27, 2007) ............................ 24

*Arica Inst., Inc. v. Palmer,*
  970 F.2d 1067 (2d Cir. 1992) ................................................................................................ 14

*Bach v. Forever Living Prods. U.S., Inc.,*
  473 F. Supp. 2d 1127 (W.D. Wash. 2007) ............................................................................ 10

*Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,*
  719 F.2d 42, 45 (2d Cir. 1983) ............................................................................................. 23

*Blanch v. Koons,*
  467 F.3d 244 (2d Cir. 2006) ................................................................................................. 17

*Borey v. Nat'l Union Fire Ins. Co.,*
  934 F.2d 30 (2d Cir. 1995) ................................................................................................... 24

*Bourne Co. v. Twentieth Century Fox Film Corp.,*
  602 F. Supp. 2d 499 ....................................................................................... 17, 18, 19, 21

*Brown v. Perdue,*
  No. 04 Civ. 7417, 2005 WL 1863673 ............................................................................. 12, 14

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ..................................................................................................... passim

*Consumers Union of U.S., Inc. v. General Signal Corp.,*
  724 F.2d 1044 (2d Cir. 1993) ............................................................................................... 23

*D.C. Comics, Inc. v. Leo Reel Fantasy, Inc.,*
  696 F.2d 24 (2d Cir. 1982) ................................................................................................... 10

*Detective Comics v. Bruns Publs.,*
  111 F.2d 432 (2d Cir. 1940) ................................................................................................. 10

*Detective Comics, Inc. v. Fox Publs., Inc.,*
  46 F. Supp. 872, 873 ............................................................................................................ 10

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,*
   109 F.3d 1394 (9th Cir. 1997) ........................................................................... 17

*E. Gluck Corp. v. Rothenhaus,*
   585 F. Supp. 2d 505 ........................................................................................... 24

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006) ....................................................................................... 8, 24

*Filmvideo Releasing Corp. v. Hastings,*
   509 F. Supp. 60 ........................................................................................... 10, 12

*Fuld v. National Broad. Co., Inc.,*
   390 F. Supp. 877 ......................................................................................... 13, 14

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
   481 F.3d 60 (2d Cir. 2007) ................................................................................ 24

*Hill v. Whalen & Martell, Inc.,*
   220 F. 359 ......................................................................................................... 10

*Ideal Toy Corp. v. Kenner Products,*
   443 F. Supp. 291 ................................................................................................. 9

*Jones v. CBS,*
   733 F. Supp. 748 ............................................................................................... 15

*JSG Trading Corp. v. Tray-Wrap, Inc.,*
   917 F.2d 75 (2d Cir. 1990) .................................................................................. 7

*King Features Syndicate v. Fleischer,*
   299 F. 533 (2d Cir. 1924) .................................................................................. 10

*Leibovitz v. Paramount Pictures Corp.,*
   137 F.3d 109 (2d Cir. 1998) .............................................................................. 18

*Lennon v. Premise Media,*
   556 F. Supp. 2d 310 ....................................................................................... 8, 25

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
   454 F.3d 108 (2d Cir. 2006) .............................................................................. 25

*MGM v. Grokster,*
   518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................................ 24

*Momento, Inc. v. Seccion Amarilla USA*,
    No. C 09-1223 SBA, 2009 WL 1363558, at *3 (N.D. Cal. May 14, 2009) ............................. 24

*New Line Cinema Corp. v. Bertlesman Music Group, Inc.*,
    693 F. Supp. 1517n.5 ...................................................................................................... 10

*New York Times v. Tasini*,
    533 U.S. 483 (2001) ........................................................................................................... 8

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) .............................................................................................. 24

*Random House, Inc. v. Rosetta Books LLC*,
    283 F.3d 490 (2d. Cir. 2002) ............................................................................................. 25

*Reyher v. Children's Television Workshop*,
    533 F.2d 87 (2d Cir. 1976) ................................................................................................ 16

*Silverman v. CBS Inc.*,
    632 F. Supp. 1344 ............................................................................................................... 9

*Suntrust Bank v. Houghton Mifflin Co.*,
    268 F.3d 1257 (11th Cir. 2001) ................................................................... 2, 17, 23, 25

*United Feature Syndicate v. Koons*,
    817 F. Supp. 370 .............................................................................................................. 10

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986) ................................................................................................ 14

*Walt Disney Prods. v. Air Pirates*,
    581 F.2d 751 (9th Cir. 1978) ............................................................................................ 10

*Warner Bros. Inc. v. Am. Broad. Co.*,
    720 F.2d 231 (2d Cir. 1983) .............................................................................................. 10

*Warner Bros. v. Am. Broad. Co.*,
    530 F. Supp. 1187 ................................................................................................... 9, 10, 11

*Warner Bros. v. Am. Broad. Co.*,
    654 F.2d 204 (2d Cir. 1981) .............................................................................................. 13

*Warner Brothers Entm't Inc. v. RDR Books*,
    575 F. Supp. 2d 513 ......................................................................................................... 24

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996).............................................................................. 8, 12, 14

*Yankee Publ'g Inc. v. News Am. Publ'g, Inc.,*
    809 F. Supp. 267 ........................................................................................................ 17

## OTHER AUTHORITIES

Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property*
    *Cases*, 48 DUKE L. J. 147 (1998) .............................................................................. 8

Pierre N. Leval, *Commentary: Toward a Fair Use Standard,*
    103 HARV. L. REV. 1105, 1133 (1990) .......................................................... 2, 3, 16

Defendants John Doe, writing under the name John David California, Windupbird Publishing Ltd. ("Windupbird"), Nicotext A.B. ("Nicotext") and ABP, Inc. d/b/a SCB Distributors, Inc. ("SCB") (collectively "Defendants")[1] submit this memorandum in opposition to the motion of plaintiff J.D. Salinger, individually and as Trustee of the J.D. Salinger Literary Trust ("Plaintiff" or "Salinger") for a preliminary injunction. For the reasons set forth below, that motion must be denied.

## PRELIMINARY STATEMENT

The Court should not ban this book. *60 Years Later: Coming Through the Rye* ("*60 Years*") is a complex and undeniably transformative exposition about one of our nation's most famous authors, J.D. Salinger, and his best known creation, Holden Caulfield from *The Catcher in the Rye* ("*Catcher*"). *60 Years* explores the famously reclusive Salinger's efforts to control both his own persona and the persona of the character he created. It also scrutinizes and criticizes the iconic stature of Salinger and his creation by comparing the precocious and self-satisfied sixteen-year-old Holden with a 76-year-old version of himself fraught with indecision and insecurity.

*60 Years* is a literary commentary on *Catcher*, Salinger and Holden that will neither appeal to nor satisfy readers interested in the further adventures of Holden and the other characters in *Catcher* (only three of whom even appear in *60 Years*). *60 Years* shows the battle between Salinger (who himself is a character in *60 Years*) and the 76-year-old "Mr. C" as

---

[1] Fredrik Colting wrote the book at issue here under the pseudonym "J.D. California." *See* Declaration of Fredrik Colting dated June 14, 2009 ("Colting Decl.") ¶ 2. Windupbird is the publisher and SCB is the U.S. distributor of the book. Nicotext had nothing whatsoever to do with the publication of the book, and will move to dismiss the complaint on that basis. *Id.*, ¶ 3 n.1. The book has been published in the United Kingdom and is scheduled to be published in the United States later this summer. *Id.*, ¶ 2.

Salinger struggles to kill off his famous character and then has to reconcile himself to Mr. C's continued existence.

As shown below, not nearly enough copyrightable material was taken from *Catcher* for Salinger to prove copyright infringement. But even if he were able to do so, Defendants nonetheless have a meritorious fair use defense, and there is no justification for an injunction. *60 Years* is a protected parody, containing important commentary and criticism of *Catcher* and its famous author. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994); *see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1268-69 (11th Cir. 2001) (work is a parody if its "aim is to comment upon or criticize a prior work by appropriating elements of the original in creating a new artistic, as opposed to scholarly or journalistic, work."). Moreover, there is no evidence whatsoever that publication of *60 Years* will have any effect on the market for *Catcher* or any authorized derivative works.

The Supreme Court has warned against issuing injunctions where there are issues of fair use. *See Campbell*, 510 U.S. at 578, n.10. If this Court ultimately determines that there is some appropriation of copyrightable elements from *Catcher*, it should not resort to the drastic remedy of a prior restraint. *Campbell* established a proposition long recognized by the courts and the commentators: there is a tension between the First Amendment and the so-called "automatic" requirement that an injunction issue when a *prima facie* showing of copyright infringement is made. The Court recognized that injunctions may be issued routinely in cases involving "simple piracy," but such cases are "worlds apart from any of those raising reasonable contentions of fair use," where "there may be a strong public interest in the publication of the secondary work [and] the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found." *Id.* (quoting Pierre N. Leval, *Commentary: Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1133 (1990)).

America's most famous and most controlling author wants this Court to ban a book. But the book on its face is a transformative commentary and criticism, a fair use of minimal elements from *Catcher*. The public should not be denied the opportunity to read and think about *60 Years* and to consider what this new work has to say about Salinger, Holden and *Catcher*.

## STATEMENT OF FACTS

**Plaintiff Salinger and His Book**

Salinger is nearly as famous for his reclusive persona as he is for being the author of *Catcher,* his most popular work. Salinger published *Catcher* in 1951. It became an instant success, remaining on *The New York Times* best-sellers list for over seven months. *See* Declaration of Edward H. Rosenthal dated June 15, 2009 ("Rosenthal Decl.") Ex. E at E-2.[2] *Catcher* has permeated both American literature and popular culture. It is a perennial staple on high school reading lists. *Id.* It is referenced in dozens of literary works, including *The Collector* by John Fowles and *Less Than Zero* by Bret Easton Ellis. It has inspired countless movies, ranging from *The Graduate* (1967) to *Igby Goes Down* (2002). *Id.* at E-61. Its protagonist, Holden Caulfield, has become synonymous with adolescent alienation and rebellion and is a cultural icon as such. He is revered by each new generation as a hero of sorts who can identify "phoniness" at any turn, does not bend to the conventions of the day and has not "sold out" like the grown-ups around him.

Salinger himself is also an American icon. In the midst of *Catcher's* early success, Salinger moved to New Hampshire and withdrew from society. *Id.* at E-5. He published his last work in 1965. *Id.* In spite of (or perhaps because of) his reclusiveness, Salinger himself has become the focus of speculation about his personal life. Many biographic works, including by

---

[2] To date, the novel has sold over 35 million copies and continues to sell over 250,000 copies each year. Affidavit of Phyllis Westberg in Support of Plaintiff's Application for a Preliminary Injunction sworn to June 1, 2009 ("Westberg Aff.") ¶ 8; Rosenthal Decl., Ex. G at G-6.

his former lover Joyce Maynard and his daughter, Margaret Salinger, examine Salinger. Salinger has also appeared as a quasi-fictional character in works such as *Shoeless Joe*, the novel by W. P. Kinsella that inspired the film *Field of Dreams*. *Id.* at E-28.

Salinger has reportedly had difficulty drawing the distinction between himself and Holden Caulfield, speaking of Holden as an actual person and admitting that *Catcher* was autobiographical and that his boyhood "was very much the same as the boy in the book." *Id.*, Ex. F at 76, 177-78. Salinger also has exercised iron-clad control over his intellectual property, refusing to allow others to adapt his characters or stories in other media. He has come out of his seclusion only (and, again, famously) for a series of lawsuits intended to prevent use of his works. Westberg Aff., ¶¶ 15-19. Salinger's work, or lack thereof, has been subjected to frequent critical examination. Analyses of his self-imposed exile and rumors of as-yet unpublished manuscripts abound. Rosenthal Decl., Ex. E at E-31-58. Even in his silence, Salinger remains very much the focus of extraordinary public interest.

### *60 Years* is Critical Commentary on *Catcher* and Holden Caulfield in Fictional Form

*60 Years* is not a sequel. Colting Decl., ¶¶ 24-25. It does not pick up where *Catcher* left off, it does not represent the next adventure in the life of Holden Caulfield and it does not even take place in the same narrative world as *Catcher*. *Id.*, ¶ 24. It was not designed to satisfy any interest the public might have in learning what happened next to Holden Caulfield or the other characters in Salinger's book. *Id.*, ¶ 25. Rather, it is a critical examination of the character Holden Caulfield and the way he is portrayed in *Catcher*, the relationship between Salinger and his iconic creation, and the life of a particular author as he grows old but seems imprisoned by the literary character he created. *Id.*[3]

---

[3] Any edition of *60 Years* published in the United States will not use the word "sequel" and will include a prominent disclaimer describing it as "An Unauthorized Fictional Examination of the Relationship Between J.D. Salinger and His Most Famous Character." The word "unauthorized"

*60 Years* imagines the interaction between two narrator/protagonists: "Mr. Salinger," a bitter and angry reclusive author, and Mr. C, the fictional character he has created, who has become more famous than Salinger could ever have imagined. *Id.*, ¶¶ 11-12. As "Mr. Salinger" himself ages, he decides once and for all to rid himself of his character and to gain back his own unfinished individuality and the life that his character has taken from him. *Id.*, ¶ 12. At times, "Mr. Salinger" seems to be in complete control of the destiny of Mr. C and, at other times, the character seems to have taken on a life of his own. *Id.*, ¶ 15. Thus, the book examines Colting's thesis that Holden has become just as real as Salinger, and Salinger just as fictional as Holden. *Id.*, ¶ 17.

*60 Years* also exposes the flaws in Holden's character by showing how shallow he would be if he had remained the same person for all of his years. *Id.*, ¶ 8. Mr. C shows us that the qualities that appealed to so many in a sixteen-year-old boy are not so admirable in a 76-year-old man and, in fact, have prevented Mr. C from leading a happy life with healthy relationships with others. *Id.* In short, *60 Years* scrutinizes and criticizes the iconic stature of both Salinger and his most famous character by transforming the precocious and authentic Holden into a 76-year-old man fraught with indecision and insecurity. *Id.*, ¶ 9.

## *60 Years* Takes Minimal Material from *Catcher* and Only to Serve its Critical Purpose

Despite Salinger's strained efforts to paint Colting as some sort of literary pirate, Colting uses only as much of *Catcher* as he needs to make his points. *Id.*, ¶ 26. Apart from the book's dedication, there is no copying of any literal expression from *Catcher*, though a few of Holden's catchphrases, such as "phony" and "goddam," are used to make the connection between Mr. C

---

also will appear on the spine and the back cover will include a prominent statement making clear that the book has not been "approved, licensed or endorsed by J.D. Salinger." The book will not be marketed as a sequel. Declaration of Aaron Silverman dated June 12, 2009 ("Silverman Decl."), ¶ 3 & Ex. A.

and Holden. *Id.* Only three of the 80 or so characters from *Catcher* appear in *60 Years*. *Id.*, ¶ 28. Each of these characters is 60 years older and so, of course, has very little in common with the characters in *Catcher*. *Id.* Holden Caulfield's name is not used anywhere in the book. *Id.*

*60 Years* also adds about 25 characters that do not appear in *Catcher*. *Id.*, ¶ 31 & Ex. A. Even more importantly, the book includes Salinger himself as the narrator/puppet master of the Mr. C character. *Id.*, ¶ 32. Indeed, it is Salinger who is the most important character, directing all of the action, trying again and again to kill off his character. *Id.* In *60 Years*, Colting has used only what he needed to further his examination of the unique relationship between Salinger and his most famous character, to point out the flaws in that character, and to explore his critical themes. *Id.*, ¶ 33.

**Academic Experts Conclude that *60 Years* is Both Transformative and a Serious Commentary on *Catcher* and Holden Caulfield**

Robert Spoo, a tenured professor at the University of Tulsa, College of Law, where he teaches *Law and Literature* and *Copyright Law*, opines that *60 Years* is a "sustained commentary on and critique of *Catcher*, revisiting and analyzing the attitudes and assumptions of the teenaged Holden Caulfield. In this respect, *60 Years* is similar to a work of literary criticism." Declaration of Robert Spoo dated June 15, 2009 ("Spoo Decl.") ¶ 7.

Martha Woodmansee, Professor of English and Law at Case Western Reserve University, opines that *60 Years* is "a work of meta-commentary . . . . [that] pursues critical reflection on J.D. Salinger and his masterpiece [*Catcher*] just as do the articles that literary scholars conventionally write and publish in scholarly journals, but it casts its commentary in an innovative 'post-modern' form, specifically, that of a novel." Declaration of Martha Woodmansee dated June 14, 2009 ("Woodmansee Decl.") ¶ 9. In her opinion, *60 Years* "seeks

to change opinions about [*Catcher*], not just scholarly opinions, which have always been mixed, but the sentimental fetishizing of this novel by three generations of fans." *Id.*

**The Defendants Will Be Damaged If *60 Years* Is Enjoined**

If *60 Years* is enjoined, Colting's reputation as a serious writer will be tarnished. SCB's failure to deliver a book presented in its catalogue will harm its reputation with its customers. The substantial time and money Defendants have invested in the marketing and promotion of *60 Years*, including by featuring it prominently in their catalogs and at the London Book Fair, distributing advance copies to book sellers throughout the United States, retaining a public relations firm and purchasing advertising, will be lost. The timing of the publication in the U.S. was set to take advantage of the publicity surrounding its publication in London several weeks ago. If *60 Years* is enjoined the Defendants will lose the public interest and other momentum they have created. Colting Decl., ¶¶ 36-37; Silverman Decl., ¶¶ 5-7.

By contrast, Plaintiff's papers do not include any evidence that the market for *Catcher* or any authorized sequel will be damaged in any way.[4]

**ARGUMENT**

**I.**

**PLAINTIFF HAS NOT MET THE EXTRAORDINARY BURDEN
REQUIRED TO OBTAIN A PRELIMINARY INJUNCTION**

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). While injunctive relief may be appropriate in copyright cases involving simple copying or "piracy," the Supreme Court has cautioned that such relief may not be appropriate where the alleged infringer

---

[4] There is no declaration at all from Salinger, including with respect to any alleged harm, only a hearsay statement that he authorized this lawsuit. Westberg Aff., ¶ 7.

has a colorable fair-use defense. *Campbell*, 510 U.S. at 578 n.10; *see also New York Times v. Tasini*, 533 U.S. 483, 505 (2001) (Justice Ginsburg cautioning that injunction was not the best remedy for an infringement); *see also* Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 DUKE L. J. 147 (1998).

A party seeking a preliminary injunction must demonstrate (1) irreparable harm, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Lennon v. Premise Media*, 556 F. Supp. 2d 310, 318 (S.D.N.Y. 2008). There is no longer a presumption of irreparable harm in copyright infringement actions. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006) ("This Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."); *Lennon*, 556 F. Supp. 2d at 320, n.1.

## II.

### SALINGER HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

On this motion, Salinger bears the burden of establishing a *prima facie* case of copyright infringement (the same burden he would have at trial). *Lennon*, 556 F. Supp. 2d at 320.

### A.    Salinger Is Unlikely to Succeed on His Claims for Copyright Infringement

Salinger claims that *60 Years* infringes the copyright in both his character, Holden Caulfield, and in *Catcher* as a whole. In order to establish those claims, Salinger must prove: (1) ownership of a valid copyright; and (2) copying of copyrightable elements. *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996). Salinger has not sustained his burden and the injunction motion must be denied.

1.   **Salinger Has Not Demonstrated a Likelihood of Success on His Claim for Infringement of the Holden Character**

In asking this Court for the extraordinary relief of banning a book in a preliminary procedure, Plaintiff bears a huge responsibility to set forth all of the substantive issues raised by his request.  Here, the most fundamental issue raised by Plaintiff's claim for infringement of the Holden Caulfield character is whether "the character *as originally conceived* and presented is sufficiently developed to command copyright protection . . . ." *Warner Bros. v. Am. Broad. Co.*, 530 F. Supp. 1187, 1190 (S.D.N.Y. 1982) ("*Warner Bros. II*") (emphasis added).  Assuming Plaintiff can overcome this threshold issue, he then must prove that the Mr. C character in *60 Years* "cop[ies] such development and not merely a broader and more abstract outline." *See id.* As set forth below, Holden – as a free-standing character – is not protected by copyright and there is no substantial similarity between Mr. C and Holden.  Thus, Plaintiff's first claim of copyright infringement must fail.

(a)   **The Holden Character Standing Alone is Not Copyrightable**

While there is no doubt that copyright protection is available for characters from cartoons, films and other visual media, courts have been reluctant to grant such protection to literary characters. *See e.g., Silverman v. CBS Inc.*, 632 F. Supp. 1344, 1354 (S.D.N.Y. 1986) (noting that "[c]artoons, and other graphic representations of characters, have been afforded greater copyright protection than characters described only by words"); *Warner Bros. II*, 530 F. Supp. at 1190 ("[a]s he is displayed in pictures in comic books, and by actors in the television and movie works, Superman is more readily protectible than he would be had he been merely a word portrait"); *Ideal Toy Corp. v. Kenner Products*, 443 F. Supp. 291, 301 (S.D.N.Y. 1977) ("a character is most readily protectible where both the original work and the copied work consist of cartoons or other graphic representations rather than 'word portraits'").  Indeed, nearly all of the

cases Plaintiff cites address copyright protection for cartoon and comic strip characters, not literary characters.[5]

No court in the Second Circuit has held that a literary character that appears in only one work is entitled to the monopoly power of a copyright.[6] Courts have only found that characters appearing in multiple works have developed enough descriptive and unique characteristics to be copyrightable. *See Warner Bros. III*, 720 F.2d at 235; *New Line Cinema Corp. v. Bertlesman Music Group, Inc.*, 693 F. Supp. 1517, 1521 n.5 (S.D.N.Y. 1988); *Warner Bros. II*, 530 F. Supp. at 1190; *Filmvideo Releasing Corp. v. Hastings*, 509 F. Supp. 60, 62 (S.D.N.Y. 1981), *rev'd in part on other grds.*, 668 F.2d 91 (2d Cir. 1981).

Here, Plaintiff admits that there are no graphic depictions of Holden. Pl. Br. at 7-8. Also, his argument that Holden has appeared in multiple works is of no moment.[7] Moreover,

---

[5] *See, e.g., Warner Bros. Inc. v. Am. Broad. Co.*, 720 F.2d 231, 240 (2d Cir. 1983) ("*Warner Bros. III*") (Superman, "the hero of comic books, television, and more recently films"); *D.C. Comics, Inc. v. Leo Reel Fantasy, Inc.*, 696 F.2d 24, 25 (2d Cir. 1982) (comic strip character Batman); *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 754-55 (9th Cir. 1978) (Mickey Mouse and other Disney cartoon characters); *Detective Comics v. Bruns Publs.*, 111 F.2d 432, 433 (2d Cir. 1940) ("pictorial representations and verbal descriptions" of Superman); *King Features Syndicate v. Fleischer*, 299 F. 533, 535 (2d Cir. 1924) (cartoon horse in syndicated comic strip); *United Feature Syndicate v. Koons*, 817 F. Supp. 370, (S.D.N.Y. 1993) (Odie character in Garfield comic strip); *Detective Comics, Inc. v. Fox Publs., Inc.*, 46 F. Supp. 872, 873 (S.D.N.Y. 1942) (drawings and cartoons of Batman and Robin); *Hill v. Whalen & Martell, Inc.*, 220 F. 359 (S.D.N.Y. 1914) (Mutt and Jeff cartoons).

[6] Plaintiff cites one case from the Western District of Washington finding a seagull character in the book *Jonathan Livingston Seagull* was protected by copyright. *See Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1127, 1134-35 (W.D. Wash. 2007). However, that court took into account that the "expression" of the character included a visual rendering in the novel and that "the name of the character and the title of the book [were] the same." *Id.* at 1135.

[7] The 1946 story Holden first allegedly appeared in, "Slight Rebellion Off Madison," was less than five pages long, featured a "Holden Morrisey Caulfield" and was clearly later incorporated wholesale into *Catcher*. That Holden also appeared in a story in Collier's magazine in 1945 (which makes no sense as Plaintiff also alleges Holden first appeared in a story in 1946) cannot be tested by Defendants or this Court, since Plaintiff did not submit this story as evidence in support of his motion. The assertion that Holden's family members (not Holden) also appeared in several short stories (two of which are unpublished) is completely irrelevant to this inquiry.

although Plaintiff claims that Holden is "one of the most recognized characters in American literature," that status has been achieved in the nearly 60 years since *Catcher* was published. Here, the Court must consider whether "the character *as originally conceived and presented* [was] sufficiently developed to command copyright protection." *Warner Bros. II*, 530 F.Supp. at 1190 (emphasis added).

As he appears in the pages of *Catcher*, Holden is simply not sufficiently delineated to warrant separate copyright protection. That he is "a precocious 16-year old boy struggling to find his way in the world and an angst-filled cynic" is not enough to set Holden apart from dozens of other literary characters. Pl. Br. at 5. That his character "speaks with a good deal of slang, and constantly criticizes people and things for being 'phony,' labels things 'crumby', and notes things that are or people who 'kill me'" can hardly be deemed such descriptive and unique characteristics to delineate Holden and entitle him to a copyright separate and apart from the text in which he appears. *Id.* In sum, the Holden character is a type – not a fully delineated character deserving of separate protection.[8] Were courts to grant the sort of protection to literary characters that Plaintiff seeks for Holden Caulfield, fiction would be frozen in time.

**(b) Mr. C Is Not Substantially Similar to Protectable Aspects of Holden**

Even if the Holden character were worthy of copyright protection separate and apart from his depiction in *Catcher*, Salinger still must demonstrate that the "alleged infringer [copied] such development and not merely a broader and more abstract outline," something that he cannot do. 1 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 12.2 n.12. In the few cases where a court has analyzed the copyright infringement of literary characters (as opposed to

---

[8] Holden is emblematic of the character type of a disaffected youth, railing against authority, parents, those who have sold out and "phoniness." But, Sophocles's Antigone reflected all those character traits, and authors throughout time have created innumerable expressions of this type.

infringement of the work in which the character appeared), there is little guidance as to how substantial similarity should be assessed. *See Filmvideo Releasing Corp.*, 509 F. Supp. at 64-65. In evaluating whether a *cartoon* character is substantially similar to one protected by copyright, courts have compared "not only the visual resemblance but also the totality of the characters' attributes and traits." *Warner Bros. III*, 720 F.2d at 240. In situations where courts have compared literary characters – in the context of determining whether an entire literary work was substantially similar to another – factors such as the characters' motivations, skills and credentials, and their interpersonal relationships have been considered. *Brown v. Perdue*, No. 04 Civ. 7417, 2005 WL 1863673, at *11-12 (S.D.N.Y. Aug. 4, 2005). Using any of these tests, Plaintiff has not shown substantial similarity.[9]

Plaintiff claims that Mr. C has many of the same personality and physical attributes as Holden. *See* Holden Chart. However, Plaintiff's list of similarities includes such "attributes" as "Holden is 16 years old in Catcher," "Holden shies away from having sex with a woman" and "repeated references to grippe/flu." Even if any of these so-called "attributes" were specific enough to identify the character of Holden, which they are not, Mr. C's characteristics are markedly different. Unlike the 16-year-old Holden, Mr. C is an old man. Unlike Holden's aborted encounter with a prostitute named Sunny, Mr. C rejects the advances of a former student named Charlie. Unlike Holden, who refers to other people having the "grippe," Mr. C wonders whether he is getting the flu when "Mr. Salinger" first reanimates him.

---

[9] Plaintiff has prepared one chart listing "similarities" between Mr. C and Holden (the "Holden Chart") and another listing "similarities" between *60 Years* and *Catcher* (the "Catcher Chart"). *See* Paul Aff., Ex. C. However, charts such as these are considered to be "inherently subjective and unreliable, particularly where the list emphasizes random similarities scattered throughout the works." *Williams*, 84 F.3d at 590 (citation and internal quotation marks omitted). Here, Plaintiff's charts are plagued with so many overstatements and inaccuracies that they must be rejected outright. *See generally* Declaration of Cameron Myler dated June 15, 2009 ("Myler Decl.").

Furthermore, with the exception of certain common words, phrases, and mannerisms ("phony," "crumby," "I really don't"), the portrait of Mr. C in *60 Years* does not draw upon any particular speeches or thoughts of Holden in *Catcher*. *See* Spoo Decl., ¶ 8. In many instances, Mr. C's thoughts "embody a linguistically more sophisticated, mature sensibility than the adolescent Holden's—a sensibility that is distinctly literary." *Id.*

"Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement." *Warner Bros. III*, 720 F.2d at 242. There is no infringement here.

## 2. Salinger is Unlikely to Succeed on His Claim that *Catcher* Was Infringed

### (a) Salinger Impermissibly Seeks Protection for His Ideas Rather than Copyrightable Expression of Those Ideas

The mere fact that Plaintiff purports to own a copyright registration for *Catcher* does not mean that every single element of that work is protected by copyright. Protection only extends to the expression of the author's ideas, not to the ideas themselves. *See Warner Bros. v. Am. Broad. Co.,* 654 F.2d 204, 205 (2d Cir. 1981) ("*Warner Bros. I*"). "[I]t is axiomatic that a copyright does not protect its owner from the use by others of the ideas, themes, locale or characters in his copyrighted work." *Fuld v. National Broad. Co., Inc.*, 390 F. Supp. 877, 881 (S.D.N.Y. 1975).

Plaintiff's charts listing the purported similarities between *Catcher* and *60 Years* are fraught with inaccuracies, exaggerations, mischaracterizations and elements far too vague to be protected by copyright. *See* Myler Decl. For example, Plaintiff claims a monopoly on such ideas as the protagonist of his story "leaves home suddenly," "arrives in New York," "lies a lot," "complains a lot" and "encounters three young women." *See Catcher* Chart. Plaintiff also claims ownership of the references in any narrative that "ends in an institution," "refers to the

reader in the second person," uses "euphemisms for urination" and includes "repeated references to grippe/flu." *Id.*, Holden Chart. Plaintiff's rights in *Catcher* simply do not, and cannot, extend that far.

**(b)     There Is No Substantial Similarity Between *60 Years* and *Catcher***

This Court must determine whether the works here are "substantially similar," which requires the Court to conduct a "detailed examination of the works themselves." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir. 1986). Only protectable elements can be considered. *Williams*, 84 F.3d at 588.[10] Here, there is no substantial similarity between *60 Years* and the protectable elements of *Catcher*.

Characters:  A court should look at the "totality of the characters' attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in [plaintiff's work]." *Brown*, 2005 WL 1863673 at *11 (citation omitted). Plaintiff claims that *60 Years* has appropriated "a slew of . . . characters from *Catcher*, including Phoebe, Allie, D.B. and Stradlater." Pl. Br. at 19-20. However, Mr. C's fleeting and fragmentary memories of certain characters that appear in *Catcher* serve chiefly as departure points for the aging Mr. C's extended dreamlike thoughts and fantasies, which occur nowhere in *Catcher*. Spoo Decl., ¶ 6. Plaintiff also fails to mention that there are almost 80 characters in *Catcher* that do not appear in *60 Years* (*see* Myler Decl., Ex. A) and that there are about 25 new characters who appear only in *60 Years*, including Salinger himself "as the narrator/puppet master of the Mr. C character" (*see* Colting Decl., Ex. A).

---

[10] Under the doctrine of "comprehensive non-literal similarity," which Plaintiff claims applies here, the requirement of substantial similarity may be satisfied where defendants have "appropriated the fundamental essence or structure of [a] plaintiff's work." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992). Under such a test, *60 Years* is not substantially similar to *Catcher*.

Tone:  Plaintiff claims that *60 Years* "adopted the tone of *Catcher*, including its choice of words, its sentence structure, its voice and its use of digressions."  Pl. Br. at 20.  Plaintiff certainly cannot own such generalities.  In any event, "unlike *Catcher*, in which Holden Caulfield is the exclusive narrator, *60 Years* is a two-ply narrative in which the voice of Mr. C. alternates with the imagined thoughts of Salinger himself, thus creating a sort of duet between author and character."  Spoo Decl., ¶ 5.

Plot/Sequence of Events:  Plaintiff also asserts that *60 Years* copies the overall plot of *Catcher* "with Holden starting in an institution, leaving for New York, spending a few days wandering, and ending up happily with his sister at the Central Park carousel" and repeats "specific incidents from *Catcher*, ranging from major (going to the Museum of Natural History, going ice skating and almost sleeping with a woman) to the mundane (eating the same large breakfast)."  Pl. Br. at 20.

It has long been recognized that all fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots.  *Jones v. CBS*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990).  Plaintiff's description of *60 Years* not only abstracts its plot beyond recognition, but fails to point out that *60 Years* includes numerous events that clearly distinguish the book from *Catcher*.  *See* Colting Decl., ¶¶ 11-16.  Furthermore, contrary to Plaintiff's assertions, *60 Years* does *not* end with Mr. C and Phoebe at the carousel (*see 60 Years* at 268-77), Mr. C does *not* go ice skating (Phoebe only talks about skating, *see id.* at 264) and while Mr. C does go to the Museum of Natural History, Holden does not (*see Catcher* at 122).

Setting:  Plaintiff claims that nearly every move Holden makes in *Catcher* is protected by copyright: his journey by train from school in Pennsylvania to New York, where he goes to a play, visits bars and Central Park and ultimately ends up in a mental institution.  The setting of *60 Years* is vastly different: it begins with Mr. C in a nursing home near New York City, he

travels by bus to New York, takes several buses to New Hampshire to meet Mr. Salinger, takes a bus to Philadelphia to rescue his sister, returns to New York, runs through a field of rye and ends up somewhere "in the mountains" near California.

Thematic Expression: "[T]he essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976). Whereas *Catcher* is a portrait of frustrated adolescence, *60 Years* is a critical exploration of such themes as the relationship between Salinger and Holden. Colting Decl., ¶ 6; Spoo Decl., ¶ 4; Woodmansee Decl., ¶ 3, 8-9.

Taking all of these factors into account, there is no substantial similarity between *60 Years* and *Catcher*.

**B.     *60 Years* Is Entitled to a Fair Use Defense**

Even if *60 Years* uses copyrightable elements from *Catcher*, any such taking is protected fair use.

The ultimate goal of copyright is to encourage and promote the development of ideas and their expression, and "excessively broad protection would stifle, rather than advance, the objective." Leval, 103 HARV. L. REV. at 1109; *see also Campbell*, 510 U.S. at 577 (Fair use "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster").

**1.     *60 Years* Is a Parody that Directly Comments upon and Criticizes *Catcher* and its Author**

As an initial matter, this Court must determine whether *60 Years* is a "parody" or a "satire" in the legal sense of those words, as defined by the Supreme Court's decision in *Campbell* and its progeny. *See Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp.

2d 499, 504 (S.D.N.Y. 2009) (granting summary judgment for defendants, finding song "I Need

a Jew" was parody of song "When You Wish Upon a Star").

Both parodies and satires borrow elements from prior copyrighted works, be they

characters, musical notes, graphic images or something else. A parody comments, at least in

part, on that underlying work. *See Campbell*, 510 U.S. at 580 ("[T]he heart of any parodist's

claim to quote from existing material, is the use of some elements of a prior author's

composition to create a new one that, at least in part, comments on that author's works."); *see

also Suntrust Bank*, 268 F.3d at 1268-69 (finding *The Wind Done Gone*, a fictional work

admittedly based on *Gone with the Wind*, to be a parody). By contrast, a satire does not

comment on the underlying work, instead its comment or criticism is directed at other targets, or

society at large.[11]

A parody need not be funny, well-written, or even successful in its attempt to comment

upon or criticize the earlier work. *See, e.g., Campbell*, 510 U.S. at 582; *Suntrust Bank*, 268 F.3d

at 1268 ("[C]ourts should not judge the quality of the work or the success of the attempted

humor in discerning its parodic character . . . .").[12] Rather, if the Court can *reasonably perceive*

---

[11] *See Blanch v. Koons*, 467 F.3d 244, 247 (2d Cir. 2006) (work copying fashion photograph of woman's legs and juxtaposing it against background of other legs and confections commented on that type of fashion photography, not the photograph itself); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1401 (9th Cir. 1997) (book not parody of "The Cat in the Hat" because it simply retold the story of O.J. Simpson trial, rather than commenting on the well-known children's book itself).

[12] Whether a "parody is in good taste or bad does not and should not matter to fair use." *Campbell*, 510 U.S. at 582. As Justice Holmes explained, "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke." *Id.* at 582-83 (citing *Yankee Publ'g Inc. v. News Am. Publ'g, Inc.*, 809 F. Supp. 267, 280 (S.D.N.Y. 1992) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed")).

a comment on the underlying work, the second work is considered a parody. *Campbell,* 510 U.S. at 582 (emphasis added); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998); *Bourne*, 602 F. Supp. at 506. Recently, in *Bourne*, this Court found that a song from an episode of *Family Guy* entitled "I Need a Jew" was a parody of the famous song "When You Wish upon a Star" from the Disney classic, *Pinocchio*. 602 F. Supp. 2d at 506-07. The defendants' song, which was purposely filled with ignorant stereotypes of Jewish people, could reasonably be perceived as commenting on both the "warm and fuzzy" world view reflected in "When You Wish Upon a Star," and on the man Walt Disney himself, an alleged anti-Semite. *Id.* at 505-07.

Here, *60 Years* comments directly on (and criticizes) *Catcher* and its author, and is thus a parody rather than a satire. In Colting's own words, his purpose in writing *60 Years* was at least twofold, to: "critically examin[e] the character Holden, and his presentation in *Catcher* as an authentic and admirable (maybe even heroic) figure;" and "explore the relationship between J.D. Salinger, the famously reclusive author, and Holden Caulfield, his brash and ageless fictional creation." Colting Decl., ¶¶ 6, 18.[13]

For over half a century, readers around the world have admired and idolized Holden Caulfield as the epitome of free-thinking, authentic and untainted youth. Holden is true to himself no matter what, and an impeccable judge of the people around him. Aged 60 years, Mr. C shows the effects of Holden's uncompromising world view. He is "miserable [and] unconnected" and although he "has some of the same attributes and, at times, responds to people and circumstances in a similar way as Holden did in *Catcher*," those attributes now seem

---

[13] The Second Circuit gives "weight to an artist's own explanation of their creative rationale when conducting fair use analysis . . . ." *Bourne*, 602 F. Supp. 2d at 507-08 (citing *Blanch*, 467 F.3d at 255).

"absurd[]" and "ridiculous." *Id.*, ¶¶ 18, 21.[14] Colting shows us that the "qualities that appealed

to so many in a sixteen-year-old boy are not so admirable in a 76-year-old man and, in fact, have

prevented Mr. C from leading a happy life with healthy relationships .... [T]he very qualities

that made this iconic character dear to so many readers have worked against him and betrayed

him in the end, making him lead a lonely and miserable life." *Id.*, ¶ 8.

     The book also critically explores the relationship between Salinger and his beloved

character, Holden.[15] Colting is fascinated by the widely-reported fact that, after creating Holden,

Salinger never published another work and essentially became a recluse, while at the same time

exercising "iron-clad control over his intellectual property, refusing to allow others to adapt any

of his characters or stories in other media." *Id.*, ¶ 7. Colting uses this as a jumping-off point,

imagining a world where "Mr. Salinger," a character Colting has created, begins to hate Holden

because Holden's fame has essentially driven Salinger into seclusion and hamstrung his ability to

write anything new. *Id.*, ¶ 12. Sixty years after the publication of *Catcher*, "Mr. Salinger"

decides to reanimate Holden as Mr. C, "in order to kill him off and gain back his own unfinished

individuality and the life that his character has taken from him." *Id.* Colting thus:

---

[14] For example, Colting questions how good Holden really is at figuring out the true nature of those around him. In *Catcher*, Holden's closest relationship is with Phoebe, whom he "endows with wisdom beyond her years." Colting Decl., ¶ 19. In *60 Years*, by contrast, Phoebe is suffering from Alzheimer's and lives completely in the past. Absurdly, Mr. C "responds to her in the same way that he did when she was ten - he plays along with her delusion and pretends that they are still kids." By "reducing Holden's elevated relationship with Phoebe [in *Catcher*] to the ridiculous and desperate attempt of an old man to connect with someone who essentially is not there" the author questions Holden's judgments about Phoebe in the first place. After all, "she was just a ten-year-old kid, not a sage prophet, and perhaps Holden should not be admired for being so perceptive if he could not see that truth in front of him." Colting Decl., ¶ 21.

[15] Just as the parody in *Bourne* extended beyond the underlying work itself to Walt Disney, the actual person who was the creative force behind that work, so the parody in this case extends to comment and criticism of Salinger himself. *See Bourne*, 602 F. Supp. 2d at 507 (part of defendants' comment was that Walt Disney himself was anti-Semitic).

19

examines the thesis that Holden Caulfield has become just as real as Salinger, and Salinger just as fictional as Holden. Because he has ventured out into public so little, Salinger is simply a fictive character living in our minds. *60 Years* is a dance between these two dimensions, the HERE that we perceive as reality (in which "Mr. Salinger" lives), and the THERE that we perceive as a made up world contained inside the covers of a book (where Holden Caulfield resides). With *60 Years*, I have taken on the task to seek out the real meaning of these "realities."

*Id.*, ¶ 17.

Although they each have a slightly different take on it, the experts here agree that *60 Years* is a parodic commentary on *Catcher*. For example, Dr. Spoo theorizes that "[w]hereas *Catcher* is a portrait of frustrated adolescence, *60 Years* is a portrait of anguished old age—a portrait that in various ways comments on and critiques the earlier picture of troubled youth." Spoo Decl., ¶ 4. He concludes that:

> *60 Years* contains a pervasive and profound criticism and commentary upon *Catcher*. It accomplishes this through its presentation of the changes Mr. C has experienced in the sixty years since he left Pencey Prep, as well in its experimental language, structure, and narrative style. Its richness and complexity are such that I can see *60 Years* being taught at the college and university levels in courses on Contemporary American Literature, Metafiction, or Literary Criticism.

*Id.*, ¶ 11. Dr. Woodmansee also concludes that *60 Years* is a "scathing parodic critique of the protagonist of [*Catcher*]." Woodmansee Decl., ¶ 8. *60 Years*, in her estimation, is "a devastating critique of Holden Caulfield in particular, of [*Catcher*] more generally, and of its author J.D. Salinger, whose apparent inability to 'develop' his hero reveals him to be 'burned out.'" *Id.*, ¶ 13. In sum, there is no doubt that *60 Years* comments heavily on both *Catcher* and its author, and is a parody in the legal sense of that word.

### 2. Applying the Four Factor Analysis to the Parody

#### (a) The Purpose and Character of the Use

Because *60 Years* clearly comments on *Catcher* and its author, the Court's only task with respect to the first statutory factor is to determine whether *60 Years* "adds something new to the

original . . . and qualifies as transformative." *Bourne*, 602 F. Supp. 2d at 509-10 (citing *Leibovitz*, 137 F.3d at 114). Here, there is no question that *60 Years* is transformative.

As set out at length in the declarations of the author, Colting, and the experts, Dr. Spoo and Dr. Woodmansee, there are marked differences between *60 Years* and *Catcher*. Colting Decl., ¶¶ 11-33; Spoo Decl., ¶¶ 4-9; Woodmansee Decl., ¶¶ 5, 11, 13. By way of example, *60 Years* transforms or adds many new elements, in terms of plot, setting (Mr. C travels to Philadelphia and New Hampshire), characters (Charlie, "Mr. Salinger" and more than 20 other characters appear only in *60 Years*), theme ("Mr. Salinger" and Mr. C confront such issues as their mortality and their loss of free will), narration style (*60 Years* intersperses the viewpoint of "Mr. Salinger" with that of "Mr. C") and many other factors. *See also* Point II(A)(1)(b), *supra*, noting the differences between the works. In sum, Colting's carefully selected use of certain elements from *Catcher* is transformative and *"adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."* *Campbell*, 510 U.S. at 579. This factor thus weighs strongly in favor of fair use.

**(b)     The Nature of the Copyrighted Work**

While *Catcher* is a work of fiction that falls within the "core of intended copyright's protective purposes," this factor is not helpful in a parody case. *Bourne*, 602 F. Supp. 2d at 509 (quoting *Campbell*, 510 U.S. at 586). Moreover, to the extent Salinger claims protection for use of the Holden character, any such protection is at most a thin one and should not lead to a finding for Salinger on this factor. See Section II(A)(1)(a), *supra*.

### (c)    The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

"The third factor asks whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal citations omitted).  A parody, of course,

> must be able to 'conjure up' at least enough of [the] original to make the object of its critical wit recognizable.  What makes for this recognition is quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know . . . .  [U]sing some characteristic features cannot be avoided.

*Id.* at 588.  As Colting has shown, he "thought very carefully about how to draw the connection between *Catcher* and [his] own work, and only took as much of *Catcher* as [he] needed to make [his] point."  Colton Decl., ¶¶ 26-33; *see also* Spoo Decl., ¶ 6 (discussing reasons for certain parallels between the works); Woodmansee Decl., ¶¶ 13-17 (same).  For example, the carousel scene that Plaintiff claims was slavishly copied from his book appears for a very specific purpose in *60 Years*, and is transformed in order to underscore Colting's theses.[16]  This factor also weighs heavily in favor of fair use.

### (d)    Effect of the Use upon the Potential Market for or Value of the Copyrighted Work

The final factor asks what impact the publication of *60 Years* would have on the market for *Catcher*.  This evidence is critical to a fair use determination, especially in cases involving parodies, "because parody and the original usually serve different market functions."  *Campbell*,

---

[16] While in *Catcher* the carousel scene serves as a way for Holden and Phoebe to reconcile, Colting has Mr. C take Phoebe back to the carousel as a way to highlight the superficiality of their relationship, and to deflate the notion that Holden is extraordinarily perceptive.  *See* Colting Decl., ¶ 21.  Dr. Spoo actually has a different interpretation of the carousel scene, explaining that it demonstrates the personal growth Mr. C has undergone.  *See* Spoo Decl., ¶ 6(c).  Dr. Woodmansee sees the carousel scene as a demonstration of Salinger's loss of control over his hero.  Woodmansee Decl., ¶ 13.  In any event, it serves an important purpose in *60 Years*, as does every other allusion to *Catcher*.

510 U.S. at 590; *Suntrust Bank*, 268 F.3d at 1275. And as the *Campbell* Court made clear, the only relevant harm is that of market substitution. *Campbell*, 510 U.S. at 570. The possibility that an effective criticism or parody might do some harm to interest in the original is simply not relevant to the analysis. *Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044, 1051 (2d Cir. 1993).

Plaintiff has not submitted any evidence that *60 Years* will usurp the market for *Catcher* or any authorized sequel. Nor does any such evidence exist, because no one is likely to buy *60 Years*, a critical analysis of *Catcher*, instead of *Catcher* itself. Indeed, according to Sara Nelson, the former editor of *Publisher's Weekly*, *60 Years* is likely to add interest in Salinger and his works, leading to an *increase* in Salinger's sales. Declaration of Sara Nelson dated June 15, 2009 ("Nelson Decl.") ¶ 7; *see also* Declaration of Lukas Ortiz dated June 15, 2009 ("Ortiz Decl.") ¶ 7. And regardless of the publication of *60 Years*, there would still be tremendous interest in a Salinger-authored sequel to his famous work or other exploitation. Nelson Decl., ¶ 8; Ortiz Decl., ¶ 7. Because there is no evidence that *60 Years* would serve as a "market substitute" for *Catcher*, the fourth factor tips conclusively in Defendants' favor.

In sum, Defendants will ultimately prevail on their affirmative defense of fair use, and Plaintiff's motion must be denied.

## III.

## SALINGER HAS FAILED TO DEMONSTRATE IRREPARABLE HARM

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that . . . applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983) (citation omitted). "A mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union*

*Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1995); *see also Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (injury must be neither remote nor speculative, but actual and imminent). Salinger has failed to make the requisite showing of irreparable harm, and his motion must be denied.

Salinger relies on the presumption that irreparable harm exists in copyright infringement cases. Pl. Br. at 29. But that ignores the Supreme Court's decision in *eBay, Inc v. MercExchange*, 547 U.S. 388 (2006), which held that a patent plaintiff who established infringement actually had to demonstrate irreparable harm to obtain an injunction. Courts in other jurisdictions have extended the *eBay* holding to copyright infringement cases. *See, e.g., Momento, Inc. v. Seccion Amarilla USA*, No. C 09-1223 SBA, 2009 WL 1363558, at *3 (N.D. Cal. May 14, 2009); *MGM v. Grokster*, 518 F. Supp. 2d 1197, 1213 (C.D. Cal. 2007); *Allora, LLC v. Brownstone,* Civ. No. 1:07CV87, 2007 WL 1246448, at *5 (W.D.N.C. Apr. 27, 2007).[17]

Without the presumption, Salinger's claim for injunctive relief fails, because while his lawyers theorize about the damages he will suffer (*see* Pl. Br. at 29), there is no evidence of actual and imminent injury in the record. Moreover, if it is found that *60 Years* appropriates some element of *Catcher* that is not justified by fair use, Salinger may seek monetary damages to compensate him for that loss. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 176 (2d Cir. 2001).

Finally, even if this Court does rely on a presumption of irreparable harm (or sufficient evidence of actual harm), it should still exercise its discretion to deny the preliminary injunction

---

[17] Although Plaintiff cites two Southern District cases for the proposition that the presumption of irreparable harm still stands post-*eBay*, those conclusions are dicta in light of the courts' findings in both cases that there was in fact irreparable harm. *See Warner Brothers Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 552 (S.D.N.Y. 2008) ("[T]here is still some question of whether the presumption of irreparable harm still applies"); *E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 519 (S.D.N.Y. 2008) (sufficient evidence to establish irreparable harm, regardless of the presumption).

as a matter of equity. *See, e.g., Lennon*, 556 F. Supp. 2d at 320 n.1 (citing *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)).

## IV.

## <u>THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS NOT SALINGER</u>

Finally, Plaintiff has failed to establish that the balance of hardships tips decidedly in his favor. *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 114 (2d Cir. 2006). In fact, the equities decidedly favor Defendants. The Second Circuit has held that the "legitimate concern" that an injunction could put a bookseller out of business outweighs "potential hardship" from fear of harm to a publisher's goodwill in the absence of an injunction. *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d. Cir. 2002).

Absent an injunction, the only "hardships" alleged by Plaintiff are the speculative effects on a sequel that Salinger has said he would never authorize and his purported right not to publish or authorize derivative works. Pl. Br. at 29-30. By contrast, an injunction would result in enormous hardship to Defendants. Colting Decl., ¶¶ 36-39; Silverman Decl., ¶¶ 6-7. Any injunction would bring *60 Years* to a grinding halt. Defendants' carefully-orchestrated marketing efforts would be thwarted, and their investments irretrievably lost. Potential customers would be unable to purchase *60 Years*, and existing orders would go unfulfilled. And, of course, the public would be deprived of this important commentary on *Catcher* and its author. *See Suntrust*, 268 F.3d at 1276. The balancing of the equities favors Defendants, and Salinger's motion must be denied.

## CONCLUSION

For all of the foregoing reasons, the Court should deny Salinger's motion for a

preliminary injunction.

Dated: New York, New York
      June 15, 2009

                              Respectfully submitted,

                         FRANKFURT KURNIT KLEIN & SELZ, P.C.

                         By: _____
                               Edward H. Rosenthal (ER-8022)
                               Maura J. Wogan (MW-9589)
                               Jessie F. Beeber (JB-3129)
                               Cameron A. Myler (CM-7942)
                               Marisa Sarig (MS-3786)

                         488 Madison Avenue
                         New York, New York 10022
                         Tel.: (212) 980-0120
                         Fax: (212) 593-9175

                         *Attorneys for Defendants John Doe, writing under the name John David California, Windupbird Publishing Ltd., Nicotext A.B and ABP, Inc. d/b/a SCB Distributors, Inc.*