UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
J.D. SALINGER, individually, and as         :
TRUSTEE OF THE J.D. SALINGER              :
LITERARY TRUST,                                  :      09 Civ. 05095 (DAB)
                                                          :
                    Plaintiff,                          :
                                                          :
          -against-                                     :
                                                          :
JOHN DOE, writing under the name JOHN    :
DAVID CALIFORNIA; WINDUPBIRD          :
PUBLISHING LTD.; NICOTEXT A.B.; and      :
ABP, INC/ d/b/a SCB DISTRIBUTORS,         :
INC.,                                               :
                                                          :
                    Defendants.                       :
-------------------------------------------------------X

## APPENDIX OF UNREPORTED DECISIONS

| Case | Tab |
|------|-----|
| *Allora, LLC v. Brownstone,*<br>Civ. No. 1:07CV87, 2007 WL 1246448 (W.D.N.C. Apr. 27, 2007) | 1 |
| *Brown v. Perdue,*<br>No. 04 Civ. 7417, 2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005) | 2 |
| *Momento, Inc. v. Seccion Amarilla USA,*<br>No. C 09-1223 SBA, 2009 WL 1363558 (N.D. Cal. May 14, 2009) | 3 |

**1**



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1246448 (W.D.N.C.), 2007 Copr.L.Dec. P 29,373
**(Cite as: 2007 WL 1246448 (W.D.N.C.))**

Page 1

c

United States District Court, W.D. North Carolina,
Asheville Division.
ALLORA, LLC, Plaintiff,
v.
BROWNSTONE, INC.; James Walker; and Steve
Rosonina, Defendants.
Civil No. 1:07CV87.

April 27, 2007.

Mark W. Bakker, Frank S. Holleman, III, Troy A.
Tessier, Wallace K. Lightsey, Wyche, Burgess,
Freeman & Parham, Greenville, SC, for Plaintiff.

David R. Payne, Peter Upson Kanipe, Asheville, NC,
for Defendants.

### *MEMORANDUM AND ORDER*

LACY H. THORNBURG, United States District
Judge.

**\*1 THIS MATTER** is before the Court on motion of
Plaintiff Allora, LLC, for a preliminary injunction
seeking to enjoin Defendants Brownstone, Inc.,
James Walker, and Steve Rosonina from "reproduc-
ing, altering, publishing, advertising, selling, distrib-
uting, or otherwise using Allora's copyrighted archi-
tectural designs and directing the Defendants to cease
using such plans to continue the construction of
houses based on the designs."**Plaintiff's Memoran-
dum in Support of Motion for Preliminary Injunc-
tion, filed March 2, 2007, at 1.**

### I. FACTUAL BACKGROUND

Plaintiff Allora, LLC, is a South Carolina real estate
development and construction company which also
designs architectural works used for constructing and
marketing personal residence homes. *Id.* at 1. Plain-
tiff is also the owner of three specific copyrighted
architectural designs of residential homes, referred to
in this litigation as the Allora designs # 's 5005, 5011,
and 5019. *Id.* at 1-2.Plaintiff sells licenses of these
copyrighted designs to real estate developers, but
places certain geographic restrictions on a number of

these designs to preserve their unique quality and
marketability due to Plaintiff's own residential devel-
opment business. *Id.* at 2-3.Defendant Brownstone,
Inc., is a Georgia company engaged in the business of
real estate development and residential construction.
**Complaint, filed March 2, 2007, at 2.** Defendants
James Walker and Steve Rosonina are employees of
Defendant Brownstone and currently act as princi-
pals, officers, and directors of Brownstone, Inc.
**Plaintiff's Memorandum,** *supra,* **at 1-2.**

In March and May of 2006, Defendant Brownstone,
through Defendants Rosonina and Walker, purchased
licenses through Donald A. Gardner Architects-a
sister company to Plaintiff-to construct one home
from each of the three aforementioned copyrighted
architectural designs owned by Allora. **Defendants'
Response to Plaintiff's Motion for Preliminary
Injunction, filed March 22, 2007, at 1-5.**These three
particular designs-# 's 5005, 5011, and 5019-are geo-
graphically restricted for non-use in Asheville, North
Carolina, and particularly in the 28805 zip code,
among other localities. **Complaint,** *supra,* **at 4.** Ac-
cording to Plaintiff, Defendants were explicitly told
verbally and in writing that there were geographic
restrictions limiting where these designs could be
used, and that such restrictions were conspicuously
placed on the website where Defendants first discov-
ered the designs as well as on a label which sealed
the cardboard tubing used to house and deliver the
designs to Defendants. *Id.* at 5. Plaintiff also contends
Defendants understood the geographic restrictions on
the designs but assured the receptionist at Donald
Gardner Architects that the designs would be used on
residences located to the southeast of Atlanta, Geor-
gia. *Id.*

Defendants, however, began construction of a resi-
dential house based upon the Allora design plan #
5011 within the 28805 zip code of Asheville, North
Carolina, in June 2006. **Defendants' Response,** *su-
pra,* **at 5.** Defendants also began preliminary con-
struction of homes based upon the Allora designs # 's
5005 and 5019 within the 28805 zip code in Septem-
ber 2006. *Id.* In December 2006, Skip Brewer, an
employee of Allora, learned of Defendants' construc-
tion projects using the Allora plans against the terms
of their restrictions, and visited the construction site

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1246448 (W.D.N.C.), 2007 Copr.L.Dec. P 29,373
(Cite as: 2007 WL 1246448 (W.D.N.C.))

Page 2

to confirm his suspicions. **Plaintiff's Memorandum, *supra*, at 2-4; Affidavit of Skip Brewer, *attached to* Plaintiff's Memorandum, at 1-2.**Brewer spoke with Defendant Walker on site, who allegedly confirmed the use of the Allora designs within the 28805 zip code. **Plaintiff's Memorandum, *supra*, at 2-4; Brewer Affidavit, *supra*, at 2-3.**Brewer asserts he took pictures of the early stages of construction on these homes and advised Defendant Walker to cease construction. **Plaintiff's Memorandum, *supra*, at 2-4; Brewer Affidavit, *supra*.**

*2 Thereafter, Plaintiff sent a letter to Defendants detailing their violation of the geographic restrictions attached to the design plans licensed by Defendants, and requested they stop construction of these particular homes.*Id.* at 6. Plaintiff offered to allow Defendants to finish construction on the home based upon the # 5011 design plan despite the restrictions, as the construction for that home had already substantially begun, so long as Defendants destroyed or returned the design plans for # 's 5005 and 5019.*Id.* The letter also stated the licenses to the design plans # 's 5005 and 5019 were revoked, and that the offer to complete construction of the # 5011 residence would be revoked if Defendants did not respond by the end of January 2007. *Id.;Complaint, supra, at 5-6.*Defendants never responded to Plaintiff's letter, nor did they destroy or return the design plans # 's 5005 or 5019. **Complaint, *supra*, at 5-6.**Plaintiff then revoked Defendants' license to design plan # 5011. *Id.* Defendants, however, have continued construction of the homes based upon the Allora design plans, despite Plaintiff's request to stop construction and revocation of the licenses to use the copyrighted design plans, and the homes are now 95 percent, 60 percent, and 30 percent complete, respectively. **Plaintiff's Memorandum, *supra*, at 6; Affidavit of Steven Rosonina, at 6, *attached to* Defendants' Response, *supra*.**

In addition to the alleged infringement based upon the construction of these homes, Plaintiff contends that Defendants have "published, distributed, marketed, advertised, constructed, and sold" Plaintiff's copyrighted design plans by including Plaintiff's actual design plans in Defendants' real estate listings while deleting Plaintiff's copyright symbol on the plans. **Complaint, *supra*, at 6.** Defendants readily admit to the infringing action of placing Plaintiff's designs on its real estate listings, and upon receiving

notice of the infringing nature of their actions regarding the real estate listings, Defendants removed Plaintiff's design plans from the listings.

Because of Defendants' actions, Plaintiff has filed the present law suit for copyright infringement pursuant to 17 U.S.C. § 101*et seq.***Complaint, *supra*, at 6-7.**Plaintiff has also filed a motion for preliminary injunction asking the Court to enjoin Defendants from "reproducing, altering, publishing, advertising, selling, distributing, or otherwise using Allora's copyrighted architectural designs and directing the Defendants to cease using such plans to continue the construction of houses based on the designs" in further violation of copyright law. **Plaintiff's Memorandum, *supra*, at 1.** Defendants' have filed their collective answer to Plaintiff's complaint, and have responded to Plaintiff's motion for preliminary injunction, in which they claim Plaintiff has not satisfied the traditional burden placed upon parties seeking a preliminary injunction. **Defendants' Answer, filed March 27, 2007; Defendants' Response, *supra*, at 24.**This Court held a hearing on Plaintiff's motion for preliminary injunction on April 20, 2007, and heard argument from both parties. Accordingly, the matter is now ripe for the Court's ruling.

## II. STANDARD

*3 The decision to grant or deny interim injunctive relief is within the sound discretion of the district court. See *Hughes Network Sys. v. InterDigital Commc'ns Corp.,* 17 F.3d 691, 693 (4th Cir.1994)."Granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. The danger of a mistake in this setting is substantial." *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 284 (4th Cir.2002) (citations and internal quotations omitted). As such, a preliminary injunction is considered "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir.1992) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989))."Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends. Particularly is this so when preliminary re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1246448 (W.D.N.C.), 2007 Copr.L.Dec. P 29,373
**(Cite as: 2007 WL 1246448 (W.D.N.C.))**

Page 3

lief, on something less than a full record and full resolution of the facts, is granted." *Consolidation Coal Co. v. Disabled Miners of S.W. Va.,* 442 F.2d 1261, 1267 (4th Cir.1971); *see also Anheuser-Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 653 (8th Cir.1984)(**"Injunctions must be tailored narrowly to remedy the specific harm shown rather than to enjoin all possible breaches of the law."**).

The Court applies a four-part balancing test, known as "the hardship balancing test," to determine whether interim injunctive relief should issue. *Direx Israel, Ltd.,* 952 F.2d at 812. Under this balancing test, the Court must consider the following, known collectively as the *Blackwelder* factors: "(1) the likelihood of irreparable harm to the plaintiff if the injunction is denied, (2) the likelihood of harm to the defendant if the injunction is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest."[FN1] *East Tennessee Natural Gas Co. v. Sage,* 361 F.3d 808, 828 (4th Cir.2004) (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189,193-96 (4th Cir.1977)); *see also Willis v. Town of Marshall,* 426 F.3d 251, 267 (4th Cir.2005) (quoting *Direx Israel, Ltd.,* at 812); *Wetzel v. Edwards,* 635 F.2d 283, 287 (4th Cir.1980). Although no one factor is generally dispositive,[FN2] "[t]he irreparable harm to the plaintiff and the harm to the defendant are the two most important factors" for the Fourth Circuit's analysis under *Blackwelder. Direx Israel, Ltd.,* 952 F.2d at 812. As the Fourth Circuit has further explained:

> FN1. The Court is also guided by Fed.R.Civ.P. 65 which governs the procedural requirements attendant to the granting of injunctive relief. Fed.R.Civ.P. 65; *see also Maryland Dep't of Human Resources v. United States Dep't of Agriculture,* 976 F.2d 1462, 1483 (4th Cir.1992).

> FN2. A failure to show any risk of irreparable harm is sufficient grounds for denial of a motion for interim injunctive relief, as likelihood of success on the merits alone-without any showing of any risk of irreparable harm-is not sufficient to warrant the issuance of a preliminary injunction. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 196 (4th Cir.1977).

When deciding whether to grant a preliminary injunction, the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant. If the balance of the hardships tips decidedly in favor of the plaintiff, then typically it will be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. But if the balance of hardships is substantially equal as between the plaintiff and defendant, then the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success.

*4 *Scotts Co.,* 315 F.3d at 271(**internal quotations and citations omitted**). Thus, as a threshold matter, "[t]he plaintiff must make a 'clear showing of irreparable harm ..., *and the required irreparable harm must be neither remote nor speculative, but actual and imminent.*' " *Id.* at 283 (quoting *Direx Israel,* 952 F.2d at 812) (**emphasis added**). Only after a plaintiff's clear showing of irreparable harm should a court then conduct a balancing of hardships and, if necessary, consider the likelihood of success and the public interest in ruling on the preliminary injunction. When considering the harm to the parties flowing from the issuance or nonissuance of the requested preliminary injunction, the real issue for the Court's consideration is the level of harm resulting from the improper grant or denial of the petitioner's request. *Id.* at 284.

If the judge grants the preliminary injunction to a plaintiff who it later turns out is not entitled to any judicial relief-whose legal rights have not been violated-the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the injunction causes to the defendant while it is in effect. If the judge denies the preliminary injunction to a plaintiff who it later turns out is entitled to judicial relief, the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the denial of the preliminary injunction does to the plaintiff.

*Id.* at 284-85 (quoting *American Hosp. Supply Corp. v. Hospital Prods. Ltd.,* 780 F.2d 589, 593 (7th

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1246448 (W.D.N.C.), 2007 Copr.L.Dec. P 29,373
**(Cite as: 2007 WL 1246448 (W.D.N.C.))**

Page 4

Cir.1986)). The Court focuses on the harm attendant to an improper grant or denial because there is no "harm," at least as that term is used in the realm of equity and equitable relief, where a party is restrained from doing that which it may properly be restrained from doing, or where the court refuses to restrain a party from doing that which it may properly do.

## III. ANALYSIS

### A. Defendants' Real Estate Advertisements

First, the undersigned notes that the parties and the Court agree that Defendants' use of Plaintiff's copyrighted materials in the content of their real estate listings or advertisements infringes upon Plaintiff's copyrights in the design plans. Although Defendants have removed Plaintiff's copyrighted designs from their advertisements, Defendants conceded at the April 20, 2007, hearing to an injunction which prohibits Defendants from further "reproducing, altering, publishing, advertising, selling, distributing, or otherwise using Allora's copyrighted architectural designs" in any manner not associated with the construction of the three disputed house projects. **Plaintiff's Memorandum, supra, at 1.** Accordingly, this Court will grant Plaintiff's motion for preliminary injunction and Defendants will be enjoined from using Plaintiff's copyrighted materials in the content of their real estate listings or advertisements or in ways not related to the completion of construction. **Plaintiff's Memorandum, supra, at 1.**

### B. Defendants' Construction of Houses

*5 At the outset, there is a dispute between the parties as to the applicable burden of proof associated with preliminary injunctions in copyright infringement law suits. Plaintiff asserts that "[i]n deciding motions for preliminary injunctions in the context of copyright law, the burden of proof that the plaintiff is required to meet is lower than in other situations."*Id.* at 13.In support of this argument, Plaintiff notes "[u]nder Fourth Circuit precedent, if a plaintiff establishes a prima facie case of copyright infringement, a court is 'entitled to presume that ... [the plaintiff] could show both probable likelihood of success on the merits and irreparable harm.' " *Id.* at 13-14 (citing *Nat'l Med. Care, Inc. v. Julian L. Espiritu, MD,* 284 F.Supp.2d 424, 431 (S.D.W.Va.1996)) (internal citation omit-

ted). Although Plaintiff stated during oral argument that the decision to presume irreparable harm and likelihood of success following a prima facie case of copyright infringement remains within the Court's discretion, Plaintiff argues Fourth Circuit precedent encourages-and virtually requires-this Court to exercise its discretion and presume these two factors in granting a preliminary injunction for Plaintiff.

In 2006 the United States Supreme Court clarified the confusion over the burden associated with preliminary injunctions in copyright actions by stating,

the Copyright Act provides that courts "may" grant injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."17 U.S.C. § 502(a). And as in our decision today, *this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.*

*eBay Inc. v. MercExchange, LLC,* --- U.S. ----, 126 S.Ct. 1837, 1840 (2006) **(emphasis added).** Although this statement could be considered dicta, it reflects a line of thought expressed by a unanimous Supreme Court which should be given greater weight than Plaintiff's citation of older Fourth Circuit precedent. Furthermore, the Fourth Circuit has since addressed the Supreme Court's opinion in eBay, albeit in a more limited fashion, by recognizing that the eBay Court held "any relief granted in equity is at the discretion of the district court, and a petitioner cannot claim that it was *entitled* to injunctive relief."*Christopher Phelps & Assoc., LLC v. Galloway,* 477 F.3d 128,143 (4th Cir.2007).

However, while it is clear that a plaintiff's showing of a prima facie case of copyright infringement will not automatically entitle a plaintiff to a preliminary injunction, what remains a question in the wake of *eBay* is whether, as Plaintiff suggests, this Court *should* presume irreparable harm and likelihood of success on the merits upon a showing of a prima facie case of copyright infringement by a plaintiff. Until this issue is clarified by the Fourth Circuit or the Supreme Court, this Court will not *presume* irreparable harm and likelihood of success on the merits following a prima facie showing of copyright infringement, but will instead treat copyright cases in the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

same manner as any other civil action requesting a preliminary injunction. That is, Plaintiff must satisfy the traditional test set forth in *Blackwelder* and its progeny to succeed on a motion for preliminary injunction.

*6 The first step in evaluating Plaintiff's motion for preliminary injunction under *Blackwelder* is to determine whether Plaintiff will suffer irreparable harm without an injunction. *Scotts Co.*, 315 F.3d at 271. As stated above, "[t]he plaintiff must make a 'clear showing of irreparable harm ..., and the required irreparable harm must be neither remote nor speculative, but actual and imminent.' " *Id.* at 283 (quoting *Direx Israel, 952 F.2d at 812).* Furthermore, "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network, supra,* at 694.However, where money damages are difficult to ascertain, or where the failure to grant the injunction results in potential permanent loss of customers and goodwill, courts have found the irreparable harm prong of *Blackwelder* to be satisfied. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551-52 (4th Cir.1994).

Plaintiff contends it has suffered and continues to suffer irreparable harm through Defendants' continued infringing use of its copyrighted design plans. **Plaintiff's Memorandum,** *supra,* **at 10.**Plaintiff claims that because "[c]opyrighted material is so unique ... its infringement cannot be fully compensated by monetary damages."*Id.* (citation omitted). However, Plaintiff fails to detail exactly how it is harmed by Defendants' continued construction of these three homes except to generally allege that its prima facie showing of copyright infringement is evidence of "irreparable harm *per se* " and entitles the Court to presume irreparable harm under *Blackwelder*-a notion which, as stated above, this Court rejects. *Id.* at 8, 10-11, 13-15.Plaintiff's only arguments regarding specific harms suffered as a result of Defendants' actions concern the use of Plaintiff's design plans in Defendants' advertisements-which Defendants concede infringed the copyright and have been remedied-and the potential loss of customers Plaintiff will experience if Defendants' homes are allowed to exist. *Id.* at 10-11.While ultimate proof of the latter argument may show a degree of harm to

Plaintiff, the undersigned is hard-pressed to characterize the existence of three homes as *irreparable* harm which monetary damages cannot sufficiently remedy. If Defendants were building an entire community of houses based upon these three designs to rival Plaintiff's proposed development in the 28805 zip code, Plaintiff's argument that Defendants' actions cause the designs to lose their unique quality and deprive Plaintiff of potential buyers would be much more feasible and immediate. However, Defendants are constructing three homes-one of each design purchased-and the undersigned simply cannot find, at this point in the litigation, that the existence of these three homes substantially and irreparably harms Plaintiff beyond a point that monetary damages cannot address.

*7 Even were the Court to consider Plaintiff's urged presumption of irreparable harm, it is not clear that Plaintiff has established a prima facie case of copyright infringement. While it is true that Plaintiff is the copyright owner of these disputed design plans, Plaintiff conceded at the hearing that Defendants legally purchased licenses to these copyrighted materials. Therefore, this law suit primarily revolves around a mere contractual dispute in the form of a license agreement that allegedly contained geographic restrictions on Defendants' licensed use of the copyrighted design plans. Plaintiff's attempt to establish a prima facie case of copyright infringement rests upon the Court's acceptance of certain factual contentions asserted by Plaintiff-namely, the existence of said restrictions attached to the copyright licenses and Defendants' notice of them-which, after considering the evidence on the record thus far, are unclear and remain questions of fact. Accordingly, the undersigned refuses to presume irreparable harm based upon Plaintiff's claimed showing of a prima facie case of copyright infringement, and further finds Plaintiff has not established a "clear showing of irreparable harm" which is "neither remote nor speculative, but actual and imminent" at this juncture. *Direct Israel, supra, 952 F.2d at 812.*

*Assuming arguendo* that the Court found Plaintiff has suffered irreparable harm resulting from Defendants' continued construction of these three homes, the Court would not find at this point in the litigation that Plaintiff is entitled to a preliminary injunction under *Blackwelder.*If the Court did not enter an injunction against Defendants' ability to complete construction

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1246448 (W.D.N.C.), 2007 Copr.L.Dec. P 29,373
**(Cite as: 2007 WL 1246448 (W.D.N.C.))**

Page 6

of these three homes, Plaintiff would suffer harm in the form of additional competition for similar houses based upon Plaintiff's design plans. Further, the uniqueness of Plaintiff's design plans would be somewhat diluted by having additional houses in an area where an entire community of these houses is intended to be constructed. However, as stated before, Defendants are only constructing three houses, which appears to lessen the extent of harm suffered by Plaintiff if no injunction is issued.

Defendants, on the other hand, are subject to much greater immediate harm than Plaintiff's very slight increase in competition and decrease in unique quality. Plaintiff's contention that Defendants' harm "consists only of the cessation of their infringement of Allora's copyrights" appears to be over-simplified. **Plaintiff's Memorandum,** *supra,* **at 11.**Were the Court to issue an injunction, Defendants would not be allowed to complete construction of these homes and thus would be prevented from selling these homes, which they contend would destroy their reputations with financial institutions and subcontractors whom Defendants are currently indebted. **Defendants' Response,** *supra,* **at 19-20.**Said another way, the granting of an injunction preventing the completion and sale of these homes could cause massive damage to Defendants' reputations and financial stability. Such harm is much more obvious and immediate than the harm detailed by Plaintiff. Accordingly, the Court finds that, had Plaintiff demonstrated irreparable harm, the balance of hardships required by the Fourth Circuit would undoubtedly tip in favor of Defendants and against granting an injunction.

*8 As an additional and final consideration, the undersigned notes the impact of Plaintiff's request for preliminary injunction on all parties not associated with this lawsuit. Were the Court to issue an injunction preventing Defendants from completing construction of these three homes, a number of subcontractors and laborers hired to work on these homes would be deprived of their means to make a living. Additionally, the neighborhood surrounding these homes would be left with the unpleasant site and potential hazards associated with incomplete construction projects for an undetermined and likely lengthy amount of time. Finally, it appears to the undersigned that stopping construction of three homes-which are said to be 95 percent, 60 percent, and 30 percent completed at this time-would be an utter waste of

resources which the Court does not wish to impose on this community.

In summation, the Court finds Plaintiff has failed to demonstrate a clear showing of irreparable harm suffered as the result of Defendants' continued construction of the three homes based upon Plaintiff's copyrighted design plans. Had Plaintiff succeeded in its attempt to demonstrate irreparable harm, the Court would nevertheless find Defendants would suffer greater harm with the injunction imposed than Plaintiff would suffer without an injunction. Additionally, the Court would have found the injunction to negatively effect the lives of numerous third parties as well as waste a number of resources. Accordingly, Plaintiff's motion for a preliminary injunction halting construction of Defendants' three homes based upon Plaintiff's design plans will be denied, and Defendants will be allowed to complete construction on the three houses currently being built.

### IV. ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's motion for preliminary injunction is **GRANTED IN PART and DENIED IN PART,** as reflected in the Preliminary Injunction filed contemporaneously herewith.

**IT IS FURTHER ORDERED** that, on or before 20 days from entry of this Memorandum and Order, the parties shall meet and confer as provided by Fed.R.Civ.P. 26(f) and file a proposed discovery plan within five days of such conference. *See also,* **Local Rule 16.1.**

W.D.N.C.,2007.
Allora, LLC v. Brownstone, Inc.
Not Reported in F.Supp.2d, 2007 WL 1246448 (W.D.N.C.), 2007 Copr.L.Dec. P 29,373

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1863673 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,248, 76 U.S.P.Q.2d 1012
**(Cite as: 2005 WL 1863673 (S.D.N.Y.))**

Page 1 

United States District Court,
S.D. New York.
Dan BROWN and Random House, Inc., Plaintiffs,
v.
Lewis PERDUE, Defendant.
Lewis PERDUE, Counterclaimant,
v.
Dan BROWN and Random House, Inc., Columbia
Pictures Industries, Inc., Sony Pictures Entertainment
Inc., Sony Pictures Releasing Corporation, Imagine
Films Entertainment, LLC, Counterclaim Defendants.
**No. 04 Civ. 7417(GBD).**

Aug. 4, 2005.

*MEMORANDUM OPINION AND ORDER*

<u>DANIELS</u>, J.

**\*1** Plaintiffs Dan Brown and Random House, Inc. bring suit seeking declaratory judgment that the book, *The Da Vinci Code,* does not infringe the copyrights defendant Lewis Perdue owns in his books, *Daughter of God* and *The Da Vinci Legacy.* Defendant asserted counterclaims alleging copyright infringement against plaintiffs and other counterclaim defendants.

Plaintiffs submitted a motion for judgment on the pleadings, or in the alternative, for summary judgment on their declaratory judgment claim. Defendant also moved for summary judgment on his counterclaims. The Court finds that there is no substantial similarity between Brown's book *The Da Vinci Code* and Lewis Perdue's books *Daughter of God* and *The Da Vinci Legacy.* Accordingly, defendant's motion for summary judgment is denied and plaintiffs' motion for summary judgment on their declaratory judgment claim is granted.

*BACKGROUND*

This is an action for copyright infringement under the Copyright Act of 1976, *as amended,* <u>17 U.S.C. §§ 101 et seq. (1994)</u>. Lewis Perdue claims that Dan Brown's novel, *The Da Vinci Code,* infringes upon copyrights

he owns in *Daughter of God* and *The Da Vinci Legacy.*<u>FN1</u> Brown, who initiated this lawsuit, seeks a declaratory judgment that his work does not infringe upon Perdue's. Perdue counterclaimed, and included as counterclaim-defendants various parties associated with production of the anticipated motion picture version of Brown's *The Da Vinci Code.* Along with his copyright infringement claim, Perdue alleges unjust enrichment, and seeks an accounting of all income deriving from *The Da Vinci Code,* as well as a permanent injunction barring the distribution of the book and the motion picture adaptation. He demands damages totaling $150 million.

> <u>FN1.</u> *The Da Vinci Code* was published by Doubleday, a division of defendant Random House, in March 2003. *The Da Vinci Legacy* was published in 1983 and *Daughter of God* was published in 2000.

The threshold issue for deciding whether *The Da Vinci Code* infringes on copyrights in *Daughter of God* and *The Da Vinci Legacy* involves a determination of whether the works are "substantially similar." This determination requires a "detailed examination of the works themselves." <u>*Walker v. Time Life Films, Inc.,* 784 F.2d 44, 49 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986)</u>.

A. The Da Vinci Code

*The Da Vinci Code*<u>FN2</u> begins with the murder of Jacques Sauniere, the curator of the Louvre Museum, by an albino monk seeking the Holy Grail. The monk is a member of Opus Dei, a devout Catholic sect headed by Bishop Aringarosa, but is acting at the direction of a mysterious and unknown figure known simply as the "Teacher." Before dying, Sauniere leaves behind a series of clues meant for his estranged granddaughter, including disrobing and placing himself, before his death, in the position of Da Vinci's Vitruvian Man and writing a note that read "P.S. Find Robert Langdon." Langdon, a Harvard professor of religious symbology, is summoned to the Louvre by Bezu Fache, captain of the French judicial police, under the guise of helping to solve the crime. Fache, however, suspects that Langdon is involved with the murder. Also present at the crime scene is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Sophie Neveu, a police cryptologist and granddaughter of the victim. Neveu recognizes that the inscription "P.S. Find Robert Langdon," is a message to her (P.S. stood for Princess Sophie). She warns Langdon that he is in danger and that he is suspected by the police of being the killer.

FN2. The synopsis of *The Da Vinci Code* from its book jacket is as follows:

While in Paris on business, Harvard symbologist Robert Langdon receives an urgent late-night phone call: the elderly curator of the Louvre has been murdered inside the museum. Near the body, police have found a baffling cipher. While working to solve the enigmatic riddle, Langdon is stunned to discover it leads to a trail of clues hidden in the works of Da Vinci-clues visible for all to see-yet ingeniously disguised by the painter.

Langdon joins forces with a gifted French cryptologist, Sophie Neveu, and learns the late curator was involved in the Priory of Sion-an actual secret society whose members included Sir Isaac Newton, Botticelli, Victor Hugo, and Da Vinci, among others.

In a breathless race through Paris, London, and beyond, Langdon and Neveu match wits with a faceless powerbroker who seems to anticipate their every move. Unless Langdon and Neveu can decipher the labyrinthine puzzle in time, the Priory's ancient secret-and an explosive historical truth-will be lost forever.

*The Da Vinci Code* heralds the arrival of a new breed of lightning-paced, intelligent thriller utterly unpredictable right up to its stunning conclusion.

**\*2** Langdon and Neveu fake an escape from the Louvre, buying them enough time to further dissect and unravel the clues and riddles Sauniere left behind. Using the Fibonacci numerical sequence, the couple determine that a poem left by Sauniere was an anagram of "Leonardo da Vinci! The Mona Lisa!" Neveu and Langdon follow Sauniere's clues to a key with a symbol of the Priory of Sion hidden in the frame of "Madonna of the Rocks," a painting by Leonardo da Vinci who himself served as a Grand Master of the Priory of Sion. Neveu and Langdon are led to the Paris branch of the Depository Bank of Zurich where they are presented with yet more riddles. Solving these riddles allows Neveu and Langdon to determine the account number for Sauniere's deposit box, where they discover a carved wooden box with a cryptex-a stone cylinder invented by Da Vinci to store objects safely, which can only be opened with a proper password.

The reader learns through Langdon, who serves as an intellectual catalyst and religious historian of the novel, that Sauniere was the Grand Master of a secret society named the Priory of Sion, an organization founded centuries ago and charged with keeping the secret of the Holy Grail. The secret of the Holy Grail is the secret of the divine feminine; that Mary Magdalene was married to Jesus and that they had offspring. Through the years, the Priory of Sion protected this information and guarded the fact that Jesus and Mary Magdalene's bloodline still survives through their descendants.

Although the police converge on the bank, Langdon and Neveu escape with the help of the bank president, who was an old friend of Sauniere. They seek refuge at the home of Sir Leigh Teabing, the wealthy Royal Historian and authority on the Holy Grail. Teabing, portly and ruby faced, suffers from polio and walks with the help of aluminum braces and crutches. Teabing provides a tutorial on the legend of the Grail, shares religious history, and offers evidence that Jesus and Mary Magdalene were married and had a child. He also shares with them clues in Da Vinci's artwork of Mary Magdalene's role in early Christianity.

Teabing's home, however, serves only as a temporary refuge, as both the albino monk and the French police track Langdon and Neveu to Teabing's estate. The monk attacks, demanding the cryptex, but with Teabing's help, the monk is subdued and Teabing, his servant Remy, Neveu and Langdon flee from his estate to the airport, where they board Teabing's private jet and head for London. During the flight, Langdon, Neveu and Teabing work together to determine the password that would unlock the cryptex. They believe that locked inside the cryptex is the location of the Holy Grail.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In London, Langdon, Neveu and Teabing search for clues to help them determine the password. The albino monk, through the help of Teabing's traitorous servant Remy, gets free, steals the cryptex from Langdon and Neveu and kidnaps Teabing. It is soon learned that Teabing is the "Teacher" and that he deceived Opus Dei into murdering Sauniere and the other Priory masters because he is obsessed with finding and releasing to the public the secret of the Holy Grail. Instead of killing Langdon and Neveu, Teabing implores Langdon to assist him in solving the password to open the cryptex. Langdon, having already determined the password and removed the contents of the cryptex, throws the cryptex in the air, presumably to destroy it. Teabing leaps to save it and falls to the ground as Fache and the police enter the room. Fache arrests Teabing, and Langdon reveals that he knew the password and saved the contents of the cryptex.

*3 The cryptex, in fact, did not contain a map, but rather another riddle that leads Langdon and Neveu to Rosslyn Chapel in Scotland, where Neveu is reunited with her grandmother and brother, whom she thought had died long ago in a car crash. She learns that she is a descendant of Jesus and Mary Magdalene. Neveu's grandmother, during a conversation with Langdon, reveals that the possibility of the existence of the documents and proof is far more important than their actual existence. Neveu invites Langdon to stay. Although he refuses, they make plans to meet again in the near future and the two share an intimate kiss. In a final epilogue, Langdon realizes that the documents and other objects concerning Mary Magdalene are safely hidden underground in an inverted pyramid at the Louvre.

B. Daughter of God

At the opening of *Daughter of God,*[FN3] two Americans, Zoe Ridgeway, an art assessor and broker, and her husband Seth Ridgeway, an ex-police officer turned professor of philosophy and comparative religion, are invited to Zurich by Willi Max, an elderly former Nazi. Faced with imminent death and suffocating guilt, Max wishes to return his vast collection of art, which he stole from Jews during World War II, to their rightful owners. He asks Zoe to assist him in this task.

FN3. The synopsis of *Daughter of God,* as revealed on its back cover, reads:

A FEMALE MESSIAH?

When Zoe Ridgeway, a prominent art broker, visits Switzerland with her husband Seth, she expects to purchase the rich estate of a secretive art collector. But before Zoe can complete the transaction, she and Seth are drawn into a thousand-year-old web of conspiracy, murder, and intrigue that begins and ends with the mystery of a female Messiah, a young girl whose existence, if proven, would explode the very foundation of Western culture.

After their meeting, Max sends to Zoe's hotel a document purportedly to be one of the many lost writings of Emperor Constantine's biographer, Eusebius. The document tells the story of a second Messiah named Sophia who lived in a small remote village during the fourth century A.D. Unbeknownst to Zoe, Max has also sent to her hotel a small painting by a German artist named Frederick Stahl which the reader later learns, is the key to finding evidence to prove her existence. Sophia was an illegitimate child born into a family of merchants and was raised in isolation until she was a teenager, when she began healing people with her touch. When the reports of her existence and the miracles she performed reached Rome, the Church, fearful of her growing following, brought Sophia and all the members of her village to Byzantium and interviewed them. After the interviews, the Romans killed them all, including the scribe responsible for recording the interviews. The Church wrapped all the victims in shrouds and buried them in a mass tomb in a cave. A week later, when the Romans went to inspect the tomb, one of the shrouds was empty, but contained the image of a fifteen year old girl, Sophia. Centuries later, Hitler gained possession of the sacred shroud, the Passion of Sophia (the story of her life), and other documents that explained her divinity. Hitler used these materials to bribe the Vatican into silence regarding Nazi atrocities. Hitler then hid all the materials in Austrian salt mines.

The story returns to the present day, where a few powerful groups are found vying for possession of the Sophia materials. The reader learns that KGB

officials and the Russian mafia, believing that Willi Max has possession of materials that can lead to the Sophia materials, steal Max's art, kill Max, burn down his house, and kidnap Zoe. The Russians believe that the Sophia materials can help them gain more power and wish to use the materials to blackmail the Russian Orthodox Church. Another group, led by Cardinal Neils Braun, a former archbishop of Vienna and the head of a secretive, powerful Vatican intelligence force called the Congregation for the Doctrine of the Faith ("CDF"), also seeks possession of the Shroud. He intends to use the materials to become the next pope. Cardinal Braun tells an unnamed American about the second Messiah, and asks for the American's assistance in securing the shroud and related documents.

**\*4** The story then flashes back to Seth Ridgeway, who, unable to find his wife, retreats to California despondent over his wife's disappearance. Seth is seen barely working, drinking, and spending a lot of time on his boat. He is visited by an unknown woman who reveals that the Stahl painting Max had sent to their Zurich hotel before Zoe's kidnaping may help to explain his wife's disappearance and lead him to her location. Suddenly, the boat is attacked and destroyed by unidentified gunmen. Seth escapes and finds help from George Stratten, an officer of the United States National Security Agency. Seth realizes that the painting may be in his unopened mail at UCLA. He slips away from the NSA agents assigned to watch him, retrieves the painting and leaves for Europe in search of his wife.

Meanwhile, in Europe, Zoe is held captive by the Russians in a warehouse. Over a period of a few months, she is interrogated about the painting and forced to help the Russians value their stolen art. Also held captive is a fellow art connoisseur who teaches her about the history of the "Great Goddess," and the presence of divine feminine elements in the world's religions and art. It is through their conversations that the history of the divine feminine is shared. Zoe manages to escape from the Russians and is met by the NSA's Stratton who brings her to a Zurich hotel. Seth, meanwhile, arrives in Europe and while traveling through Amsterdam and Zurich, engages in multiple gunfights with unknown assailants, at least some of them Russian. He manages to arrive at the same hotel where Zoe is staying, and they are reunited.

Together, Zoe and Seth bring the Stahl painting to a Zurich bank where bank officials use turpentine to remove the paint, revealing a gold ingot with Herman Goering's account number and safe deposit key. In Goering's safe deposit box are documents leading to the Sophia materials and instructions on how to dismantle the many traps in the salt mine where the Sophia materials are located. After another gun battle, Seth, Zoe and Stratton go to the Austrian town of Alt Aussee, where they join forces with Father Hans Morgan, a priest active in the Nazi resistance who now serves as a Church reformer determined to reveal the truth concerning Sophia.

Zoe, Seth, Stratton, Morgan and others crawl through the mineshafts to the heavily fortified salt mine and find the shroud and the Passion of the Sophia in a jeweled box deep within the mine. Stratton, revealed as the unknown American who had promised to help Cardinal Braun recover the shroud, steals and escapes with the jeweled box. He brings it to Cardinal Braun, his true master, who intends to use it to blackmail the current Pope into stepping down and appointing him the successor. Just as Braun is preparing to head to Rome, Seth, Zoe and Morgen arrive at Braun's chalet and attack him. Father Morgan reveals to Braun that the Cardinal is his illegitimate son. Braun, caring only about the Shroud, dies after leaping into a fire to try and save it. In a role reversal, Zoe tells Seth that God has been good to them and that Seth should renew his lapsed faith. Prior to their ordeal, it was Seth who attempted to instill faith in Zoe. They learn that as a result of the fire at Braun's retreat, the entire structure burned except for portion of the floor in the shape of a woman where Sophia's shroud had last been.[FN4]

> FN4. Although Perdue also asserts infringement of his earlier novel, *The Da Vinci Legacy,* he offers no arguments in his moving papers in support of his claims. He argues that his "copyright infringement claims in this action are based primarily on *Daughter of God"* and that "Legacy is mentioned because Brown also plagiarized many elements of Legacy in writing *Da Vinci Code.* "Perdue's Memorandum of Law at 1. Indeed, despite his later pronouncement during oral argument that he did not seek to abandon this claim, after reading *The Da*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Vinci Legacy* and reviewing the parties' arguments, it is clear that any infringement claim based on *The Da Vinci Legacy* also fails to survive Brown's motion for summary judgment. *The Da Vinci Legacy* concerns the quest for missing pages from Leonardo da Vinci's notebooks that contain information necessary to build a charged particle beam weapon. The hero's efforts to locate the missing pages pit him against the corrupt Bremen Legation and the evil Elect Brothers, who seek to construct the weapon. A thorough review of *The Da Vinci Legacy*'s plot, themes, characters and other elements supports a finding of noninfringement. Accordingly, to the extent that defendant Perdue continues to assert a claim of infringement based on *The Da Vinci Legacy*, that claim is also dismissed.

### COPYRIGHT INFRINGEMENT

*5 Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d. Cir.1994).

In order to succeed on a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340,

361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In the absence of direct evidence, copying is proven by showing that (1) defendant had access to the copyrighted work, and (2) there is a substantial similarity of expression in the respective works. *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998).[FN5] Perdue's claims, therefore, turns upon a finding of substantial similarity between the two books. The test for "substantial similarity" is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Warner Bros. Inc. v. American Broadcasting Companies,* 654 F.2d 204, 208 (2d Cir.1981) (quoting *Ideal Toy v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir.1966)).[FN6] If the similarity concerns only noncopyrightable elements of a work, or no reasonable trier of fact could find the works substantially similar, summary judgment is appropriate. *Walker v. Time Life Films,* 784 F.2d 44, 48 (2d Cir.1986).

> FN5. For purposes of their summary judgment motion, plaintiff-counterclaim defendants have conceded they had access to Perdue's books.

> FN6. In support of his claims of substantial similarity, Perdue also submits declarations from John Gabriel Olsson, a specialist in forensic linguistics and Gary Goshgarian, a professor of English at Northeastern University. However, because substantial similarity is judged by the spontaneous response of the ordinary lay observer, expert analysis of the similarities between the two works is not determinative. *See Denker v. Uhry,* 820 F.Supp. 722, 729 (S.D.N.Y. Dec. 8, 1992)(finding expert testimony unnecessary to assess substantial similarity if the proffered testimony does not deal with evidence or material that might help gauge the response of the lay reader).

It is "a principle fundamental to copyright law" that "a copyright does not protect an idea, but only the expression of an idea." *Kregos v. Associated Press,* 3 F.3d 656, 662 (2d Cir.1993), *cert. denied,* 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994)."The distinction between an idea and its expression is an elusive one."*Id.* at 587-588.Judge Learned Hand, in *Nichols v. Universal Pictures Corp.,* 45 F.2d 119,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

121 (2d Cir.1930), provides the guiding principle:

Upon any work, ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise, the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

**\*6** *Id.* Furthermore, "the line [lies] somewhere between the author's idea and the precise form in which he wrote it down ... protection covers the 'pattern' of the work ... the sequence of events, and the development of the interplay of characters." *Hogan v. DC Comics,* 48 F.Supp.2d 298 (S.D.N.Y. Jan. 26, 1999)(citing Z. Chafee, *Reflections on the Law of Copyright,* 45 Colum.L.Rev. 503, 515 (1945)).

Similarly, *scenes a faire,* sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection. *Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir.1996)(quoting *Walker,* 784 F.2d at 50);*seealso Hoehling v. Universal City Studios, inc.,* 618 F.2d 972, 979 (2d Cir.1980)('incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are *scenes a faire* ). Furthermore, "thematic concepts ... which necessarily must follow from certain plot situations" are not entitled to copyright protection. *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.1976).

When a work contains both protectible and unprotectible elements, the Court can only inquire whether "the protectible elements, standing alone, are substantially similar." *Williams v. Crichton,* 84 F.3d at 588 (quoting *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir.1995). Any dissimilarity between the works will not automatically relieve the infringer of liability as "no copier may defend an act of plagiarism by pointing out how much of the copy he has not pirated." *Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). The alleged infringer will be found innocent of infringement when the similarities between the protected elements of the

copyrighted works and the allegedly infringing work are of small import quantitatively or qualitatively.*Id.*

*A. Perdue's Specific Claims of Similarity*

The *gravamen* of Perdue's complaint is that Brown copied the basic premise underlying *Daughter of God:*

notions of a divine feminine, the unity of male and female in pagan worship, the importance of Sophia, the "Great Goddess" of the Gnostic Gospels, the fact that history is relative and is controlled by victors, not losers, the importance of the Roman Emperor Constantine in requiring a transition from a female to a male dominated religion, as well as to create a unified religion having a common dogma, the quest not only for physical objects, but for spiritual fulfillment.

Perdue's Local Rule 56.1 Statement of Undisputed Material Facts, ¶ 153; Perdue's Memorandum of Law at 5. He further argues that the following elements are common to both books: the role of the female; the Church's recasting of the great goddess as evil; the role of Emperor Constantine; Christianity's adoption of pagan practices; the existence of the divine feminine; the heroines' epiphany regarding the Great Goddess; the physical evidence of the divine feminine; the fact that there are keepers of the physical evidence; the Catholic Church's awareness of the existence of the Holy Grail and the Sophia Passion; the existence of two organizations who seek to obtain the physical evidence; similarities between Opus Dei and the Congregation for the Doctrine of Faith; the protagonists' unwillingness to participate in the struggle between the competitors to obtain the physical evidence; the female's equal claim to divinity as males and that through their union, they become much more than the sum of their parts; the enemy who acts as a wolf in sheep's clothing; the protagonists' realization that possessing the physical evidence is not as important as the understanding of what the physical evidence represents; the conclusion that the hero and heroine are themselves pursued by the quest for the physical evidence; similarities between the treatment of Mary Magdalene in *The Da Vinci Code* and Sophia in *Daughter of God;* the use of historical references, particularly Constantine, in both novels; the fact that both novels incorporate the use of a gold key; the novels' similar discussion of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1863673 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,248, 76 U.S.P.Q.2d 1012
(Cite as: 2005 WL 1863673 (S.D.N.Y.))

Page 7

women, the Goddess, Creation and How God became a male; similar discussions of Mother Earth; the theme that people create their own gods; and lastly, a similar discussion in both novels regarding communion.

*7 All of these similarities, however, are unprotectible ideas, historical facts and general themes that do not represent any original elements of Perdue's work. For example, although both novels discuss Emperor Constantine and the Council of Nicea, it is without question that references to historical figures and events constitute unprotectible elements under the copyright laws, as "[n]o claim of copyright protection can arise from the fact that plaintiff has written about such historical and factual items." *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y. Sept. 21 1978)(citing *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 309 (2d Cir.1966). Also, copyright protection does not extend to thematic concepts or scenes which must necessarily follow from similar plot situations. *See Reyher,* 533 F.2d at 91. Both *Daughter of God* and *The Da Vinci Code* involve the unprotectible *idea* of a mystery thriller set against a religious backdrop. As a mystery thriller, common themes of "the wolf in sheep's clothing," or the theme that "history is relative and is controlled by victors, not losers," or the theme that "through [the union of hero and heroine], they become much more than the sum of their parts," are unprotectible stock themes common to the genre. *See Williams v. Crichton,* 860 F.Supp. 158, 166 (S.D.N.Y. Aug 17, 1994), *aff'd Williams v. Crichton,* 84 F.3d 581 (2d Cir.1996) (holding that themes commonly repeated in certain genre are not protectible by copyright as no one can own the basic idea for a story).

Indeed, it is not original in this genre to have a storyline whereby "two organizations or people who would stop at nothing, including murder, to obtain physical evidence," that there are keepers of this physical evidence, or that "the hero and heroine became unwilling participants in the struggle between the competitors to obtain the physical evidence."Furthermore, the fact that the hero and heroine realize that possessing the physical evidence is not as important as the understanding of what the physical evidence represents, or that the reader is led to conclude that the hero and heroine are themselves pursued by the quest for the physical evidence, offers nothing new to this type of story. Moreover, because

*Daughter of God* and *The Da Vinci Code* share a religious backdrop, Perdue's claims that the novels share a similar theme that "people create their own gods," and that both novels have "discussions of Mother Earth" and "discussions about communion" are not afforded copyright protection. Perdue has not alleged that his unique *expression* of these ideas and themes were copied. Ideas and general literary themes themselves are unprotectible under the copyright law.

Perdue also alleges various discrete similarities between the two plots. However, although both novels discuss the Catholic Church, such discussion is expected from a thriller with religious themes and is an unprotectible *scene a faire.See Williams v. Crichton,* 84 F.3d at 587(similar scenic elements are unprotectible *scenes a faire* that follow naturally from the work's theme rather than the author's creativity). Similarly, Perdue's claims that both novels discuss Swiss bank accounts and gold keys or that the novels begin with a murder are unprotectible scenes a faire that precludes a finding of substantial similarity.[FN7]Perdue's claim that there are similarities between Opus Dei and the Congregation for the Doctrine of Faith, two real and existing organizations is also unprotectible. *Walker,* 784 F.2d at 49 (finding that copyright protection does not extend to facts).

> FN7. Indeed, although there is clearly a gold key in *The Da Vinci Code, Daughter of God* references a "very small *ingot* fixed into a recess of the wood substrate on which the paint had been applied."*Daughter of God* at 312 (emphasis added).

*8 A significant part of Perdue's argument focuses on the ideas and broad themes concerning the divine feminine, the important role of the female in early religion, the importance of Sophia, the "Great Goddess" of the Gnostic Gospels, and how she was recast by the Church as evil, the unity of male and female in pagan worship and Christianity's adoption of pagan practices as well as the importance of Emperor Constantine in requiring a transition from a female to a male dominated religion. Perdue argues that he "first incorporated these elements in" an earlier novel titled *Linz Testament* which he "extensively reworked" into *Daughter of God.*Perdue's Memo at 5. A central theme of *The Da Vinci Code* is the suppression of the divine feminine in the Christian tradition.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

He claims that "the material plagiarized in [*The Da Vinci Code* ] consists of an extensive and detailed synthesis of history and multiple schools of theology that Perdue created for *Daughter [of God* ] and based on equally unique work expressed in *Linz [Testament* ] and [*Da Vinci* ] *Legacy.*"Perdue's Facts ¶ 212.

Perdue argues that Brown stole his "synthesis" of differing religious beliefs emanating from the Gnostic Gospels. He has made no factual allegations, however, to support a finding that Brown copied his *expression* of these ideas. Moreover, these ideas and themes find their origin in historical facts, events and figures, as well as pre-existing works. *See Hoehling, 618 F.2d at 979* (finding that, despite plaintiff's claim that specific facts, ascertained through his personal research, were copied, such facts are unprotectible, as defendants "had the right to avail [themselves] of the facts contained in [plaintiff's] book" and "to use such information, whether correct or incorrect, in their own work")(citing *Greenbie v. Noble, 151 F.Supp. 45, 67 (S.D.N.Y.1957); seealso Alexander, 460 F.Supp. at 45*("where common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement"). In his Author's note in *Daughter of God,* Perdue himself states that "[t]his is a work of fiction based on fact.... The sections of this book dealing with the Nicean Conference and the events and religious controversies leading up to it are true and far better documented than any of the scriptures in the Hebrew or Christian Bible or the Muslim Koran."*Daughter of God* at 420. Perdue concedes that "[m]uch of his research [about the sacred feminine and the Great Goddess] involved the Gnostic Gospels, discovered at Nag Hammadi, Egypt in 1945, but not translated until the 1970's, and works commenting upon those Gospels ."Perdue's 56.1 Statement, ¶ 156. Furthermore, there is no substantial similarity in the expression of the divine feminine in each book. In *The Da Vinci Code,* the divine feminine is expressed as Mary Magdalene, a true biblical figure, while in *Daughter of God,* the divine feminine figure is Sophia, a fictional second Messiah created by Perdue. As copyright protection "does not extend to facts or to true events, even if they are discovered through original research," Perdue's claims regarding these ideas and themes are unprotectible. *Walker, 784 F.2d at 49.*

B. *A Comparison of* The Da Vinci Code *and* Daugh-

ter of God

*9 The critical examination which must be conducted, in order to determine whether *The Da Vinci Code* is substantially similar to *Daughter of God* to support copyright infringement, is a review of relevant similarities between the two works "in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting." *Williams v. Crichton, 84 F.3d at 588.*

*1. Thematic Expression*

"In its ordinary meaning, a theme is understood to be the underlying thought which impresses the reader of a literary production, or the text of a discourse. Using the word 'theme' in such a sense will draw within the circle of its meaning age-old plots, the property of everyone, and not possible of legal appropriation by an individual." *Roe-Lawton v. Hal E. Roach Studios, 18 F.2d 126, 127 (D.C.Cal.1927).* Indeed, thematic concepts which follow from similar plot situations are not afforded protection under the copyright laws. *See Smith v. Weinstein, 578 F.Supp. 1297, 1302 (S.D.N.Y. Jan. 24, 1994).* General themes expressed in *Daughter of God* are afforded no copyright protection. "[T]he essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher, 533 F.2d at 91.*

*The Da Vinci Code'* s expression of the divine feminine and its related themes differ markedly from their expression in *Daughter of God.* In *The Da Vinci Code,* Mary Magdalene represents the Divine Feminine that was suppressed by the Church. Through Langdon's character, Brown shares with the reader the history and importance of women and the sacred feminine in early religion. Through Langdon's and Teabing's monologues, Neveu and the reader are introduced to the belief that Mary Magdalene was the wife of Christ and that they produced offspring. This secret, which the reader is shocked to learn represents the truth of the Holy Grail, was kept protected by a group called the Priory of Sion, whose military arm, the Knights Templar, guarded the secret with their lives. The reader eventually learns that Neveu is a descendant of Christ and Mary Magdalene.

In *Daughter of God,* a fictional second messiah named Sophia represents the Divine Feminine sup-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

pressed by the Church. Sophia, who existed around 325 A.D. in a remote mountain village near the Anatolian city of Smyrna (in present-day Turkey), was executed by the Romans after news of her miracles hit the Vatican. An early discussion between Zoe and Seth introduces the reader to Sophia and to Constantine's influence on the early church. Sophia's history is further shared through one of the villains, Cardinal Braun, who discusses it with NSA Agent Stratton, while the historical details of the Church's suppression of the divine feminine is shared through a conversation between Zoe and Thalia, a fellow captive. Evidence of Sophia's existence, and of the role the Church played in executing her, came into the hands of the Nazis during World War II. The search for this evidence is the foundation of *Daughter of God.* Rival groups, including a conservative arm of the Church, the Russian mafia and former KGB, and the heroes all strive to obtain this evidence for their own underlying purpose. Brown's expression of his religious themes in *The Da Vinci Code* differ markedly from Perdue's expression of his themes in *Daughter of God.*

*2. Total Concept and Feel*

**\*10** The total concept and feel of a literary work is comprised of the way an author "selected, coordinated and arranged the elements of his or her work," *Feist Publications, Inc. v. Rural Tel. Serv. Co ., 499 U.S. 340, 358, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)*, taking into consideration similarities in "mood, detail or characterization." *Reyher, 533 F.2d at 91-92.* Where there is a marked difference in total concept and feel, summary judgment is appropriate. *Id. at 92; see also Denker v. Uhry, 820 F.Supp. 722, 731 (S.D.N.Y.1992),* aff'd *996 F.2d 301 (2d Cir.1993).* Although both novels at issue are mystery thrillers, *Daughter of God* is more action-packed, with several gunfights and violent deaths. *Daughter of God* also includes a perilous journey through an Austrian salt mine and includes sex scenes not present in *The Da Vinci Code. The Da Vinci Code,* on the other hand, is an intellectual, complex treasure hunt, focusing more on the codes, number sequences, cryptexes and hidden messages left behind as clues than on any physical adventure. For example, Neveu, Langdon, and his servant's escape from the police in a Range Rover through the dark woods proceeds at such a slow pace that it cannot reasonably be called a chase scene.

Furthermore, although *Daughter of God* references art and discusses religious history, *The Da Vinci Code's* treatment of these subjects involves more detail. Brown weaves his mystery through detailed discussions of Da Vinci's art, art and religious history and mathematical formulas. An early scene, involving Neveu and Langdon's attempt to decipher the clues Sauniere left at his murder site, references Leonardo da Vinci's Vitruvian Man, the Fibonacci sequence, the Divine Proportion, *Phi,* and the Mona Lisa. *Daughter of God'* s discussion of art, on the other hand, occurs principally through Thalia and Zoe's review of the art stolen by the Russians as they work to catalogue all the stolen pieces. No reasonable jury could conclude that the total concept and feel of *The Da Vinci Code* is substantially similar to that of *Daughter of God.*

*3. Plot*

A plot is "the story or narrative. It is the designed sequence of connected incidents. It is the thing which moves the [work] from cause to effect. It means, as its etymology implies, a weaving together." *Golding v. RKO Radio Pictures, Inc., 193 P.2d 153, 163 (Cal.App. 2 Distr.1948),* aff'd *35 Cal.2d 690, 221 P.2d 95 (1950).* Although "in its broader outline a plot is never copyrightable," *Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 54 (2d Cir.1936),* alleged similarities in plot and structure at "the next level of specificity" may be protectible. *Id. at 49.* Courts are to determine whether the fundamental essence and structure of the novels are substantially similar. *See Arden v. Columbia Pictures Industries, Inc., 908 F.Supp. 1248, 1260 (S.D.N.Y. Dec. 7, 1995)* (finding no substantial similarities between the fundamental structure and essence of each plot).

**\*11** At the most general level of abstraction, both novels tell a story based on religious and historical people, places and events. The factual details that underpin each book, however, are quite different. The scenes and events show no substantial similarity of expression in the respective works. For example, while the *The Da Vinci Code* weaves a story with historical references to Michelangelo and Leonardo da Vinci, Opus Dei and the Priory of Sion; *Daughter of God* discusses Adolph Hitler and the Nazis, Hermann Goering, Frederick Stahl, and the Congregation for the Doctrine of Faith. Indeed, *The Da Vinci*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Code'* s incorporation of mathematical subjects like Phi, the Divine Proportion and the Fibonacci Sequence into its story has no parallel in *Daughter of God.*

*Daughter of God* involves a husband's search for his missing wife. His search uncovers a religious secret involving a fictional second Messiah, the knowledge of which is being sought by a radical arm of the Catholic Church and by the Russian mafia and former KGB for their own evil purposes. The husband's search for his wife leads him to different parts of the globe. Furthermore, in *Daughter of God,* the search is for actual physical objects, including documents evidencing Sophia's existence and her burial shroud. In *The Da Vinci Code,* the plot centers on determining what the secret is. Langdon and Neveu's mission, as the protagonists, is to decipher, through clues left behind by her murdered grandfather as well as clues hidden in historical places and works of art, the ancient secret. Furthermore, Langdon and Neveu never actually find any physical objects. Rather, the secret they learn is that Neveu is a descendant of Christ, that her grandmother and brother are actually alive, and that Mary Magdalene's bones may be hidden beneath the inverted pyramid at the Louvre. The fundamental essence and structure of the plots are not substantially similar and offer no support to Perdue's infringement claim. *The Da Vinci Code* is simply a different story than that told by *Daughter of God.*

4. *Characters*

In determining whether characters are similar, a court looks at the "totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in [plaintiff's work]." *Walker,* 784 F.2d at 50 (internal quotations and citations omitted). What the character thinks, feels, says and does as well as the descriptions conveyed by the author through other characters' comments fill out a viewer's understanding of the character. *Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 241 (2d Cir.1983)."At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted."*Id.*

There is no substantial similarity between any of the characters in *The Da Vinci Code* and *Daughter of God.*The heroes and heroines are different in each book. In *The Da Vinci Code,* the hero is Robert Langdon, a bookish professor of symbology from Harvard. Langdon's physical attributes are not emphasized, rather, he serves as the intellectual wheel that keeps the plot moving. It is Langdon who solves most of the major riddles and questions, including the final puzzle at the climax. Interestingly, Langdon is secular, and his interests in religious history are purely academic. In *Daughter of God,* the hero is Seth Ridgeway, a former police officer who has athletic prowess and strong physical attributes. Seth retired from the police department after receiving several gunshot wounds. Although he is a professor of philosophy and religion, the book does not focus on his intellect. Unlike Langdon, Ridgeway experiences a crisis of faith because of his wife's disappearance.

**\*12** The heroines also share few similarities. Sophie Neveu, the young French symbologist, was raised by her grandfather in a life of privilege. Her intellect, coupled with her knowledge of cryptology, allow her to assist in solving the many riddles and puzzles left by Sauniere. Seth Ridgeway's wife, Zoe, on the other hand, is a more mature, self-employed art appraiser. She is an expert in her field. She has been trained in detecting forgeries and grew up in a blue collar household.

Sir Leigh Teabing serves as the primary villain in *The Da Vinci Code,* but his evil role as the "Teacher," who masterminded Sauniere's execution, is not revealed until the end of the novel. He has two associates, Remy, his assistant, and Silas, the albino monk. Remy's involvement is minor while Silas serves the role as the threatening killer. Indeed, it is through Silas' hands that Sauniere and the other members of the Priory of Sion are murdered. Teabing's quest for the Holy Grail is motivated by his distaste for the Church.

*Daughter of God,* on the other hand, has many villains. One set of villains include Russian mobsters and former KGB, who desire the Sophia documents and Shroud for power. Although the Russians dominate the early part of the book, their presence is minimized after Zoe kills the Hulk, her huge Russian captor, and escapes from their detention. Another set of villains include Cardinal Braun and his lackey, NSA Agent Stratton. Braun's desire for the Sophia

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

materials also stems from a desire for more power. In this regard, as well as in physical attributes, he is nothing like *The Da Vinci Code'* s antagonist, Teabing, who is crippled and uses crutches when he walks. Further, although Perdue argues that Teabing and Stratton are both "shapeshifters" (because they first appear friendly and later reveal themselves as the enemy), such a characterization ignores the different roles each serves in their respective novels. Teabing is the ultimate villain in *The Da Vinci Code.* His mysterious alter-ego, the "Teacher," is smart, conniving, diligent and well planned. Stratton, on the other hand, is simply a lackey for Cardinal Braun. Stratton, from physical appearance to mental and intellectual characteristics, shares nothing in common with Teabing. Other main characters such as Bezu Fache, the police captain who chases Langdon and Neveu in *The Da Vinci Code,* Father Aringosa, the head of Opus Dei in *The Da Vinci Code,* and Father Hans Morgan, the reformist priest in *Daughter of God,* have no parallels in the other book.

### 5. Sequence, Pace and Setting

Although both *Daughter of God* and *The Da Vinci Code,* as mystery thrillers, enjoy fast paced scenes, the time sequence of each book differs considerably. *Daughter of God* takes place over many months. Indeed, after the opening sequence introducing Zoe, Seth and Max in Switzerland, Seth is found in his boat *six months later,* still suffering from Zoe's disappearance. After Seth is visited by the strange woman with information concerning Zoe on his boat, the novel proceeds at a quick but steady pace over the course of a few weeks. *The Da Vinci Code,* however, starts quickly and moves quickly. The reader immediately gets a sense that time is of the essence. The period from Sauniere's death at the Louvre to the final confrontation at Westminster Abbey, the majority of the novel, takes place over a matter of days.

**\*13** The setting of each book is also different. While the *The Da Vinci Code* takes the reader from Paris to London and visits landmarks such as the Louvre Museum and Westminster Abbey, *Daughter of God* begins in Zurich, travels through southern California, Amsterdam and Italy and ends in Austria. The characters, sequence, pace and setting of each book are not substantially similar and do not support an infringement claim.

A comparison of these different novels warrants a rejection of the claim that Brown's *The Da Vinci Code* infringes upon copyrights Perdue owns in his previous works *Daughter of God and The Da Vinci Legacy.*

### REMAINING COUNTERCLAIMS

In his Third Counterclaim, Perdue alleges that "[a]s a result of [counterclaim defendants'] illegal and improper exploitation of [his] intellectual property, [counterclaim defendants] have been unjustly enriched at the sole expense and to the sole detriment of [Perdue]." Perdue's Answer and Counterclaims ¶ 107.[FN8]

> **FN8.** Although dismissal of Perdue's federal claims allows dismissal of his state common law unjust enrichment claim without prejudice to their commencement in state court, this Court exercises jurisdiction over this pendant claim and dismisses it on its merits. *See United Mine Worker's of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Under the Copyright Act, state law claims are preempted if "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Briarpatch Limited, L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 305 (2d Cir.2004). The works in question fall within the types of works protected under 17 U.S.C. §§ 102 and 103. Moreover, Perdue's unjust enrichment claim is based entirely on the validity of his copyright claim. He alleges no facts to support his unjust enrichment claim different from his copyright infringement claim. Accordingly, his unjust enrichment claim must also be dismissed.

Relatedly, Perdue's second counterclaim for an accounting of all income, expenses and profits related to *The Da Vinci Code,* and his fourth counterclaim for a permanent injunction enjoining counterclaim defendants from all activities related to the production of the motion picture version of *The Da Vinci Code,* must also be dismissed. His accounting claim

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1863673 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,248, 76 U.S.P.Q.2d 1012
**(Cite as: 2005 WL 1863673 (S.D.N.Y.))**

is pled on the grounds that he is unable to ascertain the amount of money owed by plaintiffs without an accounting. As his underlying infringement claim is unsupportable, no money is owed and no accounting is necessary. Under that same principle, Perdue's derivative claim against the motion picture defendants must also be dismissed.

*CONCLUSION*

A reasonable average lay observer would not conclude that *The Da Vinci Code* is substantially similar to *Daughter of God.* Any slightly similar elements are on the level of generalized or otherwise unprotectible ideas. Defendant Perdue's motion for summary judgment is denied and all of his counterclaims are dismissed. Plaintiffs' motion for summary judgment is granted. Plaintiffs are awarded declaratory judgment declaring that plaintiffs' authorship, publication and exploitation of rights in and to *The Da Vinci Code* do not infringe any copyrights owned by defendant.

S.D.N.Y.,2005.
Brown v. Perdue
Not Reported in F.Supp.2d, 2005 WL 1863673 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,248, 76 U.S.P.Q.2d 1012

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**3**

**H**Only the Westlaw citation is currently available.

United States District Court, N.D. California,
Oakland Division.
MOMENTO, INC., a California corporation, Plaintiff,
v.
SECCION AMARILLA USA, a California LLC,
Cory Suazo, Rafael Berrios, Does 1-50, Defendants.
No. C 09-1223 SBA.
Docket Nos. 2, 19, 60.

May 14, 2009.

Alexander Chen, Ali Kamarei, Esq., Sara B. Mack,
Inhouse Counsel, San Jose, CA, for Plaintiff.

Christopher J. Kelly, Mayer Brown LLP, Washington, DC, Edward D. Johnson, Jason Adam Wrubleski, Mayer Brown LLP, Palo Alto, CA, Richard M. Assmus, Mayer Brown LLP, Chicago, IL, for Defendants.

**ORDER**

SAUNDRA BROWN ARMSTRONG, District Judge.

*1 Before the Court is Plaintiff's Application for Order for Impound or, in the Alternative, Order to Preserve Evidence, Temporary Restraining Order, Order to Show Cause Re: Preliminary Injunction, filed March 20, 2009. [Docket No. 2]. The Court has received, read and considered the briefs and exhibits submitted by the parties, as well counsels' argument during the telephonic hearing on May 6, 2009. For the reasons discussed below, the Court GRANTS Plaintiff's motion and enters a preliminary injunction against Defendants.

**INTRODUCTION**

Because this is the second order pertaining to Plaintiff Momento, Inc.'s ("Momento") request for injunctive relief, the Court need not repeat the factual background here. The *ex parte* motion, filed on March 20, 2009, was denied on March 24, 2009, defendants were given notice and the parties were instructed to fully brief the matter. [*See*Docket No. 19]. At the telephonic hearing, the parties indicated they had no objection to treating the request for a temporary restraining order as a request for a preliminary injunction, given that six weeks have elapsed since the initial filing, the parties have been given an opportunity to be heard and the legal standard is the same for both.

Momento seeks an injunction against Defendant Seccion Amarilla, USA ("SAUSA") from copying Momento's Spanish language advertisements for use in its own Spanish language directories. The primary infringing materials include but are not limited to (1) salesperson and company files relating to solicitation of advertisements that contain copyrighted works of Momento; and (2) portable computer files and other media on which the defendants have stored copyrighted works or derivative materials, including data stored on internal hard disk drives. In addition, Momento seeks the retrieval of SAUSA directories that contain infringing material and are not in the possession of individual consumers. Finally, Momento seeks to enjoin the distribution of the April 2009 Oakland directory, currently in a warehouse pending the Court's decision on the instant motion.

**LEGAL STANDARD**

The standard for a preliminary injunction balances the plaintiff's likelihood of success against the relative hardships to the parties. To receive a preliminary injunction, Plaintiff is required to show "either (1) a likelihood of success on the merits and the possibility of irreparable injury, OR (2) that serious questions going to the merits are raised and the balance of hardships tips sharply in its favor. These two alternatives represent 'extremes of a single continuum,' rather than two separate tests. The greater the relative hardship to the moving party, the less probability of success must be shown." *Sun Microsystems, Inc. v. Microsoft Corp.* 188 F.3d 1115, 1119 (9th Cir.1999).

**ANALYSIS**

**I. Likelihood of Success on the Merits.**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## A. Copyright Infringement.

In order to prevail on its claim for copyright infringement, Momento must demonstrate 1) ownership of a valid copyright interest, and 2) copying of the copyright work. *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.,* 886 F.2d 1173, 1175 (9th Cir.1989)

### 1. Ownership.

**\*2** Momento has established that it is the owner of copyright registrations for Momento Spanish Yellow Pages, the West Bay and East Bay editions, for 2005 to 2008. By virtue of the registrations, Momento had demonstrated ownership of both the individual ads (entered as exhibits to the motion) as well as the design and layout of the directories as a whole. SAUSA's position is that it is not infringing because SAUSA obtained a non-exclusive license to use, reproduce or create derivative works directly from the clients. The non-exclusive license is purportedly granted by one of the terms and conditions stated on the reverse side of its sales contract.

SAUSA argues that Momento advertisements are jointly owned by Momento and its clients because they collaborated on creating the advertisements and because elements of the ads are preexisting elements, and thus not copyrightable. In the Ninth Circuit, a "joint work" must: (1) be a copyrightable work, (2) have two or more "authors," and (3) the authors must intend "their contributions be merged into inseparable or interdependent parts of a unitary whole."*See Aalmuhammed v. Lee,* 202 F.3d 1227, 1231 (9th Cir.2000) (citing to 17 U.S.C. § 101)."The best objective manifestation of a shared intent is a contract saying that the parties intend to be or not to be co-authors." *Id.* at 1235.

The evidence before the Court favors a finding that Momento is the sole owner of its client's advertisements. First, Momento has contracts with clients, the terms of which state that the artwork designed by Momento Inc. is its sole property and shall not be copied or reproduced in any way without written permission from Momento. Second, there is the specific conduct of one client who expressly sought permission from Momento when he wished to use a photograph that was taken by Momento for use on his

web page. Third, there are declarations from several clients who attest they never gave SAUSA permission to copy their Momento advertisements for use in the SAUSA directory. Thus, client contracts and client conduct provide the objective manifestation of sole ownership and there is no evidence to indicate otherwise.

### 2. Copying.

In order to demonstrate copying of copyrighted material, a plaintiff can show "substantial similarity" between the copyrighted and the infringing works. *Walt Disney Productions v. Air Pirates,* 581 F.2d 751 (9th Cir.1978). The Court has before it a number of advertisements which appear in the SAUSA directories and are substantially similar, or in some cases, virtually identical to Momento ads. *See, e.g.* Plaintiff's Exhibit D and Exhibit 5, for the law offices of Robert Jobe and the law offices of Robert Beles. SAUSA contends factual issues relating to copying preclude the Court from finding that Momento has established a prima facie copyright infringement case. The Court does not agree, based on the documentary evidence before it. Momento has established both prongs of its copyright claim, and thereby a likelihood of success on the merits of its copyright infringement claim.

## B. False Advertising.

**\*3** A false advertising claim under California Business and Professions Code § 17500 has three elements:

(1) an untrue or misleading statement;

(2) that is known to be untrue or misleading; and

(3) the likelihood that members of the public are deceived.

Momento alleges the following statement is false and misleading: the SAUSA sales pitch that its directories are "the first and only Spanish directory delivered to consumers in Northern California."At the hearing, SAUSA contended the statement is at best ambiguous but is neither false nor misleading because the two companies have entirely different methods of delivering the directories, thereby making them distinct from one another. SAUSA does not dispute that Mo-

mento was the first Spanish directory published in Northern California, therefore at least one part of the statement is false. In the absence of any evidence to the contrary, the Court finds Momento has demonstrated a likelihood of success on the merits of its false advertising claim.

## II. Irreparable Injury.

The familiar Ninth Circuit rule is that in cases involving copyright claims, where a copyright holder has shown likelihood of success on the merits of a copyright infringement claim, there is a presumption of irreparable harm. _Johnson Controls, Inc. v. Phoenix Control Systems, Inc.,_ 886 F.2d 1173 (9th Cir.1989). The Court agrees with SAUSA that it should not automatically presume a demonstration of irreparable harm in copyright cases since the Supreme Court's decision in _eBay, Inc. v. MercExchange, LLC,_ 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). [Opp'n, p. 11]. The _eBay_ case involved a permanent injunction in a patent case, and the Court flatly rejected a presumption of irreparable harm: "this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."_Id._ at 392-393._See also_ _MGM v. Grokster,_ 518 F.Supp.2d 1197, 1213 (C.D.Cal.2007) (declining to assume irreparable harm and following the four-part equitable test); _Allora, LLC v. Brownstone,_ 2007 WL 1246448, 5 (W.D.N.C.2007) (holding that "until this issue is clarified by the Fourth Circuit or the Supreme Court, this Court will not presume irreparable harm and likelihood of success on the merits following a prima facie showing of copyright infringement, but will instead treat copyright cases in the same manner as any other civil action requesting a preliminary injunction).

The Court intends to apply the traditional test, which requires a plaintiff to demonstrate:

(1) it has suffered an irreparable injury;

(2) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

(3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity

is warranted; and

(4) the public interest would not be disserved by a permanent injunction. _Ebay,_ 547 U.S. at 391.

*4 Momento argues that even without the application of the presumption of irreparable harm, the jeopardy to Momento's investment and competitive position caused by SAUSA's wholesale copying of at least thirty Momento-designed advertisements satisfies the requirement of irreparable harm needed to support a preliminary injunction. _See_ _Apple Computer, Inc. v. Franklin Computer Corp.,_ 714 F.2d 1240, 1254-1255 (3rd Cir.1983) (granting preliminary injunction on the basis that adequate evidence of the expenditure of significant time, effort and money directed to the production of the copyrighted material supports the rationale for protecting copyright, that of encouraging creativity, and rejecting the argument that an injunction would have a "devastating effect" on defendant's business because "if that were the correct standard, then a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone.").

SAUSA claims to be the largest publisher of Spanish Yellow Pages in the world and is distributed in 23 U.S. states and four countries. Momento is a family-owned business in northern California and has published Spanish yellow pages in northern California since 1998. The companies are direct competitors. The effect of SAUSA's false claim to being the first and only Spanish Yellow Pages that delivers to consumers in Northern California, and its unauthorized copying of advertising from the other Spanish Yellow Pages in Northern California (Momento) in order to solicit new ads for its own publication, has an adverse and irreparable effect on Momento's position in the marketplace. It is reasonable for the Court to consider protecting a plaintiff's competitive position where a defendant is believed to have built its work around the plaintiff's, and for this reason finds that the equities favor Momento.

However, SAUSA argues that because Momento delayed four months before bringing this lawsuit, the Court is precluded from finding it suffered irreparable harm. Even though four months indeed elapsed between SAUSA receiving notice of alleged infringement and Momento filing the instant lawsuit, it cannot be said that Momento stood idly by while it

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

suffered irreparable harm. Momento first wrote to SAUSA in November 2008, and explained that many display advertisements in the 2007 and 2008 SAUSA directories for Northern and Central California contained "full or partial copies of advertisements published in Momento's" directories. Momento requested SAUSA cease the allegedly infringing activity and respond by November 21, 2008. On November 21, 2008, SAUSA's counsel expressed its willingness to cooperate towards stopping any allegedly infringing activity, and requested Momento's directories in order to further investigate the allegations of copying. In addition, SAUSA asked Momento for proof of copyright registrations. And that was the end of any discussion between these parties about copyright infringement until Momento filed the Complaint and ex parte request for injunctive relief on March 20, 2009.

**\*5** Momento explains that it did not file the instant action until it actually had evidence that SAUSA had not ceased the infringing activity. The confirmation came in January 2009, when the San Jose directory was published and Momento discovered infringing advertisements. Only then did Momento determine it was necessary to bring this action and began further investigation and preparation for filing the suit, *e.g* applying for expedited copyright registrations which were received on March 10, 2009.

For these reasons, the Court finds that Momento has established that it faces irreparable harm in the absence of an injunction, and now turns to the specifics of the relief.

### III. Relief.

Implicit in the court's discretion under Rule 65(a) is the fact that the Court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case or may enter conditional preliminary relief. 11A Wright & Miller, Federal Practice and Procedure, § 2947.

SAUSA objects to an order to retrieve all directories that have already been distributed on the basis that they include only a handful of allegedly infringing advertisements. The Court recognizes that mandatory injunctions are generally disfavored, *Stanley v. University of Southern California,* 13 F.3d 1313, 1320 (9th Cir.1994), and the relief should be denied unless the facts and law clearly favor the moving party. As

discussed above, the facts and law clearly favor Momento. As a result, the Court engaged the parties in a discussion of how this order might be tailored to both reduce the burden of retrieval on SAUSA and also not interfere with the legal rights of those who already have the directories in their possession. It was determined that SAUSA could and would retrieve the 2009 San Jose and San Francisco directories that are currently stored on pallets at distribution points.

In addition to the retrieval order, the Court enjoins the distribution of the 2009 Oakland directories which have not, to date, been distributed. SAUSA had notice of Momento's infringement contentions as of the November 2009 cease and desist letter, before it printed the most current issue of the Oakland directory. Yet SAUSA proceeded with production. Clearly the injunction creates a hardship for SAUSA, but it is not an unreasonable one in light of SAUSA's election to proceed when it was aware of its infringing conduct.

SAUSA is enjoined from copying any of the copyrighted works of Momento, not limited to those identified in the exhibits submitted in support of this motion, and in particular, from preparing any derivative works from such copyrights and from causing them to be copied, disclosed or displayed. SAUSA is further enjoined from false and misleading advertisement and from promoting its yellow pages as the "the first and only Spanish directory delivered to consumers in Northern California."

Finally, SAUSA shall not destroy or conceal or in any way dispose of any reproduction, copy, facsimile, excerpt, scanned version, or derivative of any copyrighted work of Momento, including those stored on computers or computer files.

### IV. Bond Requirement.

**\*6** Federal Rule of Civil Procedure 65(c) requires the applicant to post bond, "in an amount that the court considers proper," prior to the issuance of a preliminary injunction. Fed.R.Civ.P. 65(c). The appropriate bond amount is left to the district court's discretion. *Id.* This bond requirement serves two functions: (1) it assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without regard to the possible

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

insolvency of the assured, and (2) it provides the plaintiff with notice of the maximum extent of its potential liability, since the amount of the bond "is the limit of the damages the defendant can obtain for a wrongful injunction, ... provided the plaintiff was acting in good faith." *Continuum Co., Inc. v. Incepts, Inc.* 873 F.2d 801, 803 (5th Cir.1989).

In response to the Court's inquiry as to what represents a "proper" amount, Momento suggests it should not be required to post a bond in any amount and SAUSA argues Momento should post a bond of $5 million. Neither party provides adequate legal or factual support for its respective position. For instance, Momento does not claim to be an "impecunious plaintiff," which is one factual scenario under which the Court may grant preliminary injunctive relief without any security whatsoever.

SAUSA requests the Court take into account the effect that non-distribution of the Oakland Directory will have on SAUSA. The factors to consider are: (1) cost of litigation; (2) return of deposits from clients who purchased ads in the Oakland Directory; (3) lost sales in the San Jose, San Francisco and Stockton Directories because clients tend to purchase ads in several directories at the same time; and (4) harm to reputation if it fails to distribute the Oakland Directory. SAUSA presents specific evidence that substantiates lost deposits and outstanding fees in the amount of $355,542.35 to $455,542.35. [Decl. of Arturo Pellerano].

The harm to SAUSA's reputation if SAUSA fails to distribute the Oakland Directory is not a relevant consideration because the evidence before the Court is that any delay in the distribution of the Oakland directory has little to do with the commencement of this litigation and Momento's request for injunctive relief. According to SAUSA's own sales materials, clients were promised a publication date for the Oakland/Alameda Directory of September 1, 2008. [Docket No. 59, Supp. Decl. A. Parvin, Ex. 5]. The Oakland Directory was sent to the printers on March 19, 2009, and the copies were scheduled to be ready on or about April 3, 2009. [Decl. of Nodarse, ¶ 20]. Momento filed the instant action on March 20, 2009. However, the other factors indicate that it is appropriate to require a bond in the amount of $355,500.00 in order to provide a remedy for SAUSA in the event that the preliminary injunction was improperly is-

sued.

## CONCLUSION

*7 For the reasons discussed, the Court GRANTS the plaintiff's motion for Preliminary Injunction against Defendants. IT IS HEREBY ORDERED THAT,

Defendants SAUSA, CORY SUAZO and RAFAEL BERRIOS, their servants, agents and employees, all persons acting or purporting to act under their authority, direction or control, and all persons acting in concert or in participation with any of them who receive notice of this Order, shall be and are restrained and enjoined:

1. From copying any of the copyrighted works of Momento, not limited to those identified in the exhibits submitted in support of this motion, and in particular, from preparing any derivative works from such copyrights, and from copying any of the copyrighted works into any computer data base, information service, storage facility, or archives.

2. From preparing derivative works from any portion of Momento's copyrighted works and from causing them to be copied, disclosed or displayed.

3. From destroying or concealing, or in any way disposing of any reproduction, copy, facsimile, excerpt, scanned version, or derivative of any copyrighted work of Momento including those stored on computers or computer files.

4. From false and misleading advertisement and from promoting its yellow pages as the "the first and only Spanish directory delivered to consumers in Northern California."

5. From making unauthorized reproductions of copyrighted works of the Momento website.

IT IS FURTHER ORDERED THAT:

6. Defendants RETRIEVE any and all 2009 San Jose and San Francisco Directories that are undistributed and stored on pallets outside of distribution locations.

7. Defendants TURN OVER to Plaintiff's counsel all

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

primary infringing articles used for solicitation of advertisements, in their possession, custody or control of any copyrighted work of Momento, including but not limited to: (1) salesperson and company files relating to solicitation of advertisements that contain copies copyrighted works of Momento but which exclude records documenting the sale of the advertisements; and (2) portable computer files and other media on which the defendants have stored copyrighted works or derivative materials, including data stored on internal hard disk drives. This relief is granted pursuant to 17 U.S.C. § 503(a)(1) (A) and (B).

This preliminary injunction will take effect upon Momento's posting a bond in the amount of $355,550.00.

The Court further DENIES AS MOOT Plaintiff's motion for Leave to File Supplemental Reply Brief and Supplemental Declaration to Plaintiff's Reply in Support of Plaintiff's Ex Parte Application, filed by Momento, Inc., filed on April 16, 2009. [Docket No. 60].

IT IS SO ORDERED.

N.D.Cal.,2009.
Momento, Inc. v. Seccion Amarilla USA
Slip Copy, 2009 WL 1363558 (N.D.Cal.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.