UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
J.D. SALINGER, individually and as
TRUSTEE of the J.D. SALINGER
LITERARY TRUST,

                    Plaintiff,

                  -against-

FREDRIK COLTING, writing under the name
JOHN DAVID CALIFORNIA, WINDUPBIRD
PUBLISHING LTD., NICOTEXT A.B., and ABP,
INC. d/b/a SCB DISTRIBUTORS INC.

                    Defendants.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/1/09_

09 Civ. 5095 (DAB)
MEMORANDUM & ORDER

Plaintiff J.D. Salinger brings suit against Defendants
Fredrik Colting, writing under the name John David California,
Windupbird Publishing Ltd., Nicotext A.B., and ABP, Inc., doing
business as SCB Distributors Inc., alleging claims for Copyright
Infringement and common law Unfair Competition.  Plaintiff
alleges that Defendants' novel, 60 Years Later: Coming Through
the Rye (hereinafter "60 Years"), is a derivative work of his
novel, The Catcher in the Rye (hereinafter "Catcher"), and that
the character of Mr. C from 60 Years, is an infringement on his
character, Holden Caulfield, from Catcher.

Plaintiff now moves for a preliminary injunction preventing
Defendants from publishing, advertising, or otherwise
distributing 60 Years in the United States of America during the
pendency of this suit.  For the following reasons, a preliminary
injunction is GRANTED.

Salinger et al v. John Doe et al                                    Doc. 30

1

## I. INTRODUCTION

As set forth on the record of June 17, 2009, and for the reasons stated therein, the Court found that Plaintiff possesses a valid Copyright in the novel The Catcher in the Rye, that the character of Holden Caulfield ("Holden" or "Caulfield") is sufficiently delineated so that a claim for infringement will lie. 2 Nimmer on Copyright § 2.12 (2009) ("[I]n those cases recognizing such protection, the character appropriated was distinctively delineated in the plaintiff's work."). Additionally, for the reasons stated on the record of June 17, 2009, the Court found that the Plaintiff had access to Catcher and that there are similarities that are probative of copying between the works. Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998). Finally, the Court found that Plaintiff has shown that there is substantial similarity between Catcher and 60 Years, as well as between the character Holden Caulfield from Catcher, and the character Mr. C from 60 Years, such that it was an unauthorized infringement of Plaintiff's copyright. Suntrust Bank v. Houghton Mifflin Company, 268 F.3d 1257, 1266 (11th Cir. 2001) (finding that "substantial similarity" exists where "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work"); Castle Rock, 150 F.3d at 139 ("Under the 'ordinary observer' test . . . two works are substantially

similar where the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal of the two works as the same.") (internal quotations omitted).

The Court now addresses Defendants' claim that their novel 60 Years and its protagonist Mr. C constitute fair use of Plaintiff's copyrighted work under 17 U.S.C. §§ 107(1)-(4). The Court bases its analysis on the oral arguments of June 17, 2009 and the parties' submissions.[1]

## II. DISCUSSION

### A.    The Preliminary Injunction Standard

Under Rule 65, "[t]o obtain a preliminary injunction a party must demonstrate: (1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." Bronx Household of Faith v. Board of Educ. of City of New York, 331 F.3d 342, 349 (2d Cir. 2003) (citing Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 149 (2d Cir. 1999)).

---

[1] Upon reflection, the Court denies Plaintiff's June 17, 2009 In Limine Motion to Strike Certain Exhibits and Expert Declarations. Accordingly, the Court has read the expert submissions of Defendants.

3

## B.   The Fair Use Doctrine

From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts....'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8). At the Constitutional level, while the "Copyright Clause and the First Amendment [are] intuitively in conflict, [they] were drafted to work together to prevent censorship" such that "the balance between the First Amendment and copyright is preserved, in part, by the idea/expression dichotomy and the doctrine of fair use." Suntrust Bank, 268 F.3d at 1263 (citing Eldred v. Reno, 239 F.3d 372, 375 (D.C. Cir. 2001) (quoting Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560, (1985))).

"Copyright law thus must address the inevitable tension between the property rights it establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them- or ourselves by reference to the works of others, which must be protected up to a point. The fair-use doctrine mediates between the two sets of interests, determining where each set of interests ceases to control." Blanch v. Koons, 467 F.3d 244, 250 (2d Cir. 2006); see also Warner Bros. Entertainment Inc., v. RDR

Books, 575 F.Supp.2d 513, 540 (S.D.N.Y. 2008) ("At stake in this case are the incentive to create original works which copyright protection fosters and the freedom to produce secondary works which monopoly protection of copyright stifles - both interests benefit the public.")(quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1109 (1990) (hereinafter "Leval")) (noting that although "the monopoly created by copyright . . . rewards the individual author in order to benefit the public[,]" on the other hand "the monopoly protection of intellectual property that impeded referential analysis and the development of new ideas out of old would strangle the creative process.")

The doctrine of Fair Use was codified in § 107 of the 1976 Copyright Act. Section 107 calls for a four-factor test:

Limitations on exclusive rights: Fair use:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or
        value of the copyrighted work.

17 U.S.C. § 107.

        In applying the fair use doctrine "[t]he task is not to be
simplified with bright-line rules, for the statute, like the
doctrine it recognizes, calls for case-by-case analysis" and "all
[of the four factors] are to be explored, and the results weighed
together in light of the purposes of copyright." Campbell, 510
U.S. at 577-78.


        C. Applying the Four Factor Analysis to 60 Years

            1. The Purpose and Character of the Use

        The central purpose of the inquiry into the first factor is
to determine, "in Justice Story's words, whether the new work
merely supersede[s] the objects of the original creation . . . or
instead adds something new, with a further purpose or different
character, altering the first with new expression, meaning, or
message; it asks, in other words, whether and to what extent the
new work is 'transformative.'" Campbell, 510 U.S. at 579
(internal quotations and citations omitted). Although a
transformative use is not strictly required for the Defendant to
establish the defense of fair use, "the goal of copyright, to
promote science and the arts, is generally furthered by the
creation of transformative works. Such works thus lie at the
heart of the fair use doctrine's guarantee of breathing space

                                    6

within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Id. (citing Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 478-80 (U.S. 1984) (Blackmun, J., dissenting)). "The first fair use factor calls for a careful evaluation whether the particular quotation is of the transformative type that advances knowledge and the progress of the arts or whether it merely repackages, free riding on another's creations. If a quotation of a copyrighted matter reveals no transformative purpose, fair use should perhaps be rejected without further inquiry into other factors. Factor One is the soul of fair use. A finding of justification under this factor seems indispensable to a fair use defense." Leval, at 1116.

The inquiry into the first factor of the fair use test, "'the purpose and character of the use,' . . . may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like." Campbell, 510 U.S. at 578-79 (citing 17 U.S.C. § 107). Furthermore, the Court in Campbell found that although not explicitly included in the text of § 107, "parody has an obvious claim to transformative value" and thus "like other comment or criticism, may claim fair use under § 107." Id. at 579. Accordingly, the Court first examines Defendants' assertion that

60 Years contains parodic elements that are transformative in
nature. (Defs' Mem. of Law, 16-19).

## i. The Satire/Parody Distinction

In Campbell, the Supreme Court held that parody, although
not included within the text of § 107, is a form of comment or
criticism that may have a transformative purpose. Campbell, 510
U.S. at 579. Unlike satire, which critiques and comments on
aspects of society more broadly, parody sharpens its knives for
the very work from which it borrows. See id. at 580-81, 581
n.15. Thus, whereas "parody needs to mimic an original to make
its point, and so has some claim to use the creation of its
victim's . . . imagination, [ ] satire can stand on its own two
feet and so requires justification for the very act of
borrowing." Id. at 580-81; id. at 597 (Kennedy, J., concurring)
("[P]arody may qualify as fair use only if it draws upon the
original composition to make humorous or ironic commentary about
that same composition. It is not enough that the parody use the
original in a humorous fashion, however creative that humor may
be. The parody must target the original, and not just its
general style, the genre of art to which it belongs, or society
as a whole (although if it targets the original, it may target
those features as well).)" (internal citation omitted); Rogers v.
Koons, 960 F.2d. 301, 310 (2d Cir. 1992) ("Though the satire need
not be only of the copied work and may . . . also be a parody of

modern society, the copied work must be, at least in part, an object of the parody.")

Within the domain of Copyright law, "the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." Campbell, 510 U.S. at 580. "If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish). . ." Id. at 581.

Defendants contend that 60 Years "comments directly on (and criticizes) Catcher and its author," establishing it as an example of parody, rather than merely satire or some other form of criticism. (Defs' Mem. of Law, 18). However, before a Court will analyze an otherwise infringing work as a parody under § 107, it must first determine that its "parodic character may reasonably be perceived." Campbell, 510 U.S. at 582.

Campbell and its progeny define the limits of parody to include only those elements which criticize or comment upon the source author's works, rather than the author himself. See id. at 580 ("the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments

9

on that author's works.)" (emphasis added); id. at 597 (Kennedy,

J., concurring) (". . . parody may qualify as fair use only if it

draws upon the original composition to make humorous or iconic

commentary about that same composition.") (emphasis added); see

also, Suntrust Bank, 268 F.3d at 1268 ("For purposes of our fair-

use analysis, we will treat a work as a parody if its aim is to

comment upon or criticize a prior work . . . ") (emphasis added);

Dr. Suess Enterprises, L.P. v. Penguin Books USA, Inc., 924

F.Supp. 1559, 1569 (S.D. Cal. 1996) ("Courts have allowed parody

claims only where there was a discernable direct comment on the

original.") (emphasis added).

In Suntrust Bank v. Houghton Mifflin Company, 268 F.3d 1257,

1266 (11th Cir. 2001), Plaintiff brought suit under the Copyright

Act against the publishers of the novel The Wind Done Gone

("TWDG"), which retells the Margaret Mitchell classic Gone With

The Wind ("GWTW") from the perspective of Cynara, the half sister

of Scarlet O'Hara, whose mother is a slave. In Suntrust, the

Eleventh Circuit "agree[d] with the district court that,

particularly in its first half, TWDG is largely 'an encapsulation

of GWTW that exploits its copyrighted characters, story lines,

and settings as the palette for the new story[,]" id. at 1267, as

the Court similarly found in this case. See (Transcript, at 24-

25.)

However, the factual finding of parody is what truly sets TWDG apart from 60 Years because the Court here cannot make that same factual finding. As the Suntrust court stated:

> For purposes of our fair-use analysis, we will treat a work as a parody if its aim is to comment upon or criticize a prior work by appropriating elements of the original in creating a new artistic, as opposed to scholarly or journalistic, work. Under this definition, the parodic character of TWDG is clear. TWDG is not a general commentary upon the Civil-War-era American South, but a specific criticism of and rejoinder to the depiction of slavery and the relationships between blacks and whites in GWTW.

268 F.3d at 1268-69. 60 Years, however, contains no reasonably discernable rejoinder or specific criticism of any character or theme of Catcher.[2]

## ii. Alleged Parody of Catcher and Holden Caulfield

To the extent Defendants contend that 60 Years and the character of Mr. C direct parodic comment or criticism at Catcher or Holden Caulfield, as opposed to Salinger himself, the Court finds such contentions to be post-hoc rationalizations employed through vague generalizations about the alleged naivete of the original, rather than reasonably perceivable parody.

_____

[2]In his concurrence in Suntrust Bank, Judge Marcus noted: "[h]ad Randall chosen to write The Wind Done Gone from the point of view of one of Mitchell's original characters . . . and done no more than put a new gloss on the familiar tale without criticizing or commenting on its fundamental theme and spirit, [Defendant's] case would have been much tougher." Suntrust Bank, 268 F.3d at 1279.

11

First, Colting's assertion that his purpose in writing

Catcher was to "critically examin[e] the character Holden, and

his presentation in Catcher as an authentic and admirable (maybe

even heroic) figure" is problematic and lacking in credibility.

(Colting Decl., ¶ 18.); see also (Woodmansee Decl., ¶ 13)

("Readers familiar with [Catcher] will anticipate the same

laconic observations and reflections they associate with Holden

Caulfield. What do they get from the 76 year old C? They get

much the same kinds of observations and reflections, but coming

from a 76 year old and applied to a world much changed in the 60

intervening years, such observations and reflections fall flat.

They reveal a character whose development was arrested at 16, who

instead of growing up could only grow old."); (Woodmansee Decl.,

at ¶ 17) (stating that the observations and reflections of Mr. C

evoke "[i]n style and content . . . vintage Holden Caulfield, and

coming from a 16 year old, they seemed honest and endearing.

Coming from the 76 year old C, however, they seem pathetic.

Suggesting a life of isolated drifting, they evoke Aristotelian

fear and pity - that is, they force readers to ask whether such

anomie is all we fans of Holden may expect in old age. If this

is where his rebellious independence leads, is it as attractive

as we adoring fans of CR imagined?").

However, Holden Caulfield as delineated by Salinger was

already often "miserable" and "unconnected" as well as frequently

"absurd[]" and "ridiculous," as Colting says of his elderly

version of the character. (Colting Decl., ¶¶ 18, 21). In fact, it was these very characteristics that led Caulfield to leave or be expelled from three boarding schools, to wander the streets of New York City alone for several days, to lack any close friends other than his younger sister Phoebe, and ultimately to become a patient in a psychiatric hospital. Hence, to the extent Colting claims to augment the purported portrait of Caulfield as a "free-thinking, authentic and untainted youth" and "impeccable judge of the people around him" displayed in Catcher by "show[ing] the effects of Holden's uncompromising world view," (Def's Mem. of Law, 18), those effects were already thoroughly depicted and apparent in Salinger's own narrative about Caulfield. See, e.g., (Compl. ¶ 26) ("Indeed, [Holden] feels disconnected from most of those around him."); (Compl. ¶ 28) ("While Holden may be more mature than his years in some ways, it is clear that during his adventures in New York City, he is in over his head."); (Catcher, at 90) ("The whole lobby was empty. It smelled like fifty million dead cigars. It really did. I wasn't sleepy or anything, but I was feeling sort of lousy. Depressed and all. I almost wished I was dead."); (Catcher, at 153) ("When I finally got down off the radiator and went out to the hat-check room, I was crying and all. I don't know why, but I was. I guess it was because I was feeling so damn depressed and lonesome."); (Catcher, at 169) (Phoebe, telling Holden "You don't like anything that's happening" and Holden acknowledging that "it made

13

[him] even more depressed when she said that") (emphasis
original); (Catcher, at 186) (Mr. Antolini, telling Holden that
"I have a feeling that you're riding for some kind of a terrible,
terrible fall"); (Catcher, at 189) (Mr. Antolini, telling Holden
that "[a]mong other things, you'll find that you're not the first
person who was ever confused and frightened and even sickened by
human behavior"); (Catcher, at 194) ("So I sat up. I still had
that headache. It was even worse. And I think I was more
depressed than I ever was in my whole life.").

In fact, it can be argued that the contrast between Holden's
authentic but critical and rebellious nature and his tendency
toward depressive alienation is one of the key themes of Catcher.
That many readers and critics have apparently idolized Caulfield
for the former, despite - or perhaps because of - the latter,
does not change the fact that those elements were already
apparent in Catcher.

It is hardly parodic to repeat that same exercise in
contrast, just because society and the characters have aged. See
Campbell, 510 U.S. at 599 (Kennedy, J., concurring) ("Almost any
revamped modern version of a familiar composition can be
construed as a comment on the naivete of the original because . .
. it will be amusing to hear how the old tune sounds in the new
genre.") (internal quotations and citations omitted). 60 Years
attempts to contrast these two aspects of the Caulfield character

in a manner that is nearly identical to that which Salinger did decades ago, and thus is anything but parodic in this regard.

Furthermore, it is equally apparent that J.D. Salinger was aware of, and indeed emphasized the fact that Holden's uncompromising authenticity was at least partially responsible for his failure to 'grow up' and become a fully-functional adult with the capacity for mature relationships. See, e.g., (Catcher, at 9) ("I was sixteen then, and I'm seventeen now, and sometimes I act like I'm about thirteen . . . Everybody says that, especially my father."); (Catcher, at 132-34) (Holden, describing to Sally Hayes his plan for the two of them to run away to Vermont, get married and live in a cabin, but then causing her to storm out in anger by telling her she was a "royal pain in the ass" for questioning whether his plan was realistic); (Catcher, at 172) (Holden, while trying to think of a profession he would enjoy, concluding that although "[l]awyers are alright" he would not want to be one because "[e]ven if you did go around saving guys' lives . . . [h]ow would you know you weren't being a phony? The trouble is, you wouldn't") (emphasis original); (Catcher, at 188) (Mr. Antolini, telling Holden that he "can very clearly see [him] dying nobly, one way or another, for some highly unworthy cause" and handing Holden a note of advice that reads "[t]he mark of the immature man is that he wants to die nobly for a cause, while the mark of a mature man is that he wants to live humbly for one"). Accordingly, the Court finds that to the extent

Colting and Defense experts contend that 60 Years is attempting to accentuate how Holden's emotional growth would ultimately be stunted by his unwillingness to compromise his principles or engage with 'the phonies,' they were again simply rehashing one of the critical extant themes of Catcher.

While it is true that an artist or author "need not label their whole [work] . . . a parody in order to claim fair use protection," Campbell, 510 U.S. at 583 n. 17, it is equally true that "courts . . . must take care to ensure that not just any commercial takeoff is rationalized post hoc as a parody." Campbell, 510 U.S. at 600 (Kennedy, J., concurring).[3] For the

---

[3] Until the present lawsuit was filed, Defendants made no indication that 60 Years was in any way a parody or critique of Catcher. Quite to the contrary, the original jacket of 60 Years states that it is ". . . a marvelous sequel to one of our most beloved classics." (Paul Aff., Ex. B, at 278) (emphasis added). Additionally, when initially confronted with the similarities between the two works, rather than explaining that 60 Years was a parody or critique of Catcher, Colting's literary agent, Mr. Sane contended that 60 Years "is a completely freestanding novel that has nothing to do with the original Catcher In The Rye." (Westberg Aff., ¶ 24, Ex. L) (emphasis added).

Furthermore, in a number of public statements that were made prior to the filing of the present lawsuit, Colting himself made it clear that 60 Years was not a parody or critique of Catcher, but rather a tribute and sequel. See, e.g. (Westberg Aff., Ex. G, Catcher in the Rye sequel published, but not by Salinger, guardian.co.uk, Alison Flood, May 14, 2009) ("Just like the first novel, he leaves, but this time he's not at a prep school, he's at a retirement home in upstate New York," said California. "It's pretty much like the first book . . . He's still Holden Caulfield, and has a particular view on things. He can be tired, and he's disappointed in the goddamn world. He's older and wiser in a sense, but in another sense he doesn't have all the answers."); id. ("California said he was moved to write the book [] because he'd 'always wondered what happened to [Caulfield] . . . he deserves to have another life than just his

16

foregoing reasons, 60 Years' plain purpose is not to expose

Holden Caulfield's disconnectedness, absurdity, and

ridiculousness, but rather to satisfy Holden's fans' passion for

Holden Caulfield's disconnectedness, absurdity, and

ridiculousness, which Catcher has "elevated into the realm of

protectable creative expression." Castle Rock, 150 F.3d at 143.

Accordingly, the Court finds that 60 Years contains no

reasonably perceived parodic character as to Catcher and Holden

Caulfield.

### iii. Alleged Parody of Salinger

Defendants also contend that 60 Years is a critique of

Salinger and thus, through his close association and relationship

to the character of Holden Caulfield, a parody. See (Defs' Mem.

---

16 years.' He'd tried, he added, to be 'very respectful' to both
Caulfield and Salinger's status as 'American icons.' 'I thought
about it and tried to handle it very delicately. I like the
story and Holden and I wanted to keep it respectful."); (Westberg
Aff., Ex. G, Sequel to Catcher in the Rye Published, Boston
Literary Scene Examiner, Ann Livermore, May 14, 2009)
("California has said in various statements to the media that he
was inspired to create a second half of the story, because he'd
'always wondered what happened . . .'"); (Westberg Aff., Ex. H,
JD Salinger considers legal action to stop The Catcher in the Rye
sequel, Telegraph.co.uk, Philip Sherwell, May 30, 2009) ("Author
John David California . . . said the message was described as a
Caulfield-style tribute to a 'great inspiration.' He added: 'He's
a great writer who influenced the entire world with the words he
made up. It's a tribute the way Holden would have said it.'); id.
("'But this is no spoof,' said Windupbird's Fredrik Colting. 'We
are not concerned about any legal issues. We think 60 Years
Later is a very original story that compliments Catcher in the
Rye.").

17

of Law, 19) ("[60 Years] also critically explores the relationship between Salinger and his beloved character, Holden."); see also (Colting Decl. ¶ 7) ("Like many people, I have long been fascinated by Salinger and his relationship to Holden Caulfield. I am intrigued by the fact that, after creating Holden and other characters, Salinger has not published a new work in nearly half a century and is almost never seen in public. It seems to me that Salinger has become as famous for wanting not to be famous as he has for his writings. He has stayed in the public eye by claiming to have withdrawn from it."); (Woodmansee Decl. ¶ 8) ("[60 Years] seeks to demonstrate that in writing [Catcher] J.D. Salinger was acting out of impulses similar to those of Victor Frankenstein and thus that in creating Holden Caulfield he created a freak.").

While the addition of Salinger as a character in 60 Years is indeed novel, the Court is unconvinced by Defendants' attempts to shoehorn Defendants' commentary and criticism of Salinger into the parodic framework of Campbell, which requires critique or commentary of the work.[4] Defendants' use of Salinger as a

---

[4] Defendants' reliance on Bourne Co. v. Twentieth Century Fox Film Corp., 602 F.Supp.2d 499 (S.D.N.Y. 2009), to argue that parody may target the author of a work, (Transcript, at 42), is unavailing. In that case, the finding depended not just upon the intimate association between Walt Disney and "When You Wish Upon A Star," but also upon the fact that the alleged anti-Semitism of the former allowed Defendants to further emphasize the parody of the latter. The use of the 'positive' racist song "I Need a Jew" to parody the naivete of "When You Wish Upon a Star" was skillfully reinforced by the the fact that the very creator of the brand represented by "When You Wish Upon a Star" was himself

18

character, in order to criticize his reclusive nature and alleged

desire to exercise "iron-clad control over his intellectual

property, refusing to allow others to adapt any of his characters

or stories in other media," (Colting Decl. ¶ 7), is at most, a

tool with which to criticize and comment upon the author, J.D.

Salinger, and his supposed idiosyncracies. It does not, however,

direct that criticism toward Catcher and Caulfield themselves,

and thus is not an example of parody.

Having determined that 60 Years lacks transformative parodic

character, the Court now examines whether Defendants' novel

contains other forms of transformative content.

### iv. Transformative Use of Catcher and Holden Caulfield

The Court first addresses the alleged transformative use of

Catcher and the character Holden Caulfield. While 60 Years may,

_____

allegedly racist, just like the song "I Need A Jew." Thus, the
close association between Walt Disney and "When You Wish Upon a
Star" reinforced and reiterated the parodic purpose of "I Need A
Jew" in criticizing the original song.

    However, just because an author and his work are intimately
associated does not mean that a critique of one will necessarily
equate to a critique of both. While Salinger and Catcher are
certainly intimately associated, 60 Years contains no critique of
Salinger that also critiques Catcher by extension. Salinger's
reclusive nature, fierce protection of his rights and privacy,
and decision not to publish additional works - as well as 60
Years' criticism of those traits through the character of
Salinger - do not cast any critique on Catcher analogous to the
way that Walt Disney's alleged anti-Semitism casts further
critique on the naivete of "When You Wish Upon A Star" when
parodied by the racist song, "I Need A Jew."

19

as Defendants' assert, accentuate and comment upon Holden
Caulfield's naivete, depression, loneliness, absurdity, and
inability to grow and mature as a person, because these
characteristics were abundant, and perhaps even central to the
narrative of Catcher, this aspect of 60 Years does not "add[]
something new, with a further purpose or different character,
altering the first with new expression, meaning, or message."
Campbell, 510 U.S. at 579 (internal quotations and citations
omitted).

Nor do the mere facts that Holden Caulfield's character is
60 years older, and the novel takes place in the present day make
60 Years 'transformative.' As the Second Circuit clearly noted
in Castle Rock, just because a work "recast[s], transform[s], or
adapt[s] . . . an original work into a new mode of presentation,"
thus making it a "derivative work" under 17 U.S.C. § 101, does
not make the work "transformative" in the sense of the first fair
use factor under Cambell. 150 F.3d at 143.


### v. Transformative Use of Salinger Character

Defendants' use of Salinger as a character, in order to
criticize his reclusive nature and alleged desire to exercise
"iron-clad control over his intellectual property, refusing to
allow others to adapt any of his characters or stories in other
media," (Colting Decl. ¶ 7.), has some transformative value, as
Plaintiff concedes. (Transcript, at 44) ("The fact that they

20

injected Salinger into this novel does have some transformative value. Some. Limited."). At most, however, this device utilizes Catcher and the characters of Holden Caulfield and Salinger as tools with which to criticize and comment upon the author, J.D. Salinger, and his supposed idiosyncracies, rather than on the work itself.

Furthermore, the non-parodic, transformative aspect of Salinger the character is limited. First, the admissions[5] by Defendants' as to the character and purpose of 60 Years as a sequel to a beloved classic belies any claim that this critique of J.D. Salinger and his behavior was the primary purpose of the novel. It is simply not credible for Defendant Colting to assert now that his primary purpose was to critique Salinger and his persona, while he and his agents' previous statements regarding the book discuss no such critique, and in fact reference various other purposes behind the book.

Additionally, as Defendants concede, the character of Salinger is present in only 40 of 277 pages, (Transcript, at 33), many of which occur in a single chapter: chapter 20. This is not to find that a minor or supporting character may never add transformative value to a work. However, other Courts in this jurisdiction have found that where a work is not "consistently transformative," and "lacks restraint in using [Plaintiff's] original expression for its inherent entertainment and aesthetic

---

[5] See, supra, note 3.

21

value," the "transformative character of [that work] is diminished." Warner Bros. Entertainment Inc. v. RDR Books, and Does 1-10, 575 F.Supp.2d 513, 544 (S.D.N.Y. 2008)(citing Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605 (2d Cir. 2006)).

As noted further, infra § (II)(C)(3), 60 Years borrows quite extensively from Catcher, both substantively and stylistically, such that, when combined with the inconsistent use of the transformative element of the character of Salinger, the ratio of the borrowed to the novel elements is quite high, and its transformative character is diminished. See Suntrust Bank, 268 F.3d at 1280 (Marcus, J., concurring)(finding the issue of transformative character to cut "decisively in [Defendant's] favor" where the ratio of "the borrowed and the new elements" is "very low, and the incongruity between them wide"); see also Campbell, 510 U.S. at 583 n.16 (stating in the context of parody, which this Court finds to be equally applicable to other forms of transformative works, that the "only further judgment, indeed, that a court may pass on a work goes to an assessment of whether the parodic element is slight or great, and the copying small or extensive in relation to the parodic element").

Accordingly, while there is some non-parodic transformative element in 60 Years with regard to its use of the Salinger character to criticize the author J.D. Salinger, its effect is diminished for the foregoing reasons, and the determination of

22

whether it constitutes fair use will depend heavily on the remaining factors.

### vi. Commercial Nature

The other prong of the first factor of the § 107 test asks whether the otherwise infringing work "serves a commercial purpose or nonprofit educational purpose." Suntrust Bank, 268 F.3d at 1269 (citing § 107(1)). Here, Defendants do not contest that 60 Years is to be sold for profit, and therefore this prong of the first factor weighs against a finding of fair use.

### 2. The Nature of the Copyrighted Work

"The more the copyrighted matter is at the center of the protected concerns of the copyright law, the more the other factors, including justification, must favor the secondary user in order to earn a fair use finding." Leval at 1122. "The statutory articulation of this factor derives from Justice Story's mention . . . of the 'value of the materials used.' Justice Story's word choice is more communicative than our statute's 'nature of,' as it suggests that some protected matter is more 'valued' under copyright that others. This should not be seen as an invitation to judges to pass on literary quality, but rather to consider whether the protected writing is of the creative or instructive type that the copyright laws value and seek to foster." Id. at 1117. A key distinction that has

emerged "in the decisions evaluating the second factor [is] whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational." 2 Abrams, The Law of Copyright, § 15:52 (2006).

Here there is no question that in this case, the novel The Catcher in the Rye is a "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes." Campbell, 510 U.S. at 586. Consequently, this factor weighs against a finding of fair use.

### 3. The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

The "amount and substantiality of the portion of the copyrighted work used [] must be examined in context [and] the inquiry must focus on whether the extent of [the] copying is consistent with or more than necessary to further the purpose and character of the use." Castle Rock, 150 F.3d at 144 (quoting Campbell, 510 U.S. at 586-87)(internal quotations omitted). The Court must examine not only "the quantity of the materials used, but their quality and importance too." Warner Bros. Entertainment, Inc., 575 F.Supp. at 546 (quoting Campbell 510 U.S. at 587).

Here, on the record currently before the Court, Defendants have taken well more from Catcher, in both substance and style,

24

than is necessary for the alleged transformative purpose of
criticizing Salinger and his attitudes and behavior. Most
notably, Defendants have utilized the character of Holden
Caulfield, reanimated as the elderly Mr. C, as the primary
protagonist of 60 Years. Mr. C has similar or identical
thoughts, memories, and personality traits to Caulfield, often
using precisely the same or only slightly modified language from
that used by Caulfield in Catcher, and has the same friends and
family as Caulfield. For example, like Holden, Mr. C is a
frequent liar, constantly complains, is out of shape, has trouble
maneuvering in the dark, combs his hair with his hand to one
side, wears the same red hunting cap, is obsessed with whether
birds migrate for the winter, and likes the feeling of time
standing still in museums. (Paul Aff., Ex. C, Ch.1, 1-2, 4-8) He
also loves to use the words "goddam," "phony," "crumby," "lousy,"
"hell," and "bastard," as well as the phrase "kills me," but does
not like the word "grand." (Paul Aff., Ex. C, Ch.1, 18-22).
Both characters use the phrase "shoot the bull" or "shoot the
crap" to refer to allegedly unimportant conversations about ducks
or sparrows. Compare (Catcher, at 12-13, 60, 81, 153-54) with
(60 Years, at 38-39.)

Even this frequent and extensive use of Caulfield's
character traits might arguably have been necessary to supplement
a work of parody directed at Catcher or the character of
Caulfield, given that "parody must be able to conjure up at least

25

enough of that original to make the object of its critical wit recognizable." Campbell, 510 U.S. at 588. However, for the non-parodic purpose of commenting upon Salinger, rather than his work, it was unnecessary for Colting to use the same protagonist with repeated and extensive detail and allusion to the original work.

In addition to the use of Caulfield as protagonist, 60 Years depends upon similar and sometimes nearly identical supporting characters, settings, tone, and plot devices to create a narrative that largely mirrors that of Catcher. For example, both Holden and Mr. C have a sister named Phoebe who "kills [them]" and is their only real friend, an older brother named D.B. who wrote a short story about a goldfish, a younger brother named Allie who died when he was young, a mother who experiences nervous spells, a prep school roommate named Stradlater, and a history teacher named Mr. Spencer. (Paul Aff., Ex. C, Ch. 1, 13-16.)

In Catcher, Holden asks Stradlater, "[w]ho's your date? . . . Fitzgerald?" to which Stradlater replies "[h]ell, no! I told ya, I'm through with that pig." In response, Holden says, "Yeah? Give her to me, boy. No kidding. She's my type". (Catcher, at 30.) In 60 Years, when Mr. C runs into Stradlater, he thinks to himself "I watch him hobble closer and suddenly I remember. It's all in the way he walks. Stradlater, the old bastard. . . ." Then the two exchange greetings: "You old bastard, I say again .

. . . You old pigfucker, he says . . . ." (60 Years, at 90-91.)
Again, Stradlater screams "[y]ou old pigfucker!" at Mr. C. (60
Years, at 92.)

In both novels, the protagonist nearly has sex but
ultimately decides not to, finds himself drawn to Central Park,
has a huge breakfast, which is unusual for him, ponders where the
ducks go during the winter when the ice freezes, stands on a hill
next to a cannon watching a sporting competition, and gets
punched in the shoulder by Stradlater. (Paul Aff., Ex. C, Ch.1,
2-3, 5, 7, 11-12, 16.) Both characters are disgusted by the
thought of Mr. Spencer's wearing a robe that exposes his hairy
chest, and both reference the film The 39 Steps. (Paul Aff., Ex.
C, Ch.2, 21-22.)

Both characters contemplate the cliched metaphor that 'life
is a game,' compare (Catcher, at 8) with (60 Years, at 36),
discuss Holden's gloves, which Stradlater apparently stole,
compare (Catcher, at 4) with (60 Years, at 97), refer to their
propensity to lose things, despite it not being their fault,
compare (Catcher, at 3) with (60 Years, at 60), and note the ease
with which their sister Phoebe wakes up, compare (Catcher, at
161) with (60 Years, at 69.)

Furthermore, in Catcher, Holden relates a story about his
brother Allie:

    I keep telling him to go home and get his bike and meet
    me in front of Bobby Fallon's house. Bobby Fallon used

to live quite near us in Maine-this is, years ago.
Anyway, what happened was, one day Bobby and I were
going over to Lake Sedebego on our bikes. We were
going to take our lunches and all, and our BB guns-we
were kids and all, and we thought we could shoot
something without BB guns. Anyway, Allie heard us
talking about it, and he wanted to go, and I wouldn't
let him. I told him he was a child. So once in a
while, now, when I get very depressed, I keep saying to
him, 'Okay. Go home and get your bike and meet me in
front of Bobby's house. Hurry up.' It wasn't that I
didn't use to take him with me when I went somewhere.
I did. But that one day, I didn't. He didn't get sore
about it-he never got sore about anything-but I keep
thinking about it anyway, when I get very depressed.

(Catcher, at 98-99.) In 60 Years, Mr. C relates that:

Allie died a long time ago and the thing about him was
that you had to love him. I'm not kidding, everyone
did. Even though he tried to latch on when we were
riding our bikes down to the old cemetery, or going
treasure hunting behind Leeman's Cove and was left
behind, he never once got sore. It's true, I don't
think I ever saw Allie sore once. Even though he was
the youngest, in many way he was the most grown up of
all of us.

(60 Years, at 127.)

Additionally, lending the novel its title in Catcher,

Holden describes to Phoebe what he would like to be:

Anyway, I keep picturing all these little kids playing
some game in this big field of rye and all. Thousands
of little kids, and nobody's around-nobody big, I mean-
except me. And I'm standing on the edge of some crazy
cliff. What I have to do, I have to catch everybody
if they start to go over the cliff-I mean if they're
running and they don't look where they're going I have
to come out from somewhere and catch them. That's all
I'd do all day. I'd just be the catcher in the rye and
all. I know it's crazy, but that's the only thing I'd
really like to be. I know it's crazy.

28

(Catcher, at 173) (emphasis added).  In <u>60 Years</u>, Mr. C
narrates:

> I could listen to kids screaming and laughing all day.
> I close my eyes and picture them running after each
> other. So much energy . . . .

> I think about the park. I can actually <u>feel</u> the park in
> my veins.  I bet even my blood is green.  Suddenly,
> without thinking, my legs push the bench away and I
> find myself standing up . . . . At the very same moment
> I stand up the screaming is cut off and I open my eyes
> wide and see something in the corner, a red little dot,
> and all I have time to do is lift my arms up with my
> palms facing the sky.

> A red bundle lands in my arms with a soft thud . . . .
> Something in my chest moves and as the leaf falls from
> my face a tiny little face looks up at me, he looks
> more surprised than scared, and before everything
> becomes black I get a look at his straw blond hair and
> I see that he only has two big front teeth.

> I'm in a field.  It's a gray day and only the very tips
> of the grasses move from side to side with the wind . .
> . . Only when I begin to run do I know that's what I'm
> supposed to do. The rye is shoulder high and it parts
> to let me through . . . . There's only the sky and the
> rye. Up there the sky, and to either side the golden
> brown rye.

> I lean forward and keep running . . . I hear the long
> stalks break under my feet and I hear the wind move
> through the sun brown vines, almost like a whisper.  I
> know I shall keep running.  It's very important and I
> will know when to stop.  The field has a sweet earthy
> smell and I hear the 'ritsch ratsch' of the rye against
> my body, . . . There's an ending where there's an
> ending.  I will just keep running, I have to.

> I'm not tired.  I breathe hard and I hear my heart beat
> but I'm not tired.  I keep running . . . . All I see is
> honey golden rye and the gray sky.  Then the rye ends.

It's so sudden.  One moment it's a wall all around me
and the next it's gone . . . . There's no more field,
just wide open space.  I'm falling forever, tumbling
through empty space and I don't know what's up and
what's down . . . .

There's a hollow thud when I land . . . . My arms are
outstretched and my face is old . . . and when I look
up I see myself holding myself.

(60 Years, at 271-73.)

Then, a few pages later at the end of the novel, Mr. C reunites
with his son:

I take my son's hand and look him straight in the eyes
. . . . It's a pretty hard life, you know.  Sometimes
you end up feeling crummy no matter what, but you can
never give in to that crumminess.  Never ever.

He has D.B.'s eyes and he looks at me.  I feel my son's
pulse mix with mine and we're in no hurry to be
anywhere else.  So, I inhale deeply and take it from
the beginning.

Did I ever tell you about the catcher in the rye?

(60 Years, at 276-77.)

Furthemore, in terms of the overall arc of the narratives,

both Holden and Mr. C leave their resident institutions and take

mass transit to New York, where the majority of the story takes

place, before ultimately ending up in a different institution

altogether. (Paul Aff., Ex. C, Ch.2, 8-9.)

While some allusion and reference to Catcher would certainly

have been necessary for Colting's purpose of critiquing Salinger,

as noted, supra § (II)(C)(1)(v), the ratio of the "borrowed to

the new elements" in 60 Years is unnecessarily high. See
Suntrust Bank, 268 F.3d at 1280 (Marcus, J., concurring) (finding
the issue of transformative character to cut "decisively in
[Defendant's] favor" where the ratio of "the borrowed and the new
elements" is "very low, and the incongruity between them wide.")

Finally, both narratives are told from the first-person
point of view of a sarcastic, often uncouth protagonist who
relies heavily on slang, euphemisms, and colloquialisms, makes
constant digression and asides, refers to readers in the second
person, constantly assures the reader that he is being honest and
that he is giving them the truth. (Paul Aff., Ex. C, Ch.2, 23-29,
31-32.)

While certainly unobjectionable in isolation, in concert
with the substantial aforementioned similarities, Colting's
adoption of Plaintiff's characteristic style is simply one more
indication that Defendants have not limited themselves to taking
no more than is "necessary to further the purpose and character
of the [transformative] use." Castle Rock, 150 F.3d at 144
(quoting Campbell, 510 U.S. at 586-87)(internal quotations
omitted); see also Suntrust Bank, 268 F.3d at 1279 (Marcus, J.,
concurring) (noting in the context of parody that "Randall's
style is a marked departure from Mitchell's" and that "Randall's
narrative style furthers her overall parodic purpose by
reinforcing the notion that The Wind Done Gone casts Gone With
the Wind's story and characters in a new, and contrary, light")

(emphasis original). Here, Colting does not use a change in
style to reinforce any parodic or other transformative purpose,
but to the contrary, utilizes a very similar style with the
effect of emphasizing the similarities between 60 Years and
Catcher, rather than casting a new, contrary light upon the
latter.

Consequently, while Defendants are correct that they "have a
right to be mean to Mr. Salinger," among other reasons because
"Mr. Salinger is not going to authorize somebody to write a book
to be mean about him," (Transcript, at 56), in serving that
purpose they do not have the right to take more than what is
necessary from Salinger's own copyrighted work in order to evoke
effectively Salinger as an object of criticism or ridicule.
Because Defendants have taken much more from Salinger's
copyrighted works than is necessary to serve their alleged
critical purpose, the third factor weighs heavily against a
finding of fair use.

### 4. The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

The fourth fair use factor requires courts "to consider not
only the extent of market harm caused by the particular actions
of the alleged infringer, but also whether unrestricted and
widespread conduct of the sort engaged in by the defendant . . .
would result in a substantially adverse impact on the potential

market for the original." Campbell, 510 U.S. at 590 (internal

quotations omitted). The inquiry "must take account not only of

harm to the original but also of harm to the market for

derivative works." Id. Harm to the market weighs against a

finding of fair use "because the licensing of derivatives is an

important economic incentive to the creation of originals." Id.

at 593. "Potential derivative uses include only those that

creators of original works would in general develop or license

others to develop." Warner Bros. Entertainment, Inc., 575

F.Supp. at 549 (quoting Campbell, 510 U.S. at 592) (internal

quotation marks omitted) (emphasis added).

Here, whether Defendants term 60 Years a sequel or not, the

Court finds that as a novel that continues the story of Catcher

and its protagonist, as described supra, § (II)(C)(1)(ii), it is

the kind of work that an author would 'in general' develop or

license others to develop and "recast[s], transform[s] or

adapt[s]" Catcher such that it constitutes a derivative work as

defined by 17 U.S.C. § 101. See Myrieckes v. Woods, 2009 WL

884561 (S.D.N.Y. Mar. 31, 2009) (finding that if Plaintiff proved

allegations that Defendant's work was a "continuation of"

Plaintiff's novel, it "would qualify as a derivative work that

infringes on Plaintiff's copyright")(citing Nimmer on Copyright §

2.12 (2008)) ("Subsequent works in a series (or sequels) are in a

sense derivative works . . ."); Micro Star v. FormGen, Inc., 154

33

F.3d 1107, 1112 (9th Cir. 1998) (noting that "a copyright owner holds the right to create sequels").

Defendant asserts that there is no evidence that 60 Years will undermine the market for Catcher or any authorized sequel. (Def's Mem. of Law, 23.) However, while it appears unlikely that 60 Years would undermine the market for Catcher itself, it is quite likely that the publishing of 60 Years and similar widespread works could substantially harm the market for a Catcher sequel or other derivative works, whether through confusion as to which is the true sequel or companion to Catcher, or simply because of reduced novelty or press coverage. See Warner Bros. Entertainment, Inc., 575 F.Supp. at 550-51 (finding that where Defendant's derivative work "is only marginally transformative, [it] is likely to supplant the market for [Plaintiff's derivative work]") (citing Campbell, 510 U.S. at 591). This remains true even if, as would undoubtedly be the case, significant residual interest in a Salinger-authored sequel would still remain.

Furthermore, although Salinger has not demonstrated any interest in publishing a sequel or other derivative work of Catcher, (Plt's Mem of Law, 27), the Second Circuit has previously emphasized that it is the "potential market" for the copyrighted work and its derivatives that must be examined, even if the "author has disavowed any intention to publish them during his lifetime," given that an author "has the right to change his

mind" and is "entitled to protect his <u>opportunity</u> to sell his [derivative works]." <u>J.D. Salinger v. Random House, Inc.</u>, 811 F.2d 90, 99 (2d Cir. 1987) (emphasis original); <u>see also</u>, <u>Castle Rock</u>, 150 F.3d at 145-46 (finding the fourth factor to favor Plaintiff even where it "has evidenced little if any interest in exploiting this market for derivative works" because copyright law must "respect that creative and economic choice").

This approach is also consistent with the purposes of copyright in "promot[ing] the Progress of Science and useful Arts . . . ," U.S. Const., Art. I, § 8, cl. 8, because some artists may be further incentivized to create original works due to the availability of the right <u>not</u> to produce any sequels. This might be the case if, for instance, an author's artistic vision includes leaving certain portions or aspects of his character's story to the varied imaginations of his readers, or if he hopes that his readers will engage in discussion and speculation as to what happened subsequently. Just as licensing of derivatives is an important economic incentive to the creation of originals, so too will the right <u>not</u> to license derivatives sometimes act as an incentive to the creation of originals.

Accordingly, because it is likely that the publishing of <u>60 Years</u> would harm the potential market for sequels or other derivative works based upon <u>Catcher</u>, the fourth factor weighs, albeit only slightly, against fair use.

35

## 5. Aggregate Analysis

The Court has considered the four factors set forth in § 107 in light of the purposes of copyright, and, while the Court does find some limited transformative character in 60 Years, as described, supra, § (II)(C)(1)(v), it finds that the alleged parodic content is not reasonably perceivable, and that the limited non-parodic transformative content is unlikely to overcome the obvious commercial nature of the work, the likely injury to the potential market for derivative works of Catcher, and especially the substantial and pervasive extent to which 60 Years borrows from Catcher and the character of Holden Caulfield.

## D.  Irreparable Harm

When a Plaintiff establishes a prima facie case of copyright infringement, irreparable harm may be presumed. ABKCO Music, Inc. v. Stellar Records, Inc., 96 F.3d 60, 66 (2d Cir. 1996); Warner Bros. Entertainment, Inc., 575 F.Supp.2d at 552; E Gluck Corp. v. Rothenhaus, 585 F.Supp.2d 505, 519 (S.D.N.Y. 2008).[6] Because Plaintiff has established a prima facie case of copyright infringement, irreparable harm from that infringement is presumed.

_____

[6] Although Defendants contend that eBay, Inc. v. MercExchange, 547 U.S. 388 (2006), undermines the validity of this presumption, that case dealt only with the presumption of irreparable harm in the patent law context, and thus is not controlling in the absence of Second Circuit precedent applying it in the copyright context.

36

## III. CONCLUSION

Given the Court's finding that Plaintiff is likely to succeed on the merits of its Copyright claim, as well as the presumption of irreparable harm, the Court preliminarily enjoins Defendants from manufacturing, publishing, distributing, shipping, advertising, promoting, selling, or otherwise disseminating any copy of 60 Years or any portion thereof, in or to the United States.

SO ORDERED.

Dated:    New York, New York

          July 1, 2009

                                    Deborah A. Batts
                                    United States District Judge